FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 11 2021

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

Marion Andrew Humphrey, Jr.,

        Plaintiff,

v.

Steven Payton, acting in his individual
capacity as an Arkansas State Police
trooper,

        Defendant.

Case No. 4:21cv194-LPR

**COMPLAINT**

**JURY TRIAL DEMANDED**
**UNDER FED. R. CIV. P. 38(b)**

This case assigned to District Judge _Rudofsky_
and to Magistrate Judge _Volpe_

---

For his Complaint, Plaintiff Marion Andrew Humphrey, Jr. ("Marion") hereby states and

alleges as follows:

    1.     This is an action for money damages for injuries sustained by Marion as a result

of his unlawful search and seizure in violation of his constitutional rights by Arkansas State

Police trooper Steven Payton ("Trooper Payton"). The conduct of Trooper Payton violated

Marion's well-settled federal civil rights, while acting under color of state law.

    2.     Marion brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and

Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and

1343(a)(3). The aforementioned statutory and constitutional provisions confer original

jurisdiction of this Court over this matter.

    3.     State law claims and, by consequence, any limitations and defenses under state

law are not applicable to this civil-rights lawsuit.

    4.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as a substantial part of

the events giving rise to this action occurred in this District.

5.      Marion was, at all times material herein, a citizen of the United States and a resident of the State of Arkansas.  He is a lifelong Arkansas resident and was 32 years old at the time of the incident.

6.      Upon information and belief, Trooper Payton was, at all times material herein, a citizen of the United States, a resident of the State of Arkansas, and a duly appointed and acting trooper of the Arkansas State Police.  He is sued in his individual capacity for misconduct occurring under color of state law.

7.      In mid-2020, Marion had recently completed his second year of study at the University of Arkansas School of Law in Fayetteville.  His interest in the law came from his father, the Hon. Marion Humphrey, Sr. (ret.), who served for 18 years as a Pulaski County Circuit Judge before retiring in 2010 and resuming private practice as an attorney.

8.      Marion, who is African American, observed and experienced systemic racism all around him growing up in Arkansas.  He decided to attend law school because he hopes to have a meaningful impact on racism's ill-effects on society today.

9.      Unfortunately, Marion experienced such racism first hand by an officer of Arkansas's highest law-enforcement agency – Arkansas State Police Trooper Payton.  Trooper Payton stopped and, ultimately, arrested Marion simply for "driving while black" on August 20, 2020.

10.     On that day, Marion was preparing to begin his final year of law school.

11.     Due to the COVID-19 pandemic, Marion's fall 2020 classes at the law school were moved online.

12. Accordingly, Marion decided to move out of Fayetteville and return to his hometown of Little Rock for his 3L year. He planned to move into a home near his parents' house.

13. To move his belongings from Fayetteville to Little Rock, Marion rented a U-Haul truck, a large Ford F450 15-foot box truck, in Fayetteville. His plan was to load his possessions into the truck and drive it to Little Rock, where he would unload the truck, return it to U-Haul and move into his intended residence.

14. Like most people, Marion was unaccustomed to a vehicle of the U-Haul's size.

15. Marion loaded his possessions – clothing, furniture, a mattress, books, and more – into the U-Haul. It took longer than expected, and as a result, he did not begin driving towards Little Rock until the early evening on August 20. His route eventually took him eastbound on Interstate 40.

16. Given the vehicle's size, Marion was particularly attuned to avoiding distractions and focusing carefully on the road while driving the U-Haul.

17. According to his later-submitted Memorandum to Sergeant Chase Melder, Trooper Payton was sitting in his squad car in the I-40 median near mile marker 70 at approximately 8:00 pm on August 20, 2020, when he observed Marion driving the U-Haul eastbound on I-40 in the outside lane. Trooper Payton wrote that Marion "appeared to be traveling together" with a black Cadillac Escalade.

18. Marion was not traveling with a Cadillac Escalade or any other vehicle, or anyone else, on August 20, 2020. In fact, there was a vehicle between the Escalade and Marion's U-Haul when they passed Trooper Payton's patrol car. Moreover, Marion was not in the outside lane when he drove by Trooper Payton.

19.     According to Trooper Payton's Memorandum, he decided to "watch the driving behavior of the two vehicles" and he pulled into the inside lane of I-40 to do so.  Trooper Payton claimed that he "immediately" observed Marion's U-Haul cross onto the white fog line.

