**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**MARION A. HUMPHREY, JR.**                                                        **PLAINTIFF**


**v.**                                   **CASE NO. 4:21-CV-194-LPR**


**STEVEN PAYTON**                                                                **DEFENDANT**

**BRIEF IN SUPPORT OF DEFENDANT PAYTON'S**
**MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

On the evening of August 20, 2020, around 8:00 p.m., Trooper Steven Payton was behind a U-Haul box truck driven by Marion A. Humphrey, Jr. as he was driving eastbound on Interstate 40 near mile-marker 80 in Russellville, Arkansas. Trooper Payton initiated a traffic stop after witnessing the U-Haul attempt to take the exit ramp at mile-marker 81, but immediately make another quick action to continue on the interstate without signaling. This caused the weight of the truck to shift and was observed to cross the fog line again, which Trooper Payton determined to be a violation of the Arkansas traffic law of "careless and prohibited driving." During the course of the traffic stop, Trooper Payton developed reasonable suspicion that illegal drug activity was afoot based upon his knowledge and experience, including Mr. Humphrey's extreme nervousness, Mr. Humphrey's inconsistent travel plans, and the totality of the circumstances. Thus, Trooper Payton summoned a K-9 unit to the scene.  The K-9 unit arrive on scene approximately nine (9) minutes after being requested and within thirty (30) minutes of the traffic stop being initiated. Once deployed, the K-9 alerted to the presence of narcotics being inside the U-Haul. Thus, Mr. Humphrey was detained by Trooper Payton and placed in the back of his patrol car, while a search of the U-Haul was performed. After concluding the search, which produced negative results,

Trooper Payton returned to his unit and issued Mr. Humphrey a warning for careless and prohibited driving and released him. On March 11, 2021, Mr. Humphrey filed this lawsuit pursuant to 42 U.S.C. § 1983 against Trooper Payton in his individual capacity alleging that Trooper Payton violated his rights under Fourth and Fourteenth Amendments during the traffic stop that occurred on August 20, 2020. *See* Doc. No. 1.

As this brief will show, Trooper Payton is entitled to summary judgment as a matter of law. First, Trooper Payton did not violate any of Mr. Humphrey's constitutional rights by any of Trooper Payton's actions: in initiating the traffic stop; by the length of the traffic stop; by Trooper Payton's decision to request that a K-9 be brought to the stop; nor by the search of the U-Haul following a positive alert by the K-9 for the presence of narcotics in the vehicle. Second, at a minimum, this brief will show that Trooper Payton is entitled to qualified immunity because he had arguable probable cause and arguable reasonable suspicion to justify his actions. Accordingly, Trooper Payton respectfully requests that this Court grants his motion for summary judgment and that this case against him be dismissed with prejudice.

## STANDARD OF REVIEW

Summary judgment is to be "rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact requiring the trier of fact to resolve the dispute in favor of one party or the other. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). An issue of fact is material only if the fact could affect the outcome of the case under governing law. *Anderson*, 477 U.S. at 248. The nonmoving party must establish

that there is a genuine issue of material fact in order to survive a motion for summary judgment. *Celotex*, 477 U.S. at 322; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). To establish the existence of a genuine issue, the non-moving party must produce "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587. The mere existence of some disputed factual issues will not defeat a summary judgment motion where the disputed issues are not genuine issues of material fact. *Anderson*, 477 U.S. at 247-48. A disputed issue is genuine if the evidence could lead a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248.

## **ARGUMENT**

Trooper Payton is entitled to summary judgment based upon qualified immunity. The Supreme Court has stated that 42 U.S.C. § 1983 is merely a conduit for claims alleging a violation of federal rights. *Graham v. Conner*, 490 U.S. 386, 393-94 (1989). Qualified immunity shields governmental employees acting within the scope of their duties from suit for money damages so long as their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would know." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013). To determine whether a state actor is entitled to qualified immunity, a court must consider (1) whether the facts alleged establish a violation of a constitutional or statutory right, and (2) whether the right was clearly established at the time of the alleged violation, such that a reasonable official would have known that his or her actions were unlawful. *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). Courts have discretion to decide either prong first. *Id*. at 236. If the answer to either question is no,

the state actor is entitled to qualified immunity. *Schaffer v. Beringer*, 842 F.3d 585, 591 (8th Cir. 2016).

