**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**MARION A. HUMPHREY, JR.**                                      **PLAINTIFF**

**v.**                              **CASE NO. 4:21-CV-194-LPR**

**STEVEN PAYTON**                                             **DEFENDANT**

**DEFENDANT PAYTON'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

COMES NOW, Defendant Trooper Steven Payton, by and through his attorneys Attorney General Leslie Rutledge, and Assistant Attorney General Vincent P. France, pursuant to Local Rule 56.1, provides the following Statement of Undisputed Material Facts:

1.      On the evening of August 20, 2020, Defendant, Trooper Steven Payton with the Arkansas State Police, conducted a traffic stop of a U-Haul driven by Plaintiff, Marion Humphrey, Jr., as he drove eastbound on Interstate 40 near mile-marker 81. *See* Exhibit 1, Dashcam Video.

2.      On August 20, 2020, Plaintiff, Marion A. Humphrey, Jr. was thirty-two (32) years old and was attending law school at the University of Arkansas Fayetteville. *See* Exhibit 1, Dashcam Video.

3.      On August 20, 2020, Defendant, Steven Payton, was a trooper with the Arkansas State Police and was assigned to Troop J. *See* Exhibit 1, Dashcam Video.

4.      On August 20, 2020, Trooper Payton's patrol car was equipped with a dashboard video camera that captures the events beginning one minute prior to when Trooper Payton initiated his blue lights through the entire encounter with Mr. Humphrey, Jr. *See* Exhibit 1, Dashcam Video; *see also* Exhibit 2, Deposition of Steven Payton, 10:2-25 (hereinafter "Exhibit 2, Payton's Depo.").

5.      On August 20, 2020, the chain-of-command for Trooper Payton was that he reported to Sergeant Chase Melder, who then reported to Captain Kyle L. Drown, then Major

1

Forrest Marks, then Lieutenant Colonel Shawn Garner, and finally Colonel Bill Bryant. Exhibit 4, Deposition of Chase Melder, 11:1-18 (hereinafter "Exhibit 4, Melder Depo.").

6.     On the evening of August 20, 2020, while traveling eastbound on Interstate 40, Trooper Payton was behind a U-Haul. As the vehicle approached mile-marker 81, the U-Haul signaled at the last second to exit off the interstate. Exhibit 2, Payton's Depo., 16:20—17:6, 44:19—46:18, 47:23—48:4, 50:10—51:3, 118:8-25; *see also* Exhibit 1, Dashcam Video 0:00:47—0:00:53; Exhibit 8, Documents produced by the Arkansas State Police, bates number Payton 4, 1147, 1149, 1174. (hereinafter "Exhibit 8, ASP Docs.").

7.     The U-Haul attempted to take the exit ramp at mile-marker 81, but immediately made another quick action to continue on the interstate without signaling. *Id*.

8.     The action by the U-Haul caused the weight of the truck to shift and was observed to cross the fog line again resulting in an improper and unsafe lane change. Exhibit 2, Payton's Depo., 16:20-25, 45:8-12, 118:8-25.

9.     Based upon this action by the U-Haul, Trooper Payton initiated a traffic stop based upon witnessing the traffic violation of careless and probative driving in violation of Ark. Code Ann. § 27-51-104. Exhibit 2, Payton's Depo., 16:20-25, 50:10-51:6; *see also* Exhibit 8, ASP Docs 1072.

10.     At approximately 8:00 p.m., Trooper Payton pulled over Mr. Humphrey. Exhibit 2, Payton Depo., 13:2-5; *see also* Exhibit 1, Dashcam Video 0:01:00—0:01:34.

11.     The traffic stop of the U-Haul was conducted at the mile-marker 81 eastbound entrance ramp. Exhibit 2, Payton's Depo., 16:20—17:6; *see also* Exhibit 8, ASP Docs, Payton 4, 7, 1147, 1174.

12.    Trooper Payton approached the passenger side of the vehicle, but was unable to communicate effectively with the driver of the U-Haul. Exhibit 1, Dashcam Video 0:02:04-0:03:55; Exhibit 2, Payton's Depo., 13:8-10, 121:14-23.

13.    When Trooper Payton saw the driver, the driver was acting nervous and appeared confused; therefore, Trooper Payton asked the driver to step out of the vehicle so that he would be able to communicate with the driver. Exhibit 2, Payton's Depo., 13:8—14:19.