20.     But Trooper Payton did not stop the U-Haul.  Instead, he passed the vehicle "and noticed the driver appeared extremely nervous," sitting "back in his seat" in a way in which his face could not be easily seen.

21.     According to Trooper Payton, the driver was staring straight ahead and would not look in his direction.

22.     Trooper Payton also claimed in his Memorandum that the driver had an "obvious" tight grip on the steering wheel – without any explanation what made that supposed fact "obvious" – and that the driver's hands were at the 10 and 2 positions with "his arms . . . locked out straight."

23.     According to Trooper Payton, "[t]he actions by the driver made me suspicious of some kind of criminal activity."

24.     There is nothing suspicious about driving with one's arms at the 10 and 2 positions on the steering wheel.  Indeed, the Arkansas Driver License Study Guide, issued by the Arkansas State Police itself, recommends placing hands on the steering wheel near the 10 and 2 positions:[1]

---

[1] See https://static.ark.org/eeuploads/asp/ARKANSAS_DRIVER_LICENSE_manual_revision_(Corrected).pdf, at page 46.

4



25. Nor is there anything suspicious about a driver sitting with his arms extended or a tight grip on the steering wheel, particularly on a large, unfamiliar rented vehicle. Notably, the same study guide instructs drivers to sit all the way back in the driver's seat to ensure proper seatbelt placement, and "the farther a driver is sitting from the dashboard, typically the safer he is in the case of a collision."[2]

26. Simply, nothing written in Trooper Payton's Memorandum supports his allegation that the U-Haul driver's actions were "suspicious."

27. Furthermore, Trooper Payton's Memorandum makes it wholly unclear how, on one hand, he could not easily see the driver's face, while on the other hand he somehow discerned that the driver was staring only straight ahead and would not look in his direction.

28. Trooper Payton reported that he next passed the Escalade and the driver "appeared relaxed," so he determined that the two vehicles were not traveling together.

29. At this point, Marion was behind Trooper Payton in the rented U-Haul truck. Trooper Payton decided to "observe the U-Haul further" and exited I-40 at mile marker 78, then reentered the highway some distance behind Marion.

---

[2] See https://static.ark.org/eeuploads/asp/ARKANSAS_DRIVER_LICENSE_manual_revision_(Corrected).pdf, at page 45.

30.     Trooper Payton then raced to catch the truck, reaching speeds at or over 90 miles per hour to do so.

31.     As the U-Haul approached Exit 81, Trooper Payton wrote that it "signaled to exit at the last second," made a "quick action to take the exit" and then "immediately made another" one to remain on the highway, without signaling, which "caused the weight of the truck to shift."

32.     This was inaccurate in several ways. Marion did not signal to exit "at the last second," and though he did decide to remain on the highway, the weight of the truck did not "shift" as Trooper Payton reported. He also signaled his intention to return to the interstate.

33.     Trooper Payton's Memorandum, written four days post-incident, was an after-the-fact contrivance in an attempt to justify his initial stop of the truck.

34.     Trooper Payton then initiated a traffic stop, activating his squad car's emergency lights shortly after passing Exit 81. Marion quickly pulled over, stopping the truck just past the end of the eastbound onramp from Exit 81 to the interstate, in the town of Russellville.

35.     Trooper Payton exited his squad car and approached the U-Haul from the passenger side. Once at the passenger door, he "motioned for the driver to roll down the window or open the door," but "there were some items in the passenger seat and the driver couldn't reach the door."

36.     Trooper Payton reported that the driver "appeared nervous still and confused," and he motioned for the driver to step out of the vehicle.

37.     Marion complied and exited the truck.

38.     Marion was rightly fearful of this encounter, as a Black man on the side of a highway in the waning daylight hours confronted by a lone, armed, white law-enforcement officer.

39.     Indeed, the traffic stop occurred less than three months after George Floyd, an unarmed Black man accused of passing a counterfeit $20 bill, was murdered in broad daylight by a white Minneapolis police officer, touching off protests in Russellville, Little Rock, and other cities around Arkansas, the country, and the world.

40.     Once outside of the truck, Trooper Payton began asking numerous questions of Marion, including where he was coming from and going to and why he did not take exit 81.