**I.     Trooper Payton Did Not Violate Humphrey's Constitutional Rights.**

      A.  The Initiation of the Traffic Stop Did Not Violate Mr. Humphrey's Constitutional Rights.

Trooper Payton did not violate Mr. Humphrey's constitutional rights at any point during his contact with Mr. Humphrey on the day in question. The Supreme Court has held that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. U.S.*, 517 U.S. 806, 810 (1996).  Consequently, "[a] traffic stop generally must be supported by at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring, and a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *U.S. v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (cleaned up); *accord U.S. v. Callison*, 2 F.4th 1128, 1131 (8th Cir. 2021) ("any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver"). Additionally, if the officer has probable cause to initiate the traffic stop, then the officer's ulterior motive is irrelevant. *U.S. v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016). The reasonableness of a police officer's actions under the Fourth Amendment is a legal issue. *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995).

Trooper Payton did not violate Mr. Humphrey's constitutional rights by initiating and conducting the traffic stop of Mr. Humphrey. Trooper Payton observed the U-Haul driven by Mr. Humphrey cross the fog line, which is a traffic violation in Arkansas pursuant to Ark. Code Ann. §27-51-104. *SUMF* ¶¶ 8-9. This law prohibits "improper or unsafe lane changes on public roadways." Ark. Code Ann. §27-51-104(b)(1). Recently, in upholding that an officer had probable cause to stop an individual for driving on the fog line, pursuant to §27-51-104(b)(1), the Arkansas

4

Court of Appeals explained that the boundary of the travel lane is not the outer edge of the lines, because two vehicles could be traveling "on the center yellow line heading in opposite directions and both be within their respective lanes but would collide head on." *Baker v. State*, 2022 Ark. App. 53, at 4, 640 S.W.3d 431, 434. Consequently, Trooper Payton had probable cause to stop Mr. Humphrey; therefore, Trooper Payton did not violate any of Mr. Humphrey's constitutional rights by stopping Mr. Humphrey. Accordingly, Trooper Payton is entitled to summary judgment for any claim arising from him stopping Mr. Humphrey.

B. The Length of the Initial Traffic Stop Did Not Violate Mr. Humphrey's Constitutional Rights.

While conducting a traffic stop, a law enforcement officer may conduct an investigation reasonably related to the scope and purpose of the stop. *U.S. v. Anguiano*, 795 F.3d 873, 876 (8th Cir. 2015). Additionally, an officer may conduct "certain routine tasks related to the traffic violation, including running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their destination, route, and purpose." *U.S. v. Cox*, 992 F.3d 706, 710 (8th Cir. 2021). In conducting the traffic stop, an officer may request that the driver step out of his or her vehicle during the traffic stop. *Pennsylvania v. Mimms*, 434 U.S. 107, 111, 98 S.Ct. 330 (1997) (recognizing the safety risks to an officer standing exposed to moving traffic); *see also U.S. v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008).

In *Rodriguez v. U.S.*, the Supreme Court found that a lawful traffic stop ends when tasks related to a traffic stop are completed or should have been completed. 575 U.S. 348, 354, 135 S.Ct. 1609, 1614 (2015). Thus, a stop may become unconstitutional if it lasts longer than necessary to complete legitimate law enforcement tasks. *See U.S. v. Bloomfield*, 40 F.3d 910, 917 (8th Cir.

1994). In other words, "[t]here is no per se time limit on all traffic stops, and complications in carrying out the traffic-related purposes of the stop may justify a longer detention than when a stop is strictly routine." *Anguiano*, 795 F.3d at 876. "If an officer encounters legitimate complications in completing these routine tasks, the officer may reasonably detain a driver for a longer duration than when no such complications arise." *U.S. v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2015) (cleaned up). Very recently, the Eighth Circuit explained that "[w]hen complications arise 'in carrying out the traffic-related purposes of the stop, ... police may reasonably detain a driver for a longer duration than when a stop is strictly routine.'" *U.S. v. Kennedy*, 35 F.4th 1129, 1133 (8th Cir. 2022) (quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007)). Likewise, an officer may ask questions and conduct checks and inquiries that are unrelated to the traffic stop, so long as they do not unnecessarily prolong the stop. *Id*.