14.    The individual, later identified as Mr. Humphrey, was already on the phone with a person later identified as Mr. Humphrey's father when he exited the U-Haul. Exhibit 3, Deposition of Marion Humphrey, Jr., 72:19—74:7 (hereinafter "Exhibit 3, Humphrey Depo.").

15.    Once the driver was out of the vehicle, Trooper Payton noticed that the driver's voice and hands were shaking.  Exhibit 2, Payton's Depo., 34:13-15, 92:4-15; *see also* Exhibit 8, ASP Docs, Payton 1147, 1149, 1174.

16.    Trooper Payton asked for and received the individual's license and the rental agreement for the vehicle, which the individual provided. Exhibit 2, Payton's Depo., 56:10-16; *see also* Exhibit 8, ASP Docs, Payton 1147, 1174. The documents identified the individual as Mr. Humphrey.

17.    Trooper Payton then asked Mr. Humphry to move to the area between the U-Haul and his patrol car.  Exhibit 1, Dashcam Video 0:04:04.

18.    Trooper Payton's dashcam captured footage of the stop. As Trooper Payton and Mr. Humphrey walked to the back of the U-Haul, Mr. Humphrey is heard on the video telling someone that "he is making me go towards his vehicle" and Mr. Humphrey has his hands in the air with his palms out. Exhibit 1, Dashcam Video 0:04:04—0:04:19.

19.    Trooper Payton told Mr. Humphrey that he can put his hand down. Exhibit 1, Dashcam Video 0:04:20.

20.    Mr. Humphrey admits that Trooper Payton never ordered him to raise his hands in the air. Exhibit 3, Humphrey Depo., 75:2-17.

21.    At this point, Trooper Payton began to ask Mr. Humphrey standard questions about his trip and his travel plans. Exhibit 1, Dashcam Video 0:04:23; Exhibit 2, Payton's Depo., 70:14-22.

22.    Mr. Humphrey responded saying that he is "going to Little Rock…I wanted to stop the night here and but I am going to Little Rock…I do want to stay here now, but I missed the turn and I was trying to figure out how I get back here to [Exit] 81." Exhibit 1, Dashcam Video 0:04:24—0:04:42.

23.    Mr. Humphrey attempted to explain his travel plans to Trooper Payton and that Mr. Humphrey was going to stop and get a hotel room in Russellville, but then Mr. Humphrey states that he may just drive all the way to Little Rock. Exhibit 1, Dashcam Video 0:04:22—0:05:35; Exhibit 2, Payton's Depo., 70:14-22.

24.    In his deposition, Mr. Humphrey admitted that his travel plans were unclear even to him, because he testified that "so there were a lot of different things going through my mind. Should I go all the way down to Little Rock? Would it be better just to get a hotel room?" Exhibit 3, Humphrey Depo., 77:8-11.

25.    Trooper Payton told Mr. Humphrey to hang tight for a second and then Trooper Payton asked Mr. Humphrey "are you still nervous, you look nervous." Mr. Humphrey replied, "I am still nervous." Trooper Payton then inquired if there is anything illegal in the vehicle and then

stated to Mr. Humphrey, "there is nothing to be nervous about you are not even going to get a ticket." Exhibit 1, Dashcam Video 0:05:41—0:05:59.

26.     Trooper Payton returned to his patrol car and began to run Mr. Humphrey's information through his in-car system, which checks the validity of the driver's license and the validity of the vehicle's registration.  Exhibit 1, Dashcam Video 0:06:00; Exhibit 2, Payton's Depo., 88:16—90:9.

27.     Once inside his patrol car, Trooper Payton can be heard saying that Mr. Humphrey still was "super nervous" and that his voice was shaky. Exhibit 1, Dashcam Video 0:06:09; Exhibit 2, Payton's Depo., 71:1-22, 83:3-9, 85:10-23.

28.     Trooper Payton found it odd that he would be getting a room with only one hour left in his trip. Exhibit 1, Dashcam Video 0:06:10—0:06:25; Exhibit 2, Payton's Depo., 76:6—77:20.

29.     After about three minutes in his patrol car, Trooper Payton left his vehicle and again went to speak with Mr. Humphrey. Exhibit 1, Dashcam Video 0:09:09.

30.     At some point, Trooper Payton requested that dispatch to run a criminal history check on Mr. Humphrey. Exhibit 2, Payton's Depo., 89:8—91:8.