41.     Marion explained that he was moving his belongings from Fayetteville to Little Rock and that he intended to stay in a hotel because he would not be able to unpack and move into his intended residence that evening.

42.     Trooper Payton questioned why Marion would not drive all the way to Little Rock, which was only an hour away.  Marion explained that his mother did not like him driving at night and he thought it best to stop, as it was already twilight. He also stated that he had thought about exiting at Russellville because a hotel room there likely would be cheaper than in Little Rock.

43.     Trooper Payton asked Marion for his driver's license and the rental agreement for the U-Haul. Marion provided them.

44.     Trooper Payton then ordered Marion to walk back towards his squad car. Marion again complied, walking with his hands raised in the air, as depicted in the photograph below, taken from video recorded by Trooper Payton's dashcam.



45.     Marion had his cell phone in his left hand, as he had called his father to listen to the traffic stop. Marion informed Trooper Payton that his father was an attorney and was on the phone.

46.     Marion only put his arms down to his sides when Trooper Payton instructed him that he could do so.

47.     Trooper Payton asked Marion if there was anything illegal in the truck, and Marion truthfully answered in the negative.

48.     Trooper Payton asked if there were guns or drugs in the truck, and Marion again answered truthfully in the negative.

49.     Trooper Payton falsely reported that Marion's "hands were visibly shaking and his voice was shaking as he spoke." Though Marion admittedly was nervous, he directly responded to Trooper Payton's questions, did not speak with a "shaky" voice, and did not exhibit shaking hands, as Trooper Payton's own dashcam video confirms.

8

50.     Regardless, nervousness is not a valid basis to extend a traffic stop, let alone a basis for an arrest. It does, however, provide an easy pretext for racially biased policing.

51.     Trooper Payton took Marion's license and the U-Haul rental agreement into his squad car as Marion stood on the side of the road. While in the squad car, Trooper Payton was recorded on the dashcam video derisively stating, "32 years old and going to school still?"

52.     Trooper Payton ran Marion's license and the U-Haul information through ACIC, the Arkansas Crime Information Center.

53.     According to his later-filed Memorandum, "[t]he driver was identified as Marion Humphrey Jr and the vehicle returned to U-Haul. The vehicle was rented by Marion Humphrey in Fayetteville and was to be returned to Little Rock."

54.     In other words, the information obtained through ACIC was entirely consistent with what Marion had told Trooper Payton.

55.     At this juncture, there was no valid basis to detain Marion any further. Trooper Payton's only legal options were to write Marion a traffic citation (or warning) or let him go.

56.     Trooper Payton did neither.

57.     Instead, Trooper Payton had already decided he was going to search the truck. He lacked any legal justification for doing so and he knew it, so he attempted to get Marion's consent to a search.

58.     Trooper Payton exited his squad car and approached Marion and began peppering him with questions yet again.

59.     Marion did not feel, and no reasonable person would have felt, free to terminate the encounter with Trooper Payton at that time. Indeed, Trooper Payton still possessed Marion's driver's license and the rental agreement for the truck.

60.     Marion responded to Trooper Payton's questions by asking if Trooper Payton had probable cause for the traffic stop.  Trooper Payton stated, "Yeah, you about wrecked your truck back there.  That's why I stopped you."

61.     This was false.  Marion had not almost "wrecked" the U-Haul or come close to crashing it.

62.     Marion then stated that Trooper Payton was asking questions that had nothing to do with almost "wrecking" the truck.  Trooper Payton, attempting to manufacture a basis to search, responded, "Yeah, cause you're super nervous.  So I'm trying to figure out why you're so nervous."

63.     Marion explained that any nervousness he exhibited was because he had been stopped by law enforcement, and "I don't get stopped."

64.     It is not unusual or remotely suspicious for a motorist to exhibit signs of nervousness when confronted by a law-enforcement officer.

65.     Marion, seeking to end the encounter, asked Trooper Payton "what do I need to do?"  Trooper Payton, again, asked Marion if there was anything illegal in the truck, and Marion replied in the negative.

66.     From Trooper Payton's response to Marion's question, it was clear that Marion would not be allowed to leave unless the U-Haul was first searched.

67.     Trooper Payton then asked if Marion would mind if Trooper Payton searched the truck.  Marion responded, "I do.  I, actually I do."