In *Anguiano*, the Court found that an initial traffic stop had not been unconstitutionally prolonged, especially considering that the officer had to wait fifteen minutes for dispatch to run checks on the license and criminal history. *Id*. at 874. Similarly, the Eighth Circuit found that the tasks of the initial traffic stop had not been completed roughly twenty-three minutes after the officer had stopped the vehicle. *Murillo-Salgado*, 854 F.3d at 416. Specifically, the Court explained that "[t]he video recording of the roughly twenty-three-minute traffic stop indicates that [the officer] spent that time asking permissible questions…regarding the purpose of their trip and their travel route, attempting to corroborate the responses to those questions, placing calls to dispatch, waiting for responses to verify…identification and criminal history, and entering information into the patrol car's computer." *Id*. at 416.

In this case, the actions taken by Trooper Payton within the first approximately fifteen (15) minutes of the traffic stop were all proper tasks that an officer can conduct during a traffic stop for

6

a minor violation. First, Trooper Payton asked Mr. Humphrey to step out of the vehicle and then asked him to move between the U-Haul and his patrol car. *SUMF* ¶¶ 12-13, 17-18. According to the Supreme Court, Trooper Payton was allowed to ask Mr. Humphrey to exit the vehicle and move away from the traffic on Interstate 40. *See Mimms*, 434 U.S. at 111. Trooper Payton asked Mr. Humphrey for his license and rental agreement for the U-Haul. *SUMF* ¶ 16. Additionally, Trooper Payton inquired into Mr. Humphrey's travel plans including where he was coming from, where he was going, and the purpose of his trip. *SUMF* ¶¶ 21-23. Then, upon returning to his patrol car, Trooper Payton then ran a check of Mr. Humphrey's license through his in-car system. *SUMF* ¶ 26. At some point, Trooper Payton contacted dispatch and requested that dispatch run a criminal history search on Mr. Humphrey. *SUMF* ¶ 30. These are all actions that are "routine tasks related to the traffic violation." *See Cox*, 992 F.3d at 710.

In fact, within approximately fifteen (15) minutes into the stop, Trooper Payton learned from dispatch that Mr. Humphrey did not have a criminal history. *See SUMF* ¶ 42. This amount of time is well within the acceptable timeframes for a traffic stop. *See Anguiano*, 795 F.3d at 874 (15 minutes for a traffic stop); *Murillo-Salgado*, 854 F.3d at 416 (23 minutes was acceptable for a traffic stop). Thus, Trooper Payton's actions within the first 15 minutes of the traffic stop did not violate Mr. Humphrey's constitutional rights. Additionally, as will be discussed below in more details, Trooper Payton had already developed reasonable suspicion to warrant him requesting a K-9 to the stop. *SUMF* ¶¶ 38-41. Accordingly, Trooper Payton is entitled to summary judgment for his actions taken as routine tasks of the traffic stop.

    C.  <u>Trooper Payton Had Reasonable Suspicion to Prolong the Length of the Traffic Stop for a K-9 Unit to Arrive on Scene.</u>

Trooper Payton had sufficient reasonable suspicion to extend the length of the traffic stop in order to have a K-9 brought to inspect the vehicle driven by Mr. Humphrey. Generally, a dog-

sniff by a well-trained narcotics detection K-9 does not implicate the protections of the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 408-09, 125 S.Ct. 834 (2005). In *Caballes*, the Supreme Court found that a dog-sniff conducted during the course of the normal traffic stop for speeding, where the entire encounter lasted less than ten minutes, did not violate the Fourth Amendment. *Id*. When a K-9 is used after the completion of the traffic stop or would prolong the traffic stop, then an officer must have reasonable suspicion to conduct a dog-sniff of the exterior of the vehicle. *Rodriguez*, 575 U.S. at 350.

In order for an officer to extend a stop beyond the time necessary to complete the stop, an officer must have "reasonable suspicion that other criminal activity may be afoot." *De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017). "Reasonable suspicion is a fact-specific inquiry, determined by the totality of the circumstances, taking account of an officer's deductions and rational inferences resulting from relevant training and experience." *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021) (citing *U.S. v. Arvizu*, 534 U.S. 266, 273-74, 122 S.Ct. 744 (2002)). Reasonable suspicion requires that the officer has "a particularized objective basis" and "some minimal level of objective justification." *De La Rosa*, 852 F.3d at 744. This requires more than a hunch. *See U.S. v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012). "This standard is less demanding than probable cause and much lower than preponderance of the evidence." *U.S. v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021); *accord U.S. v. Pacheco*, 996 F.3d 508, 511-12 (8th Cir. 2021).