31.     While speaking with Mr. Humphrey, Trooper Payton visited with Mr. Humphrey about who rented the truck and they discussed the traffic stop. Exhibit 1, Dashcam Video 0:09:15—0:12:38.

32.     During this conversation, after Trooper Payton asked about anything illegal being in the U-Haul, Mr. Humphrey took a noticeably deep breath. Exhibit 1, Dashcam Video 0:10:25.

33.     Sergeant Melder testified regarding Mr. Humphrey being nervous that "there's a really deep breath taken by him [Mr. Humphrey] when Trooper Payton asked if there was drugs

in the car. He made a really deep breath, which was different than the rest of the time that he was talking to Trooper Payton. And he looked back at the vehicle when he - - when he did that." Exhibit 4, Melder Depo., 24:24—25:4.

34.    At another point during the conversation, Mr. Humphrey told Trooper Payton that his mother did not want him driving at night, which is one of the reasons he was going to stop in Russellville. Trooper Payton responds that "it is confusing as to why you would not have just drive on to Little Rock it is an hour away." Exhibit 1, Dashcam Video 0:10:55—0:11:07.

35.    Mr. Humphrey at one point told Trooper Payton, "Honestly, I just don't want to get shot…and I am sorry about that." Exhibit 1, Dashcam Video 0:11:18—0:11:22; Exhibit 3, Humphrey Depo., 81:14-22.

36.    After Mr. Humphrey refused to give consent to Trooper Payton to allow him to search the U-Haul, Trooper Payton tells Mr. Humphrey to "have a seat right there [motioning to the back bumper of the U-Haul] I am going to get a dog." Exhibit 1, Dashcam Video 0:11:38—0:11:46.

37.    Based upon his experience as a law enforcement officer, Trooper Payton thought that Mr. Humphrey was way more nervous than an average person that Trooper Payton had previously stopped for a traffic violation. Exhibit 2, Payton's Depo., 92:25—93:4; *see also* Exhibit 8, ASP Docs, Payton 1148, 1149, 1174.

38.    Trooper Payton thought he had reasonable suspicion that additional criminal activity was afoot considering everything he had observed from Mr. Humphrey, and combined with his training and experience, believed Mr. Humphrey was concealing something from him. Exhibit 2, Payton's Depo., 93:24—95:1, 105:14-25.

39.    Sergeant Melder testified that he believed that Trooper Payton had reasonable suspicion sufficient to extend the traffic stop to request a K-9. Exhibit 4, Melder Depo., 80:1-6, 144:15-18.

40.    Roughly eleven (11) minutes into the traffic stop, Trooper Payton then returned to his patrol car to request a K-9 unit. Exhibit 1, Dashcam Video 0:12:40—0:14:51.

41.    Trooper Payton then made contact with Hugh Davis with the United States Forest Service who said he would respond with his K-9. Exhibit 1, Dashcam Video 0:13:11—0:14:51; *see also* Exhibit 5, Deposition of Hugh Davis, 10:1-24 (hereinafter "Exhibit 5, Davis Depo.").

42.    Dispatch advised Trooper Payton that Mr. Humphrey had no warrants and his license was active. Exhibit 1, Dashcam Video 0:16:32—0:16:47.

43.    Throughout the entire traffic stop up to this point, Mr. Humphrey was able to speak with his father, Marion Humphrey, Sr., a lawyer and former judge. Exhibit 3, Humphrey Depo., 51—52:7, 6:25—7:1.

44.    Likewise, Mr. Humphrey was able to make Facebook posts using his cell phone during the traffic stop to this point. Exhibit 3, Humphrey Depo., 38:16—39:16, Exhibit 3 of Humphrey Depo., bates number HUMPHREY_000100-01.

45.    Approximately nine (9) minutes after being requested, Hugh Davis and his K-9, Dunja arrived on scene and within thirty (30) minutes of the initiation of the traffic stop. Exhibit 1, Dashcam Video 0:27:43—0:28:30; Exhibit 2, Payton's Depo., 127:12-23; *see also* Exhibit 5, Davis Depo., 11:1-7.

46.    Prior to initiating the search with Dunja, Officer Hugh Davis thought that Trooper Payton had reasonable suspicion sufficient for him to initiate the search with Dunja. Exhibit 5, Davis Depo., 65:6-11.