68.     Trooper Payton asked Marion what would happen if he brought a dog to search the truck, and Marion again refused to allow a search of the U-Haul.

69.     Trooper Payton then made quite clear he had no valid basis for Marion's continued detention, stating:

> [H]ere's how it works.  I've got probable cause to stop you.  I did that.  When I get up here to make contact with you, you are super nervous.  Your hands are shaking.  They're still shaking.  Your voice is shaky.  So then that makes me suspicious that there's more than just a "you missed your exit."  Okay?

70.     Trooper Payton added, again, that it was "confusing" why Marion would not drive all the way to Little Rock, even though Marion had already explained why he was not doing so.

71.     Having heard Trooper Payton's purported explanations for the stop over Marion's cell phone, Marion's father asked to speak to Trooper Payton and Marion handed him the phone.

72.     Trooper Payton took the phone and then asked Marion, "If I bring a dog, is it going to alert on anything?"

73.     Marion responded, "Ye- no, it's not going to alert on anything.  I promise you." Explaining his alleged nervousness, Marion stated, "I honestly just don't want to get shot.  It happens, and I know it happens."

74.     Marion also stated that he thought it was unfair to have his truck searched by a dog, especially when he had not almost wrecked it, as Trooper Payton claimed.

75.     Trooper Payton then stated that if Marion did not want the truck searched with a dog, "just let me look in here real quick and I'll get you down the road."

76.     Marion responded that he believed such a search was invasive of his rights.  But reasonably believing Trooper Payton would not release him without conducting a search of the truck, Marion gestured to the truck's back door and stated, "But you can look in here if you'd like to, sir."

77.     Marion's statement was not a valid consent to a search, let alone a search by a canine.

78.    Trooper Payton knew this, and in fact later in the encounter confirmed that Marion did not provide consent for a search.

79.    Perturbed that Marion would not consent, Trooper Payton told Marion, "No. Have a seat right there. I'm going to get a dog out here."

80.    Marion, surprised, responded "you said just look, which is it, just look or is it a dog?"

81.    Trooper Payton responded that he was going to call for a dog.

82.    Marion then asked for his phone back to speak to his father. Trooper Payton got right in Marion's face and, in a belittling tone, asked Marion, "How old are you, 16?" When Marion responded that he was 32, Trooper Payton retorted, "You're a grown man," as if to suggest there was something untoward about an adult man speaking with his father – a person who had been identified as an attorney.

83.    Trooper Payton directed Marion to sit on the back bumper of the U-Haul truck to wait for the dog.

84.    Trooper Payton then returned to his squad car and placed a phone call to U.S.D.A. Forest Service canine officer Hugh Davis.

85.    Trooper Payton explained to Davis that Marion had looked "super nervous" when he initially passed the U-Haul truck and that he remained nervous when he stopped the truck. He recounted his questioning of Marion and that Marion had been speaking to his father on the phone.

86.    Nothing in Trooper Payton's description to Davis supported reasonable suspicion or probable cause for Marion's detention or a search of the truck.

87.     Nevertheless, Trooper Payton asked Davis to respond to his location with a canine, and Davis indicated he would do so.

88.     In the meantime, Trooper Payton radioed dispatch with Marion's name and date of birth, and he was informed that Marion had a valid driver's license and was "10-52[,] showing no numbers," meaning he had no prior criminal history and was not wanted.

89.     Before Davis arrived, Trooper Payton exited his squad car and spoke with Marion again. He told him that the dog was on its way and would be run around the truck once it arrived.

90.     Marion explained to Trooper Payton that he was extremely nervous, and Trooper Payton sloughed it off, asking, "Because the police shoot people?" Marion chose not to respond but later told Trooper Payton, "I just want to be here. . . . I just hope I make it home."

91.     Trooper Payton then informed Marion that the situation was "no big deal." Marion responded, "It is a big deal. It's a very big deal."

92.     Trooper Payton replied that it was "not a big deal *yet*" – suggesting he had already made up his mind that a search of the truck would reveal something illegal.

93.     Trooper Payton told Marion that they were in a well-lit area and they would remain there waiting on the dog's arrival. Marion, humiliated and demoralized, could only sit on the back bumper of his rented U-Haul under the glare of Trooper Payton's gaze and his squad-car lights.