Reasonable suspicion is based upon the totality of the circumstances. *De La Rosa*, 852 F.3d at 744. Thus, in evaluating reasonable suspicion courts cannot view each factor in isolation. *U.S. v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020). Rather, courts "must view the individual elements in context, *i.e.*, in light of one another, and give "due weight" to the officer's inferences when assessing the overall level of suspicion." *Id*. (citing *Ornelas v. U.S.*, 517 U.S. 690, 699, 116 S.Ct.

1657 (1996)). Similarly, "[a]lthough each factor giving rise to reasonable suspicion may appear innocent when viewed by itself, a combination of factors may warrant further investigation when viewed together." *U.S. v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (cleaned up). Accordingly, an officer can have reasonable suspicion without ruling out innocent conduct. *Robbins v. City of Des Moines*, 984 F.3d 673, 679 (8th Cir. 2021); *see also Sanchez*, 955 F.3d at 675. Finally, a court can only consider the information known and possessed by the officer at the time of the incident. *Waters v. Madison*, 921 F.3d 725, 736 (8th Cir. 2019).

Courts have found that the following factors that can create reasonable suspicion: 1) unusual driving behavior; 2) attempts to evade the police; 3) indirect or incomplete answers; 4) nervousness and lack of eye contact; and 5) inconsistent responses regarding travel plans. *Callison*, 2 F.4th at 1132. Additionally, in *De La Rosa*, the Eighth Circuit summarized cases in which it had previously concluded that the officer had reasonable suspicion. 852 F.3d at 746. The Court explained that in *Riley, supra.*, a trooper had sufficient reasonable suspicion to wait for a drug dog based upon the driver's undue nervousness, difficulty in answering basic questions regarding his travel, and not being forthright about criminal history. *Id*. Furthermore, in *De La Rosa*, the Court explained that in *U.S. v. Lyons*,[1] a trooper had reasonable suspicion to extend a stop for a drug dog when the driver had unusual travel plans, gave contradictory story, and was driving a van loaded with luggage. *Id*. Lastly, the Court explained that in *Fuse, supra.*, a trooper had reasonable suspicion to request a drug dog, because of "the driver's unusual explanation for traveling to Kansas City, and the travelers' ***continued, unusual nervousness*** even after being told only a ***warning citation*** would be issued." *Id*. (emphases added). More recently, in *Pacheco*, the Eighth Circuit found an officer had reasonable suspicion when 1) there were inconsistencies with the

---

[1] 486 F.3d 367, 372 (8th Cir. 2007).

rental agreement; 2) the driver gave odd answers about travel plans, and 3) the driver "appeared very nervous" even after the officer informed him that he would only be receiving a warning. 996 F.3d at 512. In light of these cases, the Eighth Circuit determined an officer can use a driver's extreme or unusual level of nervousness as an objective factor in developing reasonable suspicion. *Id*. at 513.

In the case-at-hand, Trooper Payton had reasonable suspicion that additional criminal activity was afoot considering everything he had observed from Mr. Humphrey, and combined with his training and experience, and his belief that Mr. Humphrey was concealing something from him. *SUMF* ¶ 38. Trooper Payton came to this conclusion based upon the totality of the circumstances and the information known to him at the time. *See De La Rosa*, 852 F.3d at 744; *see also Waters*, 921 F.3d at 736. Moreover, Trooper Payton possessed objective justification for believing that additional criminal activity was afoot based upon Mr. Humphrey's unusual level of nervousness and his odd and inconsistent travel plans. *See De La Rosa*, 852 F.3d at 744.