47.     Hugh Davis let his K-9 out of his vehicle and almost immediately the K-9 began to alert as to the odor of narcotics from the U-Haul. Exhibit 1, Dashcam Video 0:28:28—0:29:07; Exhibit 5, Davis Depo., 47:5-8, 49:1—50:9; Exhibit 6, Body-Cam Video of Hugh Davis, 0:00:54.

48.     The K-9 gave a strong indication that the source of the narcotics odor was the passenger-side directly behind the cab of the U-Haul. Exhibit 2, Payton's Depo., 150:5-15; Exhibit 5, Davis Depo., 42:18-23, Exhibit 6, Body-Cam Video of Hugh Davis, 0:01:14-0:01:28; Exhibit 7, Hugh Davis's Incident Report, bates number Humphrey_002326 (hereinafter "Exhibit 7, Davis Report").

49.     Officer Davis then gave Trooper Payton a thumbs-up indicating that there was a positive alert for the odor of narcotics. Exhibit 1, Dashcam Video 0:29:07; Exhibit 2, Payton's Depo., 130:6—131:24; Exhibit 5, Davis Depo., 53:25—54:7.

50.     Trooper Payton then placed Mr. Humphrey into handcuffs to detain him while he conducted a search of the U-Haul and Mr. Humphrey was placed into the back of Trooper Payton's patrol car. Exhibit 1, Dashcam Video 0:29:12—0:30:10; Exhibit 2, Payton's Depo., 131:25—132:2; Exhibit 5, Davis Depo., 40:20-25.

51.     The K-9 was brought out several additional times in order to confirm and pinpoint the source of the odor, which the K-9 continued to alert to the same area which was between the cab and the box area of the truck on the passenger side. Exhibit 1, Dashcam Video 0:49:35—0:50:52, 1:21:30—1:21:49; Exhibit 2, Payton's Depo., 138:17—139:16; Exhibit 7, Davis Report, bates number Humphrey_002326.

52.     The area of the U-Haul in which the dog alerted appeared to have recent body work done. Exhibit 5, Davis Depo., 30:10-24, 56:19—57:17; Exhibit 7, Davis Report, bates number Humphrey_002326.

53.     Even though the officers were unable to locate any drugs in the U-Haul, Trooper Payton and Hugh Davis still believed that drugs were hidden somewhere within the U-Haul. Exhibit 2, Payton's Depo., 139:20—140:4, 140:23—141:1; Exhibit 5, Davis Depo., 30:10-24, 54:8—55:2.

54.     While Mr. Humphrey was alone in Trooper Payton's patrol car, and unbeknownst to Trooper Payton at the time, Mr. Humphrey is heard stating to himself that he has an open container in the U-Haul. Exhibit 1, Dashcam Video 1:23:35—1:23:52; Exhibit 3, Humphrey Depo., 94:10—95:19.

55.     After searching for approximately an hour and twenty minutes, which produced negative results, Trooper Payton returned to his unit and issued Mr. Humphrey a warning for careless and prohibited driving and released him. Exhibit 2, Payton's Depo., 85:3-5; Exhibit 8, ASP Docs, Payton 1072; *see also* Exhibit 1, Dashcam Video 1:49:53—1:51:38.

56.     Captain Drown reviewed the traffic stop. In a memorandum to Major Marks dated September 4, 2020, Captain Drown following his review of the traffic stop of Mr. Humphrey explained that "[i]n my experiences I often found individuals looking for or at signs, places, or other items of identification to quickly develop a response for a destination when trying to conceal something from me. It was also odd that a short trip from Fayetteville to Little Rock would require an overnight stay. He then said he wasn't even sure if he was going to get a room or not. The driver said his mother did not want him traveling at night. Trp. Payton found these responses odd and so do I." Exhibit 8, ASP Docs, Payton 7.

57.     In addition, regarding Mr. Humphrey's nervousness, Captain Drown explained that "everyone is a bit nervous or apprehensive when stopped by the police, including myself. The nervousness subsides and either goes away mostly or completely after initial contact is made and

there is nothing other than the traffic violation to conceal. In this case the nervousness continued

to increase up and to detainment." Exhibit 8, ASP Docs., Payton 7.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

By:   Vincent P. France
Ark Bar No. 2010063
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone:  (501) 682-1314
Fax:     (501) 682-2591
Email:  vincent.france@arkansasag.gov
*Attorneys for Defendant Steven Payton*

10