94.     Nearly sixteen minutes elapsed between the time Trooper Payton told Marion that he would bring a dog to search the truck and Davis's arrival with the dog on scene.

95.     This was an unreasonable and unlawful extension of the traffic stop without a proper basis.

96.     Once Davis arrived with his canine, Trooper Payton ordered Marion to move away from the truck. Marion complied and walked back to Trooper Payton's squad car.

97.     Davis then circled his dog around the U-Haul.

98.     After circling the truck for approximately one minute, Davis looked back at Trooper Payton and made a "thumbs up" sign.

99.     Trooper Payton then directed Marion to place his hands on the hood of his squad car and spread his feet apart. He took hold of Marion's left hand.

100.    Trooper Payton started to handcuff Marion, who began to scream in horror to his father (still on the phone), "He's arresting me! Daddy he's arresting me! There's, there is nothing in that vehicle! I promise you!"

101.    Trooper Payton handcuffed Marion behind his back, walked Marion to his squad car, and placed him in the back seat.

102.    Marion began to sob and yelled to his father, "I don't want to die tonight!" He repeated that fear multiple times, sobbing.

103.    Marion's father called out over the phone to Trooper Payton. When he asked why Marion had been stopped, Trooper Payton falsely responded that Marion had "almost wrecked" the U-Haul truck.

104.    When asked why Marion was being arrested, Trooper Payton responded that the dog had alerted to the presence of narcotics and that he was going to search the U-Haul.

105.    Trooper Payton, who was not trained in the use of drug-detection dogs, later admitted that it was possible a dog might alert on something other than narcotics.

106.    In fact, there were no narcotics in the truck.

107.    Nevertheless, Marion sat handcuffed in the backseat of the squad car while Trooper Payton and Davis proceeded to search the truck's cab and a suitcase Marion had there.

108.    Finding nothing, the officers moved to the back of the truck – filled with Marion's furniture, suitcases, boxes, packages, bags, and the like – opened the door, and proceeded to search through his belongings.  They ripped open boxes, unzipped his suitcases, climbed over and on his belongings and threw his possessions around the back of the truck *for more than an hour*.

109.    All the while, Marion sat in the back of Trooper Payton's squad car, despondent, dehumanized, and in pain from the handcuffs, especially given the lengthy period of time he was required to sit cuffed behind his back while the officers fruitlessly searched for narcotics that did not exist.  He intermittently sobbed and cried out for help.

110.    A short time after Trooper Payton and Davis began searching the truck, Deputy Derek Jones of the Pope County Sheriff's Office arrived on scene and aided in the search.  They were later joined by Russellville Police Department officer Kyle Cromer.

111.    Jones asked Trooper Payton if Marion had provided consent for the search, and Trooper Payton responded, "No."  When Jones repeated, "No?", Trooper Payton replied, "He's just super nervous acting."

112.    Payton provided no other ostensible justification for his arrest of Marion or the search of the truck.

113.    Unsurprisingly, at no time did any of the officers locate narcotics or any illegal items in the truck, because there were none to be found.

114.    Frustrated with having turned up nothing, the officers attempted to tear open the truck's seats and began tapping on various metal components of its sides and walls, commenting that they looked freshly repaired and might be hiding drugs.

115.    There is nothing noteworthy about a U-Haul truck having freshly repainted or repaired sections.

116.    As Trooper Payton himself recognized, it is not uncommon for U-Haul trucks, often used to move the entire contents of people's homes, to be damaged and repaired.

117.    Trooper Payton at one point suggested using a drill and a scope to look inside the walls of the truck.  At another point he placed a phone call to another officer hoping that officer would bring an X-ray machine to the location.  Davis stated during the search that he was "hoping" to find something.

118.    Throughout the officers' time searching, Trooper Payton made numerous disparaging remarks about Marion as captured on his dashcam, calling him "obnoxious," claiming that his father might not actually be his father, and belittling the fact that he was in school.  Davis gratuitously added, "I wouldn't call my daddy at 32."

119.    Trooper Payton also repeated his false assertion that Marion had almost wrecked the U-Haul truck several times.

120.    In actuality, Marion had done nothing more than drive while Black.  But that was enough for Trooper Payton to arrest him and rummage through his belongings without any legal or moral justification, believing that Marion must have been a drug dealer.