### 1. *Mr. Humphrey Exhibited an Unusually High Level of Nervousness*

The undisputed facts show that Mr. Humphrey was more nervous than other individuals encountered during a normal routine traffic stop. Trooper Payton indicated that from his initial contact with Mr. Humphrey that Mr. Humphrey appeared nervous and confused. *SUMF* ¶ 13. When Mr. Humphrey got out of the U-Haul, Trooper Payton noticed that Mr. Humphrey's voice and hands were shaking. *SUMF* ¶ 15. Additionally, Mr. Humphrey displayed a significant degree of nervousness because he walked with his hands in the air even though Trooper Payton never ordered him to do so. *SUMF* ¶¶ 18-20. Trooper Payton also noted, while in his patrol car, that Mr. Humphrey still was "super nervous" and that his voice was shaky. *SUMF* ¶ 27.

Mr. Humphrey remained extremely nervous even after Trooper Payton told him that he would not be receiving a ticket. *SUMF* ¶ 25. For instance, after Trooper Payton asked about anything illegal being in the U-Haul, Mr. Humphrey took a noticeably deep breath, which is an indication that Mr. Humphrey was very nervous. *SUMF* ¶¶ 32-33. Captain Drown,[2] who reviewed the traffic stop, wrote in a memo that generally a person's level of nervousness decreases during a traffic stop; however, Captain Drown observed that Mr. Humphrey's nervousness increased. *SUMF* ¶ 57. Court have found nervousness to be a factor for reasonable suspicion especially when the individual's nervousness continues in an unusual level even after being told that he or she was either only going to receive a warning or that no citation was going to be issued. *See De La Rosa*, 852 F.3d at 746; *see also Pacheco*, 996 F.3d at 512. Accordingly, Trooper Payton was justified in considering Mr. Humphrey's level of nervousness in determining that he had reasonable suspicion.

### 2. Mr. Humphrey's Travel Plans

In addition to Mr. Humphrey's unusual degree of nervousness, he also provided Trooper Payton with odd and unusual answers regarding his travel plans. When asked about his travel plans, Mr. Humphrey responded saying that he is "going to Little Rock…I wanted to stop the night here and but I am going to Little Rock…I do want to stay here now, but I missed the turn and I was trying to figure out how I get back here to [Exit] 81." *SUMF* ¶¶ 21-22. Mr. Humphrey then attempted to explain his travel plans to Trooper Payton and that Mr. Humphrey was going to stop and get a hotel room in Russellville, but then Mr. Humphrey states that he may just drive all the way to Little Rock. *SUMF* ¶ 23. In fact, under oath Mr. Humphrey admitted that his travel plans were unclear even to him, because he testified that "so there were a lot of different things going through my mind. Should I go all the way down to Little Rock? Would it be better just to get a

---

[2] Captain Drown was one of Trooper Payton's supervising officers at the time of the incident.

hotel room?" *SUMF* ¶ 24. At another point, Mr. Humphrey told Trooper Payton that his mother did not want him driving at night, which is one of the reasons he was going to stop in Russellville. Trooper Payton responds that "it is confusing as to why you would not have just drive on to Little Rock it is an hour away." *SUMF* ¶ 34. Trooper Payton found it odd that he would be getting a room with only one hour left in his trip. *SUMF* ¶ 28. Likewise, in reviewing the traffic stop, Captain Drown wrote that "[i]t was also odd that a short trip from Fayetteville to Little Rock would require an overnight stay. He then said he wasn't even sure if he was going to get a room or not. The driver said his mother did not want him traveling at night. Trp. Payton found these responses odd and so do I." *SUMF* ¶ 56. As noted above, unusual and odd travel plans are factors that can help to create reasonable suspicion. *See Callison*, 2 F.4th at 1132. Trooper Payton rightly considered Mr. Humphrey's unusual travel plans in determining that he had reasonable suspicion to think that criminal activity involving drugs was afoot.

As a result, Trooper Payton had a particularized basis for reasonable suspicion that additional criminal activity involving drugs was afoot based upon Mr. Humphrey's level of nervousness and is odd and inconsistent travel plans. *See De La Rosa*, 852 F.3d at 744. Accordingly, Trooper Payton is entitled to summary judgment for any claim arising from the prolonging of the traffic stop.