121.    After more than an hour searching through all of Marion's belongings and finding nothing, the officers finally gave up.

122.    Trooper Payton returned to the squad car and wrote Marion a warning for careless driving.

123.    The warning was a pretext to cover for Trooper Payton's misconduct.  Marion had not "carelessly" driven the U-Haul.

124.    It took Trooper Payton approximately five minutes to write the warning.

125.    He left Marion handcuffed in the back seat of his squad car the entire time, despite knowing he had no valid basis for Marion's continued detention.

126.    Only after completing the written warning did Trooper Payton finally remove the handcuffs, return Marion's license and the rental agreement, and release Marion to continue to Little Rock.

127.    In the days following Trooper Payton's pretextual and unlawful stop and search, the incident received significant media attention.

128.    In a prophylactic attempt to exonerate himself for his unconstitutional misconduct, Trooper Payton reviewed the dashcam video of the stop multiple times before writing his 3-page Memorandum attempting to justify his arrest of Marion and the search of the U-Haul.

129.    Even in that Memorandum, Trooper Payton was unable to provide any greater justification for his actions than his "suspicions" based on Marion's alleged nervousness.

130.    Notably, that Memorandum nowhere states that Marion had almost wrecked the U-Haul.

131.    Trooper Payton had no valid legal basis for his initial stop of Marion.

132.    Trooper Payton had no valid legal basis to extend the traffic stop.

133.    Trooper Payton had no valid legal basis to call for a drug dog.

17

134.     Trooper Payton had no valid legal basis to search the U-Haul truck or the contents inside of it.

135.     Trooper Payton had no valid legal basis to arrest Marion.

136.     The entire incident of August 20, 2020, traumatized Marion deeply.  He feared for his life on that evening.  And he had every shred of his dignity taken away by Trooper Payton for no good reason.

137.     Marion remains emotionally scarred by the events of August 20, 2020, to this day.

<div align="center">

**COUNT ONE**

</div>

**42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS**

138.     Marion realleges and incorporates by reference herein each and every allegation contained in each above paragraph as though fully set forth herein.

139.     Trooper Payton, an on-duty Arkansas State Police officer, was acting under color of state law when he stopped Marion, extended that stop, arrested Marion, and searched Marion's rented U-Haul truck and his belongings.

140.     By the actions described above, Trooper Payton deprived Marion of his clearly established and well-settled right to be free from unlawful seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

141.     By the actions described above, Trooper Payton deprived Marion of his clearly established and well-settled right to be free from unlawful searches under the Fourth and Fourteenth Amendments to the United States Constitution.

142.     Trooper Payton subjected Marion to these deprivations of rights either maliciously or with reckless disregard for whether his rights would be violated.

143.     As a direct and proximate result of the acts and omissions of Trooper Payton, Marion suffered a violation of his constitutional rights, harm to his reputation and standing in the community, mental distress, shame, humiliation, and embarrassment and was thereby damaged in an amount to be determined by a jury.

144.     Punitive damages are available against Trooper Payton and are hereby claimed as a matter of right under federal common law and *Smith v. Wade*, 461 U.S. 30 (1983).

145.     Marion is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Marion Andrew Humphrey, Jr., prays for a judgment against Defendant Steven Payton as follows:

1.     That this Court find that Defendant Payton committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983;

2.     As to Count One, a money judgment against Defendant Payton for compensatory and punitive damages in an amount to be determined by a jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988, and prejudgment interest; and

3.     For such other and further relief as this Court may deem just and equitable.

**ELDRIDGE BROOKS, PLLC**

Date: 3/11/21

Conner Eldridge, Arkansas Bar No. 2003155
Emily Neal, Arkansas Bar No. 2003087
5100 West J.B. Hunt Drive, Suite 840
Rogers, AR 72758
Telephone: 479-553-7678
conner@eldridgebrooks.com
emily@eldridgebrooks.com

- and -

**ROBINS KAPLAN, LLP**
Robert Bennett (*pro hac vice pending*)
Andrew J. Noel (*pro hac vice pending*)
Marc E. Betinsky (*pro hac vice pending*)
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
mbetinsky@robinskaplan.com

*Attorneys for Plaintiff*
*Marion Andrew Humphrey, Jr.*