D. The K-9 Unit Arrived on Scene in an Acceptable Amount of Time.

When a law enforcement officer determines that reasonable suspicion exists that criminal activity such as drug trafficking may be occurring and "need[s] the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one ... the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times." *U.S. v. Lyons*, 486 F.3d 367, 372 (8th Cir. 2007) (quoting *U.S. v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994)). In *Lyons*, the Eighth Circuit found that a dog sniff that occurred thirty-one minutes after

12

the officer had issued a warning ticket to the driver and twenty-five minutes after the K-9 unit was requested did not create an unreasonably long period of time as to violate the driver's constitutional rights. 486 F.3d at 372. Similarly, the Eighth Circuit has found that a period of fifty minutes from when the K-9 was requested until it arrived was reasonable. *U.S. v. Salgado*, 761 F.3d 861, 866 (8th Cir. 2014).

In this case, the K-9 unit arrived at the traffic stop in an acceptable amount of time as not to offend Mr. Humphrey's constitutional rights. Approximately nine (9) minutes after being requested, and within thirty (30) minutes of the initiation of the traffic stop, Hugh Davis and his K-9, Dunja, arrived on scene. *SUMF* ¶ 45. Thus, the time it took for the K-9 to arrive on scene was an acceptable time. *See Lyons*, 486 F.3d at 372; *see also Salgado*, 761 F.3d at 866. Mr. Humphrey's constitutional rights were not violated by the delay in the time for the K-9 to arrive on scene. Accordingly, Trooper Payton is entitled to summary judgment.

E.  <u>Once the K-9 Alerted, Trooper Payton Had Authority to Detain Mr. Humphrey During the Duration of the Search of the U-Haul.</u>

Trooper Payton had authority to detain and search the U-Haul driven by Mr. Humphrey once the K-9 alerted. An alert of a well-trained narcotics dog provides probable cause to search a vehicle. *Florida v. Harris*, 568 U.S. 237, 247, 133 S.Ct. 1050 (2013). Additionally, an officer may rely upon the probable cause determination of another officer. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1010 (8th Cir. 2017). Moreover, probable cause does not dissipate simply because officers are unable to find drugs during a search of the vehicle on the roadside. *Olivera-Mendez*, 484 F.3d at 512; *see also U.S. v. Bettis*, 946 F.3d 1024, 1030 (8th Cir. 2020). In *Olivera-Mendez*, after conducting a roadside search of the vehicle with negative results, the officer had the vehicle towed to a garage for a more extensive search that lasted six hours. 484 F.3d at 505. In *Bettis*, the Eight Circuit upheld a search of a vehicle that was towed for a more thorough search after an initial

13

search on the roadside that lasted over an hour. 946 F.3d at 1026-27.  In both cases, the Eighth Circuit found that "[i]f probable cause justifies the search of lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Olivera-Mendez*, 484 F.3d at 512 (quoting *U.S. v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157 (1982)); accord, *Bettis*, 946 F.3d at 1030.

In this case, Trooper Payton did not violate Mr. Humphrey's rights under the Fourth Amendment or the Fourteenth Amendment when he proceeded to conduct a search of the U-Haul following the sniff by the K-9. Once the K-9 arrived and was allowed to sniff around the U-Haul, the dog almost immediately began to alert as to the presence of narcotics in the U-Haul. *SUMF* ¶ 47. The K-9 then gave a strong indication that the source of the narcotics odor was the passenger-side directly behind the cab of the U-Haul. *SUMF* ¶ 48. Thus, probable cause existed for the officers to conduct a search of the U-Haul. *See Harris*, 568 U.S. at 247. Following the positive indication by the K-9, Davis, the K-9's handler, gave Trooper Payton a thumbs-up indicating that there was a positive alert for the odor of narcotics. *SUMF* ¶ 49. Trooper Payton was able to rely upon the indication by Davis that the K-9 had sufficiently indicated the presence of narcotics in the U-Haul. *See Ehlers*, 846 F.3d at 1010. Accordingly, Trooper Payton then placed Mr. Humphrey into handcuffs to detain him while he conducted a search of the U-Haul and Mr. Humphrey was placed into the back of Trooper Payton's patrol car. *SUMF* ¶ 50.

While conducting the search, the area of the U-Haul in which the dog alerted appeared to have recent body work done. *SUMF* ¶ 52. In addition, the K-9 was brought out several additional times in order to confirm and pinpoint the source of the odor, which the K-9 continued to alert to the same area which was between the cab and the box area of the truck on the passenger side. *SUMF* ¶ 51. Even though the officers were unable to locate any drugs in the U-Haul, Trooper

14

Payton and Hugh Davis still believed that drugs were hidden somewhere within the U-Haul. *SUMF* ¶ 53. Regardless of the fact that no narcotics were found, Trooper Payton still had probable cause to search the U-Haul. *See Olivera-Mendez*, 484 F.3d at 512. Theoretically, Trooper Payton could have had the U-Haul towed for a more thorough search. *See Id*. Moreover, Trooper Payton did not violate Mr. Humphrey's constitutional rights by keeping him and searching the U-Haul on the roadside for approximately an hour and twenty minutes. *See Olivera-Mendez*, 484 F.3d at 512-13; *see also Bettis*, 946 F.3d at 1030. Thus, the search of the U-Haul and the length of the search did not violate Mr. Humphrey's constitutional rights. Accordingly, as to the search of the U-Haul and the length of the search, Trooper Payton is entitled to summary judgment.

II.     **Trooper Payton Is Entitled to Qualified Immunity Because the Law Was Not Clearly Established and He Had at Least Arguable Reasonable Suspicion.**

Trooper Payton is entitled to qualified immunity. As noted above, a state actor is entitled to qualified immunity if no rights were violated or if the law was not clearly established. *Pearson*, 555 U.S. at 236. Thus, even if this Court finds Trooper Payton's conduct was impermissible, Trooper Payton is still entitled to qualified immunity under the "clearly established" prong. The clearly established law weighs in favor of Trooper Payton, an no precedent existed at the time to have put Trooper Payton or any other reasonable officer on notice that this traffic stop and the subsequent search would run afoul of the Fourth Amendment or the Fourteenth Amendment.

Qualified immunity balances two important societal interests. Society has an interest in holding government officials accountable when they act in patently unconstitutional or illegal ways; but this interest must be balanced against the need to protect officials from harassment, distraction, and liability when they act reasonably. *Pearson*, 555 U.S. at 231. This is why the doctrine of qualified immunity protects government actors from mistaken but reasonable

judgments as to the constitutional or legal propriety of their conduct. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

State actors "are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004). "The determination of whether an officer is entitled to qualified immunity requires consideration of the objective legal reasonableness of the officer's conduct in light of the information he possessed at the time of the alleged violation." *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir. 2001) (citation omitted). The standards used to determine whether an officer is entitled to qualified immunity are lenient so that officers may pursue their duties without fear of being sued. *Davis*, 375 F.3d at 711-12; *Johnson v. Schneiderheinz*, 102 F.3d 340, 342 (8th Cir. 1996) ("qualified immunity doctrine must accommodate for reasonable error because officials should not err always on the side of caution because they fear being sued"). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter*, 502 U.S. at 229 (internal quotations and citations omitted).

"To be clearly established for qualified immunity purposes, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *De La Rosa*, 852 F.3d at 745 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). This requires that the law must be "particularized" to the specific facts at issue and not in general terms. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). In warning of the dangers of defining "clearly established" in more generalized terms, the Supreme Court explained that "it could plausibly be asserted that any violation of the Fourth Amendment is "clearly established," since it is clearly established that the protections of the Fourth Amendment apply to the actions of police." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Accordingly, existing precedent cases must have placed the

16

issue—how the general rule is to be applied in the specific circumstances facing the officer—"beyond debate." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). For this reason, the Supreme Court has made clear that, to meet this extraordinarily high bar, on-point precedential cases must either (1) be from a controlling authority within the specific jurisdiction or (2) unmistakably show "a robust 'consensus of cases of persuasive authority.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011) (quoting *Wilson*, 526 U.S. at 617).

"When the issue is whether a § 1983 defendant police officer violated a *clearly established* Fourth Amendment right, if we determine that the officer lacked reasonable suspicion and thus conducted an unlawful *Terry* stop, he 'may nonetheless be entitled to qualified immunity if [he] had *arguable* reasonable suspicion – that is, if a reasonable officer in the same position could have believed [he] had reasonable suspicion.'" *Irvin v. Richardson*, 20 F.4th 1199, 1204-05 (8th Cir. 2021) (quoting *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019)) (alterations in the original). Likewise, an officer is "entitled to qualified immunity if there is arguable probable cause, which exists when 'an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable.'" *Robbins v. City of Des Moines*, 984 F.3d 673, 680 (8th Cir. 2021) (quoting *Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013) (cleaned up). Similarly, arguable reasonable suspicion exists "if a reasonable officer could have believed that he had a reasonable suspicion; in other words, if he had arguable reasonable suspicion." *De La Rosa*, 852 F.3d at 745-46.

At a minimum, Trooper Payton is entitled to qualified immunity for any of his actions taken towards Mr. Humphrey. At worst, Trooper Payton's actions were mistaken judgments. *See Hunter*, 502 U.S. at 229. More specifically, Trooper Payton is entitled to qualified immunity because he

had at least arguable probable cause to initiate the traffic stop and at least reasonable suspicion to prolong the traffic stop.

Based upon the undisputed facts, Trooper Payton had at least arguable probable cause to conduct the traffic stop of Mr. Humphrey. The undisputed facts show that Mr. Humphrey attempted to take Exit 81 off Interstate 40, but immediately made another quick action to continue on the interstate without signaling. *SUMF* ¶ 7. Trooper Payton observed this action and believed it caused the weight of the truck to shift and was observed to cross the fog line again resulting in an improper and unsafe lane change. *SUMF* ¶ 8. Thus, Trooper Payton initiated a traffic stop based upon witnessing the traffic violation of careless and prohibited driving in violation of Ark. Code Ann. § 27-51-104. *SUMF* ¶ 9. Based upon these facts, it was objectively reasonable for Trooper Payton to believe that he had probable cause to stop Mr. Humphrey for the traffic violation. *See Robbins*, 984 F.3d at 680. Moreover, Mr. Humphrey is unable to produce sufficient evidence to otherwise deny Trooper Payton qualified immunity regarding him having arguable probable cause. *See Bishop*, 723 F.3d at 961.

As to having arguable reasonable suspicion, not only did Trooper Payton believe that he had reasonable suspicion (*SUMF* ¶ 38), but also, Hugh Davis of the United States Forest Service thought that at the scene that Trooper Payton had reasonable suspicion to justify the prolonging of the traffic stop. *SUMF* ¶ 46. Likewise, Sergeant Melder, Trooper Payton's direct supervising officer,[3] testified that he believed that Trooper Payton had reasonable suspicion sufficient to extend the traffic stop to request a K-9. *SUMF* ¶ 39. Thus, objectively reasonable officers believed that Trooper Payton had reasonable suspicion to prolong the traffic stop and request a K-9 to the scene.

---

[3] *See SUMF* ¶ 5.

*See De La Rosa*, 852 F.3d at 745-46. As a result, Trooper Payton had at least arguable reasonable suspicion and is entitled to qualified immunity.

In conclusion, Trooper Payton is entitled to qualified immunity. First, Trooper Payton is entitled to qualified immunity, because he did not violate any of Mr. Humphrey's constitutional rights. Second, Trooper Payton is entitled to qualified immunity, because the law was not clearly established. Additionally, at a minimum, Trooper Payton had arguable probable cause and arguable reasonable suspicion to justify the actions he took regarding Mr. Humphrey. Thus, Trooper Payton is entitled to qualified immunity. Accordingly, Trooper Payton respectfully requests that this Court grants his motion for summary judgment in its entirety and dismisses this lawsuit against him with prejudice.

## **CONCLUSION**

For the foregoing reasons, Defendant Trooper Steven Payton is entitled to summary judgment. First, Trooper Payton is entitled to summary judgment because he did not violate any of Mr. Humphrey's constitutional rights. Second, Trooper Payton is entitled to qualified immunity regarding Mr. Humphrey's claims against him. Accordingly, Defendant Trooper Steven Payton respectfully requests that this Court grants his motion for summary judgment and dismisses this lawsuit against him with prejudice and for any and all other just and proper relief to which he may be entitled.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

By:   Vincent P. France
      Ark Bar No. 2010063
      Assistant Attorney General
      Arkansas Attorney General's Office
      323 Center Street, Suite 200

19

Little Rock, AR 72201
Phone:  (501) 682-1314
Email:  vincent.france@arkansasag.gov
*Attorneys for Defendant Steven Payton*