UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

Marion Andrew Humphrey, Jr.,

Plaintiff,

v.

Steven Payton, acting in his individual capacity as an Arkansas State Police trooper,

Defendant.

Case No. 4:21-CV-00194 LPR

PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

On August 20, 2020, Defendant Steven Payton (Payton), an Arkansas State Trooper, pulled over Plaintiff Marion Andrew Humphrey, Jr. (Humphrey), who was driving a rented U-Haul at dusk in an unfamiliar area, and began interrogating him about drugs (which he did not have) and almost wrecking the truck (which he did not do). Payton had an unjustified hunch that Humphrey was up to something besides, as Humphrey calmly explained, moving from Fayetteville to Little Rock. Nothing is unusual about a Black man being nervous when stopped and interrogated by a police officer at nightfall in an unfamiliar area. Nothing is suspicious about deciding not to drive a large, rented truck at night after a long day of moving. In fact, nothing Payton uncovered during this interaction objectively supported his hunch. As a reasonable officer in Payton's shoes would conclude, Humphrey was just a tired Black man moving from Fayetteville to Little Rock with rented box truck. But Payton was dead set on making a drug bust that evening. What ensued was a two-hour ordeal whereby Payton called in a drug dog and ransacked

1

Humphrey's belonging—uncovering no drugs—while leaving Humphrey handcuffed in the back of the squad car.  Humphrey sued Payton pursuant to 42 U.S.C. § 1983 for violating his Fourth Amendment rights.  Payton now moves for summary judgment on qualified immunity grounds.

Payton is not entitled to summary judgment because most of the material facts are in dispute, and Humphrey raises serious doubts about Payton's crumbling credibility.  Such issues must be resolved by a jury.  While the parties disagree on the facts, it is Humphrey's version of events that controls at summary judgment.  According to Humphrey, Payton violated his clearly established Fourth Amendment rights in three ways.  First, Payton stopped him without probable cause that he committed any traffic offense, in order to go on a fishing expedition for drugs.  Second, Payton extended the traffic stop for a canine sniff without reasonable suspicion of drug-related activity.  The only two justifications Payton offers as a basis for reasonable suspicion—extreme nervousness and unusual travel plans—are both disputed questions of fact.  Third, Payton kept Humphrey handcuffed in his squad car after he decided that Humphrey would be let off with nothing more than a traffic warning, with no objectively reasonable belief that Humphrey was armed or dangerous or that handcuffs were necessary for a legitimate law-enforcement purpose.  Because a reasonable jury could find in Humphrey's favor on these claims, each of which alleges a violation of Humphrey's clearly established Fourth Amendment rights, Humphrey respectfully requests that this Court deny summary judgment.

## FACTUAL BACKGOUND[1]

Genuine issues of material fact lurk around every corner of Payton's Motion for Summary Judgment. Nevertheless, for purposes of this Motion, it is the facts below—all of which find support in the record—that must control:

### A.    Marion A. Humphrey, Jr.

On August 20, 2020, Marion A. Humphrey, Jr. was a 32-year-old law student attending University of Arkansas at Fayetteville. *Humphrey 6:2-3, 17:2-6.* Humphrey is a Little Rock native. *Id. 6:4-5, 19:17-24.* He has long been interested in serving his community. *See* Noel Exhibit 1, Humphrey Resume. Before becoming a lawyer, he worked for years as a community organizer, advocating for youth and teachers. *Humphrey 12:21—14:12.* He also earned a Master of Public Administration from the University of Arkansas Little Rock while he was working full-time. *Id. 10:12-24.* Following in the footsteps of his father, Marion Humphrey, Sr.—an attorney and retired Pulaski County Circuit Judge—Humphrey decided to go to law school in 2018. *Id. 6:6-8, 10:6-11.* His interest in service continued while there; as a law student he received public service fellowships to work at the Campaign for Youth Justice and Arch City Defender's. *Id. 18:23—19:6.*

---

[1] Many of the relevant deposition transcripts and documents were submitted with Payton's Motion, Docket No. 28, and for brevity will not be submitted again. Additional relevant evidence is submitted with the Declaration of Andrew J. Noel. Deposition citations herein follow the format "Name Page:Lines" (*e.g., Payton 12:3-7*). Citations to Payton's dashboard camera video, submitted as Exhibit 1 to Payton's Motion, will follow the format "Dashcam Hour:Minute:Seconds" (*e.g., Dashcam 1:28:39-50*). Documents are referenced by the name of the individual submitting them and the exhibit number (*e.g.*, Payton Exhibit 3).

Mid-way through Humphrey's second year of law school, the COVID-19 pandemic swept across the nation and the world.  Because Humphrey's classes had moved to an online format, he decided to move home to Little Rock to take his courses online.  Dashcam 00:05:06.  His parents had a second home that they usually rented out, but it was conveniently empty.  *Humphrey 77:24—78:2.*  On August 19, 2020, at 5:22 p.m., Humphrey picked up a rented U-Haul box truck at the Fayetteville store. Noel Exhibit 3, Rental Agreement.  He packed his entire apartment into the U-Haul the next day. *Humphrey 77:1-9.*  Because Humphrey tries not to drive at night—a choice his mother supports—his initial plan was to make the approximately three-hour drive from Fayetteville to Little Rock before nightfall.  *Id.*  As is often the case, packing and loading the U-Haul was exhausting and took longer than expected; Humphrey got on the road later than intended.  *Id.*  It was unlikely Humphrey would make it to the Little Rock before nightfall, and he was unsure that his friend would be available to help him unload at night, in the dark.  *Id.*  So, Humphrey decided that he would spend the night at a hotel in Russellville and continue the last leg of the journey in the morning.  Dashcam 00:04:22-40.  After all, he had until the next day to return the U-Haul in Little Rock.  Noel Exhibit 3, Rental Agreement.

### B.    Payton Sets his Sights on Humphrey

Around 8:00 p.m. on August 20, 2020, Defendant Steven Payton was parked on the median observing traffic near mile marker 70 of Interstate 40.  Payton Exhibit 8, ASP Docs, Payton 1147, 1173.  Payton was a highway trooper for the Arkansas State Police (ASP) at this time, but he had expressed interest in joining ASP's drug interdiction team.  *Melder*

4

*55:7-24.* Payton had been praised by his fellow troopers and supervisors for a few narcotics busts he made during previous traffic stops. *Payton 142:1-11*; *Melder 100:19—101:4.* Unfortunately, this encouragement had gone to his head. Payton was seeking more positive feedback, and a coveted spot on the drug interdiction team, when he encountered Humphrey that evening.

According to Payton, he saw a black Cadillac Escalade SUV drive by, followed by smaller car, and then a U-Haul box truck. Payton Exhibit 8, ASP docs, Payton 1173; Noel Exhibit 4, Pre-stop Dashboard Camera Video 0:00:27-32. Payton decided to pursue the vehicles to see if the U-Haul and SUV were traveling together, which he believed might indicate drug-trafficking activity. Payton Exhibit 8, ASP docs, Payton 1173. First, he pulled up next to the U-Haul truck. *Id.* Payton noted that the U-Haul was driven by a Black man (Humphrey) who was sitting upright with his hands at ten-and-two on the steering wheel. *Id.* Humphrey was looking straight ahead and did not look over or acknowledge Payton. *Id.* Holding the steering wheel at ten-and-two is normal, and recommended, driving behavior.[2] Noel Exhibit 2, Expert Report of Shaun Santos, ¶¶ 136-38, 173 (hereinafter, "Santos Report"); *Payton 40:2-17*; *Melder 36:22—37:5.* Payton then moved on to observe the SUV. He observed a Hispanic female driver who appeared

---

[2] Notably, although Payton's post-incident memoranda and summaries focused heavily on the "suspicion" engendered from this typical driving conduct, he does not rely on it as a basis for reasonable suspicion in his Motion for Summary Judgment. Actually, Payton makes *no mention* of his initial pursuit and his observations of Humphrey before he initiated the traffic stop.

relaxed, with backseat passengers watching a video screen. Payton Exhibit 8, ASP docs, Payton 1173.

Although Payton dispelled any suspicion that the SUV and U-Haul were traveling together, he was not done with Humphrey. *Id.* Far from it. Payton exited the highway in order to allow the U-Haul to pass and then re-entered the interstate so that he could pursue it. *Id.* Payton raced to over 100 miles per hour to chase Humphrey down, knowing only that he was a Black man who was driving a large rental vehicle in a cautious manner. *Melder 86:10—87:4*; Noel Exhibit 5, Screenshot of Squad Video. As Payton agrees, U-Haul trucks are generally rented vehicles with which drivers are not familiar, and U-Haul drivers are often in unfamiliar areas. *Payton 37:16—38:5, 40:24—41:22.* Thus, a driver can reasonably be expected to drive a large and unfamiliar with additional caution. Santos Report ¶¶ 136-38, 173.

### C.    The Traffic Stop and Extension

Payton proceeded to chase Humphrey at high speed, nearly catching up to him as he approached the mile 81 marker on I-40. Dashcam 00:00:20-50. As aforementioned, Humphrey was planning to stop for the evening in a hotel in this area. *Id.* 00:02:50—3:14. He knew that the hotel was near the Cracker Barrel, but he was not familiar with this area as he had never stayed in Russellville before. *Id.* Humphrey put on his turn signal and moved slightly towards the exit. *Id.* 00:00:45-55. Unsure that this was the correct exit, Humphrey changed his mind. *Id.* He turned off his signal and continued straight on the highway. *Id.* He did not dramatically veer towards or away from the exit or come anywhere close to causing an accident. *Id.* Indeed, any movement of the U-Haul is nearly

imperceptible on Payton's dashcam video. *Id.* Humphrey did not cross the white fog line. *Humphrey 81:7-11.* However, Payton seized on this innocuous driving behavior to get Humphrey in his grasp. He engaged his flashing lights and pulled Humphrey over. Dashcam 00:1:06-25. Humphrey pulled over onto the shoulder immediately. *Id.*

Payton exited his squad car and approached the passenger side of Humphrey's U-Haul, but they were unable to communicate through the passenger window because Humphrey's bags or belongings were in the way. *Payton 13:23—14:19, 121:18—122:2, 147:1-4.* Payton, however, saw a suitcase on the passenger seat and "automatically" thought it must be full of contraband. *Id. 145:14—146:16.* Of course, U-Hauls are often used for moving personal belongings, including suitcases. *Id. 37:20-38:1* (agreeing that the vast majority of people driving U-Hauls are law-abiding folks using the vehicles to move something); *Melder 84:6-9* (agreeing that moving suitcases is one of the most common uses for a U-Haul). Humphrey's U-Haul truck was conspicuously labeled a SUPERMOVER that could fit a two-bedroom apartment's worth of personal belongings inside. Dashcam 00:01:44. But Payton had already made up his mind about what a young, Black man must be transporting in a U-Haul.

Payton proceeded around the truck to the driver's side door and asked Humphrey to exit, then began questioning him about his travel plans. *Id.* 00:02:40—3:20. He asked Humphrey for his license and the rental agreement for the U-Haul—which Humphrey provided. *Id.* 00:03:20. The two then walked around to the back of the U-Haul. *Id.* 00:04:08-20. Humphrey kept his hands in the air, a sign of compliance and deference towards Payton, until Payton told him he could put his hands down. *Id.; see also* Santos

Report ¶ 194, 311.  Humphrey had his phone in his hand; he was on the phone with his father throughout most of the encounter.  *Humphrey 51:5-18.*  Payton asked Humphrey, again, where he was headed.  Dashcam 00:04:22-45.  Humphrey calmly and clearly explained that his final destination was Little Rock, but that he was planning to spend the night in Russellville.  *Id.*  He had just missed the turn for his hotel, and now he needed to figure out how to get back to Exit 81.  *Id.*  Payton was aware that there was a hotel off of Exit 81.  *Payton 69:20-22.*  Payton told Humphrey he could direct him.  Dashcam 00:04:45.

Humphrey further explained that he was coming from Fayetteville, where he went to school, and headed to Little Rock, where he lives.  *Id.* 00:04:45—5:20.  His classes would be remote in the fall, so he was moving home to Little Rock to take them online.  *Id.* As a precaution to protect his older parents, Humphrey was planning to quarantine at his parent's rental home when he arrived.  *Id.*; *Humphrey 78:15—79:12.*  Just as any reasonable person would be during the COVID-19 pandemic, Payton was familiar with the concept of quarantining.  *Payton 76:14—77:1*; *Melder 59:8-23*; Santos Report ¶¶ 167-68. Moreover, it was nightfall.  *Humphrey 77:3-4.*  As Payton acknowledges, it is reasonable for a person driving an unfamiliar vehicle—such as a rented U-Haul—to avoid driving at night.  *Payton 102:11-15.*  However, since Humphrey had missed his exit and been stopped by the police, he told Payton that he just might finish the trip.  Dashcam 00:05:35.

Humphrey confirmed that he had his furniture and all of his belongings packed into the U-Haul.  *Id.* 00:05:38-59.  Payton asked if Humphrey had anything illegal in the U-Haul, and Humphrey firmly and unequivocally answered that he did not.  *Id.*  Contrary to Payton's self-serving characterization, Humphrey does not appear outwardly nervous on

the dashcam video. Dashcam 00:04:21—5:42. He is calm and respectful, and answers all of Payton's questions in a clear and even tone. *Id.* Payton told Humphrey there was nothing to be nervous about anyway because he would not even be getting a ticket that evening, to which Humphrey smiled and joked, "I hope not." *Id.* Payton headed to his squad car, while Humphrey waited outside near the back of the truck. *Id.*

In the squad car, Payton ran a license and record check on Humphrey using ASP databases. *Payton 88:21-25, 121:2-6.* Payton also texted Hugh Davis of the U.S. Forestry Service to ask if he was available that evening. *Id. 52:18-25, 91:9-16.* Payton wanted Davis to prepare for a canine sniff. *Id.*; Noel Exhibit 6, Davis Text Messages. He sent this text less than eight minutes into the traffic stop—according to Payton's own testimony, he did not have reasonable suspicion to extend the stop at this point. *Payton 51:10—15, 63:18—64:7.* Yet, Payton was clearly determined to search Humphrey's truck.

Payton went back to speak to Humphrey. Dashcam 00:09:10. Try as he might, he could not drum up any objectively suspicious information to justify the search he had predetermined to conduct. Payton asked Humphrey questions about the U-Haul. *Id.* 00:09:15—25. Humphrey responded that he had rented the truck in Fayetteville the day prior, which his rental agreement confirmed. *Id.* Payton then claimed that he had pulled Humphrey over because he "about wrecked his truck" and almost did so at mile marker 81, which Humphrey immediately denied. *Id.* 00:09:30-40. Notably, Payton has now completely abandoned any suggestion that a near crash served as the basis for pulling Humphrey over, despite repeating that contention over and over on the evening of August 20, 2020. *Compare, e.g.,* Dashcam 00:04:23, 00:9:30, 00:31:42-54, 00:35:45, 01:48:41,

*with Payton 46:2-23, 48:8-10.*    Payton also inquired about Humphrey's nervousness. Dashcam 00:09:50-58.  Humphrey explained that he was nervous because he was stopped by the police, and Payton was asking him questions not related to the traffic stop.  *Id.*  There was nothing even remotely suspicious about Humphrey being nervous, as Payton's own witnesses agree that nearly *everyone* is nervous when stopped by law enforcement.  *See, e.g., Melder 25:23-24; Davis 38:11-18*; Payton Exhibit 8, ASP Docs., Payton 7*; Santos Report ¶ 123, 195.  In particular, it is understandable for a Black man to be nervous when stopped by police just a few months after George Floyd was murdered by a police officer during a routine stop gone horrifically wrong.  *Payton 80:5-13.*  Humphrey was familiar with and weary of police shootings of unarmed Black men.  As Humphrey told Payton, he just didn't want to get shot.  Dashcam 00:11:19-25.

Getting nowhere with his questioning, Payton tried to pressure Humphrey to consent to a search.  Dashcam 0:10:20-40.  Humphrey repeated that he had nothing illegal in the U-Haul.  *Id.*  Payton asked to take a look inside.  *Id.*  As was his right, Humphrey told Payton that he *did* mind if Payton looked.  *Id.*  He had done nothing wrong, and he was feeling especially uncomfortable that Payton was falsely accusing him of "almost wrecking" his U-Haul—which *undisputedly never happened.  Id.*; *Humphrey 81:7—84:2*; *Payton 46:2-23*, *48:8-10.*  Although Payton accused Humphrey of having shaking hands and a shaky voice, the objective video evidence does not support these claims.  Dashcam 00:10:40—11:10.  Humphrey reiterated that he simply wanted to stop in Russellville for the evening, as he had told Payton multiple times, and that his mother does not like him to drive at night.  *Id.*  Payton switched tactics, asking Humphrey if a dog would alert if Payton

10

brought one out; Humphrey insisted that it would not alert on anything, telling Payton he promised. *Id.* 00:11:13-19.  Humphrey told Payton he did not believe Payton was justified in bringing out a dog, and he repeated that he did *not* almost wreck his truck. *Id.* 00:11:25-54.  Still, Payton kept up the pressure campaign, telling Humphrey that if Payton could just have a look inside the truck, he would not have to bring the dog out. *Id.*  Humphrey reluctantly gave in and told Payton that, even though Humphrey felt it invaded on his rights, he could look in the U-Haul. *Id.*  Apparently, Payton understood that any "consent" offered under these coercive circumstances would be invalid.  His bid for consent having failed, Payton decided to call Davis for a canine. *Id.* 00:12:29.

### D.    The Canine Sniff and Unsuccessful Search

Payton returned to his squad car and called Davis to request a canine sniff.  Dashcam 00:13:11—14:33.  Notably, Payton relied only upon Humphrey's nervousness in reasoning to Davis why a canine search was justified; he made no mention of any allegedly "odd" travel plans that Payton now raises in this Motion. *Id.*  Humphrey sat on the bumper of the U-Haul waiting patiently and speaking to his dad on the phone. *Id.* 00:12:44—28:08. As the dashcam video shows, Payton demonstrates no objective signs of nervousness or agitation during this wait. *Id.*  Humphrey used his phone:

11



*Id.* 00:14:19.  At times, he appeared outwardly bored:



*Id.* 00:18:08.  As they waited, dispatch informed Payton that Humphrey had a valid license,

no warrants, and no criminal history.  *Id.* 00:16:40-47.  After about eight minutes of

12

waiting, Payton returned to speak with Humphrey outside. *Id.* 00:21:11-25. Payton told Humphrey the dog was on the way, and that Humphrey would be on his way if the dog did not alert. *Id.* Payton volunteered that he was "not a bit nervous about" Humphrey. *Id.* 00:21:33-50.

Davis arrived with the canine about fifteen minutes after Payton called. *Id.* 00:27:45. Humphrey moved towards the squad car to allow for the sniff. *Id.* 00:28:12-19. Davis and the canine headed directly for the right side of the U-Haul. *Id.* 00:28:29. Most of the canine sniff is not visible on the dashcam video, but Davis returns to view and gives Payton a thumbs-up about forty seconds into the search. *Id.* 00:28:08. At this point, Payton brought Humphrey around to the front of the squad car. *Id.* 00:29:20. Humphrey—still speaking to his dad—put his phone on the hood and placed his hands on the car, as requested. *Id.* 00:28:20-30. Payton patted Humphrey down and placed him in handcuffs. *Id.* 00:29:30-59. Humphrey complied with the handcuffing process despite his distress. *Id.* Humphrey promised that there was nothing in the vehicle and stated twice that he "didn't do anything." *Id.* 00:29:54—30:06. Payton then placed a handcuffed Humphrey in the back of the squad car – where he would remain *for the next hour and twenty minutes*.

As the dashcam video shows, Payton spent that time tearing apart Humphrey's belongings in the U-Haul looking for narcotics. *Id.* 00:32:00—1:42:50. Davis assisted with the search, along with two more officers who arrived from different law enforcement agencies. *Payton 136:4-25.* Together, the officers searched the U-Haul truck from stem to stern—and turned up nothing. As they searched, Payton also disparaged Humphrey for being "obnoxious," Dashcam 00:33:57, "calling his daddy" at age thirty-two, *id.* 00:34:47,

and for still being a student. *Id.* 00:34:55. Moreover, Payton twice claimed that Humphrey did not want him near the passenger side of the U-Haul and refused to open the door for him—which is false. *Compare* Dashcam 01:21:13-22 and 01:32:49, *with Payton 13:23—14:19, 146:20—147:20.* Payton described Humphrey as "going ballistic" to Davis, which Payton conceded at his deposition never happened. *Compare* Dashcam 01:01:19, *with Payton 130:2-5, 144:2-17.*

After finding nothing in the main cabin of the U-Haul, the officers began examining and discussing whether there could possibly be a false compartment near the front passenger side. Dashcam 01:01:52—01:22:59. They never found one. Payton declined to bring out a drill to keep searching that area or to have the U-Haul towed for a more thorough examination. *Payton 142:12-15; Davis 34:21—35:5.* Payton never told his supervisor, Sergeant Chase Melder, that he still believed there were drugs in the U-Haul when Humphrey drove away. *Melder 18:4-8.* Payton never followed up with the Little Rock U-Haul store about this vehicle and the supposed secret compartment. *Payton 141:1-19.* Payton speculated during the search about the possibility that the hypothetical drugs belonged to someone besides Humphrey, since the U-Haul was a short-term rental. Dashcam 01:34:50—35:35, 01:40:15-25, 01:49:47; *see also Davis 30:21-24, 34:15-20* (noting that Humphrey might have no knowledge of a hidden compartment).

For the entirety of the search, Humphrey sat in the back of the squad car with his arms handcuffed behind his back. Humphrey begged to be let out of the handcuffs and cried out that his hands hurt so bad. Dashcam 00:57:50—58:12. Again later, he repeated that his hands hurt so much. *Id.* 1:17:50.

About an hour in, having found nothing, Payton called Melder to discuss the stop. *Id.* 01:32:25. Payton gave Melder a full rundown—including his disputed subjective impressions. *Id.* 01:32:25—36:33. He explained that he stopped a big box truck full of furniture, clothes, and food, that Humphrey was allegedly "super nervous" and that he was shaking and his voice was trembling, *falsely* claimed that Humphrey "didn't want him in the passenger side," explained that the dog had alerted, stated that Humphrey had picked up the U-Haul in Fayetteville and would return it in Little Rock, and described his suspicion about an alleged elaborate secret compartment. *Id.* Payton said the *biggest reason* for his desire to search the truck was Humphrey's nervousness. *Id.* 1:32:43. Although Payton had the U-Haul agreement with accurate dates, Payton incorrectly claimed that Humphrey picked up the U-Haul two days ago (rather than 5:22 p.m. the day before) and had it for four days (rather than a little over two). *Id.* 1:33:50. Even with Payton's misleading account of the stop, Melder quickly and easily concluded this was not a load of narcotics. *Id.* 1:36:31; *Melder 47:16—48:11, 51:13—53:7*; *Payton 155:3-23*. According to Melder, who is trained in drug interdiction, Fayetteville to Little Rock was not a likely drug trafficking corridor. *Melder 47:16—48:11*. Melder would not have searched Humphrey's U-Haul based on the evidence relayed to him by Payton. *Melder 99:11-17; 113:6-11*. Naturally, Payton called the unsuccessful search quits just a few minutes later.

The officers' thorough search included scouring Humphrey's personal belongings that he had spent the whole day packing into the truck. Despite ravaging the back of the truck, Payton did not return Humphrey's belonging to their original condition. Payton Exhibit 8, ASP Docs, Payton 8. Payton failed to do so because he was *frustrated* that he

15

did not find drugs. *Id.* Melder later reprimanded Payton for this conduct. *Melder 97:11—98:1.*

### E.    Payton Leaves Humphrey Handcuffed to Issue a Warning

According to Payton, after about an hour and ten minutes of searching he decided to end the search and send Humphrey on his way with a traffic warning. *Payton 159:2-24.* Payton told Davis he appreciated him and sent him away. Dashcam 01:42:02. It was now just Payton and Humphrey—and all Payton had left to do was complete the traffic warning. *Payton 159:2-24.* Yet, Payton left Humphrey in handcuffs for another approximately nine minutes. Dashcam 01:42:23—01:51:39; *Payton 160:7-19.* Payton did not have any concerns about his safety with Humphrey secured in the backseat. *Payton 161:5-25, 162:14-18.* Humphrey had not been violent at any point during the encounter, and Payton had already frisked him for weapons. Dashcam 29:30-59; *Payton 6:23-25; 113:14-17.* To the contrary, Humphrey had been polite and cooperative during the stop and search. *Payton 6:19-22; 8:3-5.* The only justification Payton offered for handcuffing Humphrey was that he was nervous and Payton wanted to keep him away from traffic during the search. *Payton 163:1-7.* According to Payton, there was nothing preventing him from taking off Humphrey's handcuffs by this point – the search was concluded. *Payton 164:10-24.*

Humphrey reminded Payton that he had been in handcuffs for over an hour, and he complained repeatedly that they were very tight. Dashcam 1:45:55, 1:46:18-23, 1:47:52-56. Payton ignored Humphrey's complaints about the handcuffs, and instead used this time to lecture Humphrey about the difficulties of policing, telling Humphrey that maybe he

should go to trooper school. *Id.* 1:47:17. Payton became aggravated that he thought Humphrey was insinuating race had played a role in the stop. *Payton 171:7-15.* Payton told Humphrey that "there's nothing wrong with being Black in Russellville," and untruthfully claimed he "had no idea" Humphrey was Black until he pulled him over. Dashcam 1:48:32-42; *Payton 167:24-168:13; 172:14-25.* He scolded Humphrey—still handcuffed in the back of the squad car—for supposedly telling him how to do his job. Dashcam 1:49:26-33. At long last, Payton issued Humphrey a traffic warning for careless driving—reiterating that he was "not even getting a ticket." *Id.* 01:49:58. Humphrey drove away in his U-Haul, physically and emotionally wounded, about an hour and fifty minutes after the initial stop.

### F.    The Aftermath

Humphrey was in physical pain during the week following this ordeal. *Humphrey 32:23—33:6.* He had back pain from sitting handcuffed in the back of the squad car; he had trouble bending over and using the restroom. *Id.* The handcuffs were so tight that they left rings and bruising on his wrists. *Id.* 33:7-17. Humphrey also suffered long-lasting mental anguish and emotional distress because of Payton's conduct that evening. Humphrey had trouble focusing and completing his law school coursework, and he sought professional mental health treatment. *Id. 21:14—20, 24:1—32:13.*

Meanwhile, the Arkansas State Police suffered swift backlash for Payton's conduct that evening. There was public outcry, prompting a flood of phone calls and emails from hundreds of citizens disturbed by the stop and outraged by Payton's treatment of Humphrey. *Melder 13:18-22, 15:10-13, 32:25—33:5, 106:15-25.* A deputy prosecutor

17

asked to review the video of the stop as well. *Melder 102:15—103:2.* The prosecutor's office was likewise receiving phone calls from across the country about the stop. *Id.* Internally, Payton's entire chain of command became involved in reviewing the stop. *Melder 11:8-18, 13:16-22, 19:19—20:5,* 32:25—33:5. In light of the blowback, Payton's superior officers asked him to complete a summary and, later, a more detailed account of the stop. *Melder 19:2—22:11, 32:17—33:5.* This was not standard reporting policy for a traffic stop, because this was no ordinary stop. *Id.* Payton's supervisors also wrote memoranda that, unsurprisingly, largely regurgitated Payton's discredited version of the stop. Payton Exhibit 8, ASP Doc, Payton 3-8. Aside from a reprimand for failing to reorder Humphrey's belongings, ASP never disciplined Payton for his conduct. *Payton 35:12-15*; *Melder 9:19—10:1.*

On March 11, 2021, Humphrey sued Payton under 42 U.S.C. § 1983 for violating his Fourth and Fourteenth Amendment rights. Humphrey alleged that Payton violated his constitutional rights when he stopped him without probable cause that he committed a traffic violation, Doc. 1 at ¶ 32; prolonged the traffic stop for a canine sniff absent reasonable suspicion that Humphrey had engaged in any criminal activity, *id.* at ¶¶ 84-95; and restrained Humphrey in handcuffs longer than was objectively reasonable under the circumstances, *id.* at ¶¶ 107, 109, 125-26. Payton now moves for summary judgment based on qualified immunity. For the reasons that follow, his arguments are all fatally flawed and his Motion should be denied.

## STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of showing that no reasonable jury could find in favor of the nonmoving party based on the evidence in the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up). Finally, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and are not to be resolved by the court at summary judgment. *Anderson*, 477 U.S. at 255.

## ARGUMENT

Payton moves for summary judgment based on qualified immunity. Qualified immunity shields a state actor from civil liability unless his conduct violated a clearly established constitutional right of which a reasonable official would have known. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A defendant is *not* entitled to qualified immunity at summary judgment if: 1) the facts, construed in the light most favorable to the plaintiff, show the challenged conduct violated a constitutional right; and 2) that right was clearly established at the time of the defendant's alleged misconduct so that a reasonable officer would have known his actions were unlawful. *Id.* at 232-33. If there is a genuine issue of material fact as to whether the defendant violated the plaintiff's constitutional rights or whether a reasonable officer would have known his actions were unlawful,

19

qualified immunity must be denied. *See Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). In other words, a defendant is not entitled to summary judgment where qualified immunity is entwined with disputed factual issues and assessments of credibility that are properly reserved for the jury. *See Aaron v. Shelley*, 624 F.3d 882, 884 (8th Cir. 2010) (affirming denial of summary judgment on qualified immunity where "the district court carefully explained the material disputed facts which, when viewed most favorably to Aaron, would permit a reasonable jury to find that the officers lacked objectively reasonable probable cause to arrest Aaron on each of the three charges.")

The present case is riddled with genuine disputes of material fact and credibility determinations that render qualified immunity inappropriate at the summary-judgment stage. The parties disagree on, *inter alia*, whether Payton had probable cause to stop Humphrey for crossing the fog line, whether Humphrey was unusually nervous during the traffic stop, whether a reasonable officer would find Humphrey's travel plans odd or suspicious, and whether it was reasonably necessary to handcuff Humphrey after the failed U-Haul search to protect officer safety. Importantly, Humphrey's version of events finds support in the record such that a reasonable jury could find in his favor. That is all that is required at this stage. Because the Court is "prohibited from weighing evidence or making credibility determinations" that are essential to the issue of qualified immunity, summary judgment must be denied. *Nance*, 586 F.3d at 609.

20

## I.   PAYTON VIOLATED HUMPHREY'S RIGHTS UNDER THE FOURTH AMENDMENT.

Payton violated Humphrey's Fourth Amendment rights in three separate ways, any one of which standing alone is sufficient to defeat Payton's Motion for Summary Judgment.  First, Payton violated Humphrey's right to be free from unreasonable seizures when he initiated a traffic stop of Humphrey's U-Haul without probable cause that he had committed a traffic violation.  Second, Payton violated Humphrey's rights when he prolonged the traffic stop to conduct a canine sniff without reasonable suspicion that Humphrey was engaged in criminal activity.  Third, Payton violated Humphrey's rights when he chose to keep Humphrey restrained in handcuffs for an unreasonably long period, including while he was issuing Humphrey a mere traffic warning after the unsuccessful search.[3]  Genuine issues of material fact exist with respect to each separate violation.

### A.   Payton violated the Fourth Amendment by stopping Humphrey's U-Haul without probable cause that Humphrey committed a traffic violation.

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const., amend. IV.  "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of

---

[3] Payton argues that the length of the traffic stop before he decided to extend it for a canine sniff (about fifteen minutes) did not violate Humphrey's constitutional rights, Payton Br. at 5-7, and that the length of the U-Haul search after the canine alert did not violate Humphrey's rights. *Id.* at 13-15.  Humphrey does not intend to challenge these aspects of the stop at trial and therefore will not address these arguments.  But of course, if Payton lacked probable cause to seize Humphrey and/or reasonable suspicion to extend the detention, it is of no benefit to him that the unlawful seizure otherwise complied with Fourth Amendment temporal limitations.

21

'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). A traffic stop is constitutionally reasonable "where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. Although "[a]ny traffic violation, however minor, provides probable cause for a traffic stop[,]" an officer (obviously) cannot fabricate a traffic violation to seize and interrogate an innocent driver. *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir.1994) (*en banc*). The officer must have an objectively reasonable basis to conduct the stop. *Whren*, 517 U.S. at 810.

An officer is not entitled to summary judgment where a reasonable jury could conclude from evaluating the objective evidence and credibility assessments of the witnesses that no traffic violation occurred. *Garcia v. City of New Hope*, 984 F.3d 655, 667 (8th Cir. 2021) (holding that an officer "is not entitled to qualified immunity" at the summary judgment stage where "there is a genuine dispute of material fact as to whether [the defendant officer] had probable cause to conduct a traffic stop"). In *Garcia*, the defendant officer claimed that she had probable cause to stop the driver, Garcia, because his license plate was covered by a plate frame that obstructed the car's registration tags, in violation of Minnesota law. *Id.* at 664. Garcia denied that his plate was covered by any such illegal cover or frame at the time of the stop. *Id.* The Court found the video evidence of the stop inconclusive because it was too blurry to support the officer's claim that she had an objectively reasonable belief the license plate was covered. *Id.* at 665 ("[T]he blurriness of the video makes it unhelpful to Officer Baker"). The Court concluded that:

> [t]he fact of the visibility of the license plate is genuinely disputed. "We have stated that disputed factual issues and conflicting testimony should not be resolved by the district court at the summary judgment stage." *Henderson*

22

*v. City of Woodbury*, 909 F.3d 933, 940 (8th Cir. 2018) (cleaned up).  Further "[w]hich story is more plausible we cannot say because it is not our function to remove the credibility assessment from the jury." *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1211 (8th Cir. 2013) (internal quotation omitted).

*Id.* at 666.  Thus, left with only "a blurry and thus unhelpful video" and competing accounts from the officer and the driver, the Court denied summary judgment on qualified immunity. *Id.* at 666.

The same is true here.  Far from uncontested, whether Payton had probable cause to stop Humphrey's U-Haul is a core disputed factual issue.  Payton (now) claims he had probable cause to stop Humphrey after he observed Humphrey cross the fog line in his U-Haul, a traffic violation under Arkansas law prohibiting "improper or unsafe lane changes on public roadways."  Ark. Code Ann. §27-51-104(b)(1). For his part, Humphrey has consistently and vehemently denied that Payton had a traffic-related justification for the stop.  During the stop, Humphrey repeatedly denied Payton's false accusation that Payton stopped him because he "almost wrecked" the U-Haul.  Dashcam 00:09:30-40, 00:11:34. Likewise in his deposition, Humphrey maintained that Payton stopped him for no reason. *Humphrey 75:5, 77:11-15, 81:7-11*.  Additionally, Humphrey testified that he was uncomfortable about the stop, in part, because Payton kept lying about how Humphrey almost wrecked the truck when really Humphrey "didn't so much cross a white line." *Id. 81:7-11* ("He lied to me. He said that I wrecked—I almost wrecked my vehicle and I didn't so much cross a white line, so he lied directly to me."), *81:23—84:2*.

Like the issue of whether Garcia's license plate was covered, the issue of whether Humphrey crossed the fog line is a genuinely disputed material fact at the center of the

23

case. Similar to the video evidence in *Garcia,* the dash camera footage of the supposed violation is ambiguous. Payton was hundreds of feet behind the U-Haul at the time of the alleged violation. At most, his dash camera captures Humphrey signaling to exit the interstate, moving slightly towards the ramp, and then turning off the signal and continuing past the exit (as reflected in still frames from the dashcam video below):





24







Dash Cam 00:40-59. Given the distance between the vehicles and the low quality of the footage, it is impossible to conclude as a matter of law that Humphrey crossed the fog line. Notably, Payton's direct supervisor agrees. As he testified: "I watched the video. I couldn't – the video was inconclusive to where I couldn't see – I couldn't see the -- the violation." *Melder 30:2-6*. Melder further agreed that turning on your turn signal, not changing lanes, and turning it back off is not a traffic violation. *Id. 30:15-20.*

Actually, Payton's dashcam video undermines his arguments in two ways: not only is it "blurry and thus unhelpful" in proving that Humphrey committed a lane violation, but it also utterly discredits Payton's contention that Humphrey "almost wrecked" the U-Haul by taking the exit and swerving back onto the road—as Payton himself now admits. *Garcia*, 984 F.3d at 666. In the video, the movement of the U-Haul towards the exit, if any, is slight. Yet, Payton repeatedly accused Humphrey of almost wrecking the U-Haul on the scene that evening. Dashcam 00:04:23, 00:9:30, 00:31:42-54, 00:35:45, 01:48:41. Despite Payton's claim that Humphrey drove so recklessly he almost crashed, he never issued Humphrey a ticket; that evening, Humphrey drove away with just a warning. Payton finally abandoned the near-accident story when confronted with the uncontroverted dashcam video in his deposition, conceding that Humphrey "didn't almost wreck" the U-Haul, *Payton 46:2,* that "I didn't think he was going to wreck the truck," *id. 46:22-23*, and that Humphrey was right and Payton was wrong about whether this near-crash happened, *id. 48:8-10.* Nor does Payton argue in this motion that he pulled Humphrey over because he nearly wrecked the U-Haul. The video thus exposes Payton's shifting justifications for

26

the stop—that evening, a near-wreck that never actually occurred; now, simply crossing the fog line—and calls into question his credibility. *See Garcia*, 984 F.3d at 666.

Moreover, Payton omits from his Motion that he started following Humphrey *miles* before he purportedly observed a lane violation. Payton Exhibit 8, ASP Docs, Payton 1147, 1173. Payton was so keen on investigating Humphrey that he chased him down at speeds exceeding 100 mph. *Melder 86:10—87:4*; Noel Exhibit 5, Screenshot of Squad Video. The only reason Payton was poised to observe Humphrey near mile marker 81 was because he had predetermined that a Black man driving a U-Haul in a cautious manner must be trafficking drugs. He just needed a reason to stop him. Conveniently, Payton alleges he observed a traffic violation right when he caught up to Humphrey, from hundreds of feet away. Though Payton disclaims that his initial observations of Humphrey contributed to the decision to pull him over or to extend the traffic stop, the jury rightly could conclude from this evidence that Payton was simply dissembling when he claimed he saw Humphrey cross the fog line.[4]   *Payton 44:6-9*.

As *Garcia* explained, analyzing ambiguous video evidence and assessing the credibility of conflicting witness testimony are tasks for the jury and not for the Court on

---

[4] Where Payton's motion for summary judgement depends entirely on the jury accepting his disputed testimony—that Humphrey crossed the fog line, that he appeared super nervous, that his travel plans seemed odd—his tenuous credibility is a stake to the heart of his qualified immunity claim. Payton spent much of his deposition back-tracking on his own discredited statements: that Humphrey went ballistic that night, *Payton 130:2-5, 144:2-17*; that Humphrey tried to keep him away from the passenger door, *id. 13:23— 14:19, 146:20—147:20* ; that Humphrey almost wrecked his truck, *id. 46:2-23, 48:8-10*; that he did not know Humphrey was Black until he stopped him, *id. 167:24-168:13; 172:14-25*.

summary judgment. 984 F.3d at 666. Because there is a genuine issue of material fact regarding whether Payton had probable cause to stop Humphrey, Payton is not entitled to summary judgment on Humphrey's Fourth Amendment claim for an unreasonable Fourth Amendment seizure.

**B. Payton violated Humphrey's constitutional rights when he unlawfully extended the stop to detain him for a canine sniff without reasonable suspicion.**

Even assuming Payton had probable cause to initiate the traffic stop (he did not), Payton violated Humphrey's rights when he extended the traffic stop without reasonable suspicion in order to conduct a canine sniff. Because a traffic stop is a Fourth Amendment seizure, the stop must last no longer than necessary to effectuate its traffic-related purpose. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* "[E]xtending the detention beyond the time needed to complete the traffic-ticketing process is unlawful unless additional investigation, such as a dog sniff of the vehicle's exterior, is warranted by the officer's reasonable suspicion that other criminal activity may be afoot." *De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017).

Determining if there is reasonable suspicion to extend a stop for a canine search is a fact-intensive inquiry that looks at the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (cleaned up). Although reasonable suspicion is not amenable to precise line-drawing, it requires more than an officer's "inchoate and unparticularized suspicion or 'hunch'" that criminal activity is

afoot. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). In that regard, "courts must not uphold 'virtually random seizures' based on 'circumstances [that] describe a very large category of presumably innocent travelers.'" *De La Rosa*, 852 F.3d at 744 (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)). Additionally, a person's race cannot factor into the reasonable suspicion calculus. *See United States v. Clay*, 640 F.2d 157, 159 (8th Cir. 1981) ("Police cannot have grounds for suspicion based solely on the race of the suspect.").

Payton claims he had reasonable suspicion to detain Humphrey beyond the time necessary to issue him a warning for a lane violation—which Payton concedes he could have completed about ten and a half minutes into the stop—because he suspected Humphrey had drugs in the vehicle. *Payton 106:3-22*. Payton emphasizes that the Court must consider the totality of the circumstances that caused him to suspect drug-related activity, viewing each element in context. Payton Br. at 8-9. So, what is the tally according to Payton? Hardly a vast sum, Payton identified just two circumstances that allegedly created a reasonable suspicion Humphrey was engaged in drug-related activity: 1) Humphrey was "unusually" nervous; and 2) Humphrey's travel plans struck Payton as odd or unusual. *Id.* at 10-12.

Payton's argument, however, fails to two separate reasons. First, Payton ignores that both of these supposed "grounds" for reasonable suspicion are hotly contested. Second, even if the Court were to accept these disputed allegations, Payton's argument would still fail: "[w]hen an officer can cite only one or two facts, including a generic claim of nervousness, as supporting his determination of reasonable suspicion, then we may

29

conclude that his suspicion was not reasonable." *United States v. Jones*, 269 F.3d 919, 929 (8th Cir. 2001). This renders summary judgment inappropriate.

### 1.    Nervousness

Turning first to Humphrey's supposed nervousness, it is well-settled in the Eighth Circuit that nervousness alone does not provide an objectively reasonable basis to prolong a stop. *See, e.g., United States v. Guerrero*, 374 F.3d 584, 590 (8th Cir. 2004) ("[N]ervousness is also of limited significance, as this court has held that it cannot be deemed unusual for a person to exhibit signs of nervousness when confronted with an officer."); *Jones*, 269 F.3d at 928 (explaining that generally "nervousness is of limited significance in determining reasonable suspicion" and that "generic claims that a [person] was nervous or exhibited nervous behavior after being confronted by law enforcement officials" should be "treated with caution") (cleaned up). Critically, Payton's own witnesses, *including Payton himself and his supervisor*, agree that just about everyone is nervous when stopped by the police, including innocent travelers. *Melder 25:23-24*; *Davis 38:11-18*; *Payton 81:4-13, 129:13-17*; Payton Exhibit 8, ASP Docs., Payton 7*; see also* Santos Report ¶ 123.

Payton thus gilds his argument with vague descriptors such as "unusually" and/or "extremely" nervous. The video of the traffic stop belies Payton's characterization. Dashcam 00:4:25—00:6:00, 00:9:12—00:12:30. Humphrey does not display objective signs of nervousness that past courts have deemed "extreme" or "unusual," such as sweating profusely on a cold day, a visibly elevated pulse or heart rate, or excessive fidgeting. *See, e.g., United States v. Lebrun*, 261 F.3d 731, 733 (8th Cir. 2001) (noting that

the suspects were sweating profusely on a cold day, refusing to make eye contact, and fidgeting or trembling excessively); *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012) (identifying "visibly elevated heart rate, shallow breathing, and repetitive gesticulations, such as wiping his face and scratching his head" as undue signs of nervousness); *United States v. Briasco*, 640 F.3d 857, 860 (8th Cir. 2011) (finding "cotton mouth and the visible pulsation of his carotid artery," in combination with the strong odor of air freshener, a sagging trunk despite claims that it was empty, vague travel plans, and failure to criminal charges for drug distribution, sufficient to raise reasonable suspicion). Melder agrees that, from the dashcam video, he does not see Humphrey's "hand shaking or the carotid artery pulsing, even really the chest rising a whole lot; other than the one instance where I saw him take a deep breath." *Melder 25:6-18*.  But the single deep breath that Payton now identifies as suspicious is nothing more than a sigh from a driver growing exasperated during what he believes, and has told Payton, is an unjustified stop by an overreaching officer.[5]  Dashcam 00:10:25.  Sighing is facially innocent behavior that falls far short of the objective signs of extreme or unusual nervousness that engender reasonable suspicion. *See Jones*, 269 F.3d at 929 (concluding "that any suspicion engendered by this nervous behavior is at best minimal" where suspect "yawned, his voice cracked, his thumb

---

[5] Notably, Payton raises this supposed deep breath for the first time in this Motion—having made no mention of it, or any heavy breathing, in his post-stop summaries and memoranda or during his own deposition.  The jury would therefore be justified in rejecting this reasoning as a post-hoc justification for Payton's unlawful conduct.

shook, and he failed to make eye contact" with the officer).  Just as the Eighth Circuit noted in *Jones* that "[e]verybody yawns," everybody breathes.  *Id.*

The video also rebuts Payton's claim that Humphrey's hands and voice were shaking.  Dashcam 00:4:25—00:6:00; 00:9:12—00:12:30.  Humphrey was calm and respectful during his interaction with Payton.  *Id.*  He answered Payton's questions clearly and directly, without hesitation or evasion. *Id.*  Humphrey maintained a polite and conversational tone; he even smiled and joked "I hope not" when Payton told him not to be nervous because he wouldn't even be getting a ticket.  *Id.* 00:5:53-57.  Moreover, Humphrey was at ease as he awaited a drug-sniffing canine to search his U-Haul—what would surely a nerve-wracking wait for someone who is trafficking narcotics. *Id.* 00:12:44—28:08.  Humphrey sat patiently on his bumper, using his phone and looking bored.  *Id.*  Because the objective video evidence of the encounter undermines Payton's characterization, the Court should not credit Payton's subjective account of Humphrey's nervous demeanor.[6]  *See United States v. Rodriguez-Escalera*, 884 F.3d 661, 669 (7th Cir. 2018) ("While nervousness is certainly a factor that can support reasonable suspicion, the court was not required to credit [the officer's] testimony that the couple appeared nervous when the court's own review of the traffic stop footage led it to the opposite conclusion." (citation omitted)).

---

[6] Even so, Humphrey's police-practice expert opines that based on his specialized training and extensive experience in law enforcement, shaking hands and a cracking voice "would be consistent with a normal level of nervousness exhibited by a large number of motorists, stopped by a law enforcement officer for a motor vehicle violation."  Santos Report ¶¶161-62.

Moreover, as Payton suggests, Humphrey's nervousness must be evaluated in context. Payton makes much of Humphrey keeping his hands up until Payton told Humphrey he could put them down.  Humphrey is a Black man who was stopped by law enforcement in an unfamiliar area, at sundown, only a few months after George Floyd was murdered by a police officer during a police stop gone horrifically and tragically wrong. Humphrey—who was familiar with and weary of unprovoked police shootings of unarmed Black men—shared with Payton that he just didn't want to get shot that evening.  Dashcam 0:11:18-22.  Humphrey's nervousness would be understandable to a reasonable officer in context—especially after Humphrey offered a reasonable, non-criminal explanation for feeling nervous and afraid.  *Payton 80:5-13* (agreeing that a Black man would be reasonably expected to have some level of nervousness when stopped by law enforcement three months after the murder of George Floyd); Santos Report ¶ 74.

Although Payton contends that Humphrey's nervousness should have subsided over time, the Eighth Circuit has found that a suspect's "behavior is rendered less suspect" where "any nervous behavior he might have displayed was likely accentuated by the appearance of another officer at the scene." *Jones*, 269 F.3d at 929.  So too here.  A reasonable officer would anticipate a person becoming *increasingly* nervous when that officer repeatedly questions him about criminal activity not related to the initial traffic stop and calls in additional officers to conduct a canine sniff and vehicle search.  Also like in *Jones*, Payton "had never met [Humphrey], and was unfamiliar with his usual demeanor, and thus [Payton's] evaluation of [Humphrey's] behavior lacks any foundation." *Id.*; *see*

33

*also Beck*, 140 F.3d at 1139; *Payton 129:19—130:1* (agreeing that he had no baseline to determine what Humphrey's normal level of nervousness would be).

In short, whether Humphrey exhibited "extreme" and "unusual" signs of nervousness beyond that of a typical driver detained by police at dusk in an unfamiliar area is, at best, a disputed question of fact for the jury to resolve.[7]

### 2.    *Humphrey's Travel Plans*

The second, and final, factor that Payton contends justified extending the traffic stop for a canine search is that Humphrey's travel plans struck Payton as odd or unusual. Payton Br. at 11-13. This also does not move the needle. When Payton asked Humphrey where he was headed, Humphrey said he was headed to Little Rock. Dashcam, 00:04:22-25. He was planning to stop for the night in Russellville, but he missed the exit and needed to figure out how to get back to the hotel. *Id.* 00:4:25-45. Humphrey further explained that he was moving from Fayetteville, where he went to school, back home to Little Rock because his classes had been moved online due to the COVID-19 pandemic. *Id.*

---

[7] As aforementioned, Payton has abandoned his previous contention that Humphrey seemed nervous or suspicious because he looked straight ahead with his hands on the wheel at ten and two when Payton initially passed him on the interstate. *See* Payton Exhibit 8, ASP Docs, Payton 1147, 1173. A smart omission, as no reasonable officer would find suspicious a person driving in the exact manner suggested by Arkansas state law, especially when operating a large and unfamiliar vehicle. *Payton 40:11-16*; Santos Report ¶¶ 136-40. As the Eighth Circuit explained in *Jones*, exercising sound judgment by driving cautiously in a large vehicle in an unfamiliar area does not suggest criminal activity is afoot. *Jones*, 269 F.3d at 927-28; *see also Beck*, 140 F.3d at 1139 (storing luggage in the trunk is not a basis for suspicion since law enforcement agencies typically recommend doing so as a crime prevention tactic).

00:04:45—05:06.  As Humphrey later explained to Payton, his mother—like many mothers of young, Black men—did not want him driving at night.  *Id.* 0:10:55—0:11:07.

Apparently, Payton felt it was odd that Humphrey would stop for the night with about an hour or so left in his trip. Just because Payton—once sued—generically labeled something suspicious does not make it so.[8]   The question is not whether Payton subjectively believed Humphrey's travel plans were odd—it is whether an objectively reasonable officer would believe Humphrey's travel plans indicated he was engaged in drug trafficking.   By Payton's own admission, this purported justification was no justification at all.  During his deposition, Payton agreed that an officer would reasonably expect that a person who rented a U-Haul was unfamiliar driving such a vehicle, *Payton 38:2-5, 40:2—41:2*, that people drive rented U-Hauls on unfamiliar roads and highways, *id. 4:14-25*, and that it would not be unusual for someone who is not used to driving a U-Haul box truck to avoid driving it at night.  *Id. 102:11-15.*  Payton's direct supervisor, Melder, did not find Humphrey's travel plan indicative of drug trafficking either.  After Payton described, *inter alia*, Humphrey's travel plans and demeanor on the phone, Melder informed Payton that this was not a known drug corridor and that this was likely "not a [narcotics] load." *Melder 47:16—48:11, 51:13—53:7*; *Payton 155:3-23.*  Melder, who is trained in drug interdiction, would not have searched Humphrey's U-Haul based on the evidence relayed to him by Payton.  *Melder 99:11-17, 113:6-11.*

---

[8] Payton had little to say about Humphrey's travel plans in either his summary or memorandum drafted in the days just after the stop.  Payton Exhibit 8, ASP Docs., Payton 1147-48, 1173-75.  Once again, Payton's shifting justifications for making and then extending the traffic call into question his credibility.

The Eighth Circuit's decision in *Beck* is instructive.  The officer there relied on his "subjective disbelief" that Beck, a truck driver passing through Arkansas, "would travel across the United States to procure employment given the number of employment opportunities for truck drivers between California and North Carolina." *Beck*, 140 F.3d at 1139. The Eighth Circuit rejected this as a factor indicating reasonable suspicion, explaining that:

> we see nothing suspicious about Beck's explanation for interstate travel in order to seek employment. Untold numbers of Americans move for employment reasons every year, many moving across the United States to take advantage of employment opportunities.  We are unwilling to suggest that a job search in a distant location is inherently suspicious merely because similar employment opportunities exist in closer proximity to one's residence.

*Id.*

Like in *Beck*,  Payton's subjective belief about Humphrey's travel plan is merely a puzzling personal opinion about an inherently innocent itinerary with no objective connection to criminal activity.  Payton fails to draw any objective link between spending a night in Russellville during a move and his suspicion about drug-trafficking. *See Jones*, 269 F.3d at 928 (finding that a driver's inconsistent answers regarding his prior theft arrests had no connection to drug trafficking and therefore "could not generate a reasonable suspicion that Jones was involved in interstate narcotics trafficking").  To the contrary, courts have generally credited an officer's suspicion of drug trafficking where a traveler does *not* want to stop during a trip. *See, e.g.,  United States v. Pacheco*, 996 F.3d 508, 512 (8th Cir. 2021) ("[T]he rental vehicle had a lived-in look, suggesting that [the driver] was attempting to travel without making many stops.  We have previously found reasonable

36

suspicion to extend a traffic stop in part because of a vehicle's lived-in look."); *Lebrun*, 261 F.3d at 734 (noting that "there were drink containers, food wrappers, a cellular telephone, a road atlas, pillows, and blankets" in the suspect's car, suggesting "that the occupants of the car were traveling without making any stops, a common practice, he testified, among drug traffickers"); *United States v. Anguiano*, 795 F.3d 873, 877 (8th Cir. 2015) (explaining that a vehicle "exhibited some indications consistent with drug trafficking" where it "appeared messy and 'lived-in,' with trash and clothing strewn around the floor and backseat"). As the Eighth Circuit held in *Beck*, "untold numbers of Americans move for employment reasons every year." *Beck*, 140 F.3d at 1139. Similarly, there is nothing inherently suspicious about Humphrey stopping at nightfall when he is driving a large, rented vehicle, especially after a long day of moving. Such a travel plan is eminently reasonable and, consequently, not suspicious.

Humphrey's supposedly "odd" travel plan is far afield from the types of implausible travel itineraries courts have indicated are suspicious in previous cases. *See, e.g., United States v. Sokolow*, 490 U.S. 1, 9 (1989) (finding it suspicious that a person would spend 20 hours flying round trip from Honolulu to Miami to spend only 48 hours in Miami, a known narcotics port); *United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008) (finding it suspicious that a driver told the trooper that he planned to be in Branson, Missouri within an hour, which was physically impossible); *United States v. Lyons*, 486 F.3d 367, 372 (8th Cir. 2007) (finding that an "unusual itinerary, which involved flying to Phoenix from Ohio, staying three days in Phoenix, then renting a van in Phoenix and driving to Chicago, then dropping off the van and renting a different car to drive back to Ohio" indicated potential

drug trafficking); *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 830 (2022) (finding it suspicious that a car pulled into a seemingly random driveway in the middle of the night when the officer started following, none of the occupants knew the street name or address, and the passengers gave conflicting names for the person they were supposedly dropping off). Nor does Payton allege that Russellville is a narcotics source or destination city, or that Fayetteville to Little Rock is a known drug corridor. *See, e.g., De La Rosa*, 852 F.3d at 744 ("[A]ccording to White, Arizona is a source state for contraband and Illinois is a destination site."); *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (including traveling from a drug source state as a factor in the reasonable suspicion analysis). As aforementioned, Melder easily concluded that a U-Haul traveling from Fayetteville to Little Rock was not carrying a load of narcotics. *Melder 47:16-25; 51:13—53:7.*

That Humphrey's travel plans were flexible does not render his itinerary suspicious. Moving is unpredictable. Although Humphrey initially planned to make it to Little Rock before nightfall, packing took longer than expected (as it often does), and he decided to stop at a hotel for the evening because he tries not to drive at night. *Humphrey 77:1-12.* Consistent with this story, Humphrey explained to Payton that his mother also does not like him driving at night. Dashcam 0:10:55—0:11:07. Under Payton's scrutiny about why Humphrey was planning to stop for the night rather than finish the trip, Humphrey stated that he "just might" continue to Little Rock after the traffic stop was complete. *Id.* 00:05:20-35. After all, the damage had been done by that point—it was nightfall, he had already missed the exit for the hotel, and he was in an unfamiliar area where he now

38

distrusted the law enforcement officials assigned to protect him. Once again, nothing about a flexible travel itinerary objectively indicates drug trafficking.

### 3. Totality of the Circumstances

Try as he might, Payton's "[r]eliance on the mantra 'the totality of the circumstances' cannot metamorphose these facts into reasonable suspicion." *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997). Adding up two innocuous facts changes nothing; zero plus zero still equals zero. And although Payton identifies cases that include nervousness and/or suspicious travel plans as potential indications of criminal activity— these cases also each include several other factors that are conspicuously absent here. *See* Payton Br. at 9-10.

In *Riley*, for example, not only did the traveler exhibit objective signs of nervousness far in excess of those present here—"a visibly elevated heart rate, shallow breathing and repetitive gesticulations, such as 'wiping his face and scratching his head'"—he also lied about his criminal history by omitting his drug convictions, and he gave two entirely contradictory accounts of where he had spent the previous night. 684 F.3d at 761, 763. In *Lyons*, the Eighth Circuit found reasonable suspicion of drug trafficking where: 1) the travel itinerary involved "flying to Phoenix from Ohio, staying three days in Phoenix, then renting a van in Phoenix and driving to Chicago, then dropping off the van and renting a different car to drive back to Ohio[;]" 2) the driver contradicted himself about whether the friends he visited in Phoenix were college students; 3) the passenger gave a conflicting account of the pair's travel plans; and 4) there were several large suitcases for an allegedly

39

short trip.[9] *Lyons*, 486 F.3d at 371-72.  The decision in *Fuse* implicated a laundry list of factors not present here: 1) a strong odor of air freshener the trooper believed was used to mask the odor of controlled substances; 2) the driver's prior arrest; 3) the car did not belong to the passenger or driver; 4) the pair was traveling from a narcotics source state; 5) an unusual explanation for the trip; 6) continued, unusual nervousness; and 7) the presence of a mobile phone and caffeine tablets in the car.  *Fuse*, 391 F. 3d at 929.  This case also is nothing like *Callison*, where the facts, taken together, gave an officer reasonable suspicion after a car pulled into a residential driveway in the middle of the night shortly after the officer began following it, the driver avoided eye contact and behaved nervously, no one in the car knew the street or address where they were stopped, and the two passengers supplied different names for the friend they were supposedly dropping off.  2 F.4th 1128, 1132.

*United States v. Pacheco*, 996 F.3d 508 (8th Cir. 2021), is also distinguishable. There, the officer found it suspicious that the period listed on the rental agreement was too short to cover the lengthy trip described by the driver, suggesting he was lying about his plans.  *Id*. at 512.  Here, Payton was in possession of Humphrey's rental agreement that

---

[9] Payton blatantly mischaracterizes *Lyons* by stating it was suspicious the traveler there "was driving a van loaded with luggage." Payton Br. at 9.  Not so.  The suspicion stemmed from the mismatch between the length of the trip (three days) and the amount of luggage (several large suitcases).  *Lyons*, 486 F.3d at 369-70.  Here, in contrast, there is nothing suspicious about having a U-Haul van loaded with luggage in order to move.  The U-Haul van at issue is conspicuously labeled a "SUPERMOVER" that can fit up to two bedrooms. Dashcam 00:01:44; *Payton 37:20—38:1* (agreeing that the vast majority of people driving U-Hauls are law-abiding folks using the vehicles to move something); *Melder 84:6-9* (agreeing that moving suitcases is one of the most common uses for a U-Haul)*.*

corroborated his travel account, namely, that he picked the U-Haul up the day before in Fayetteville and planned to return it the next day in Little Rock. *Payton 56:10—58:1*; Noel Exhibit 3, Rental Agreement. Moreover, the driver in *Pacheco* gave vague and inconsistent answers about his travel plans, whereas Humphrey offered concrete and consistent answers to Payton's questions. Finally, the Eighth Circuit noted "that the rental vehicle had a lived-in look, suggesting that [the driver] was attempting to travel without making many stops." *Pacheco*, 996 F.3d at 512. The opposite is true here—Humphrey was planning to stop for the evening at a hotel, which, according to the case law, would be unusual for a drug trafficker.

Payton's reliance on *De La Rosa* is also unavailing. There, a trooper based his suspicion on the fact that De La Rosa lied about having a criminal history; he was traveling from a contraband source state to a contraband destination state; he was storing his spare tire, which can be used to transport contraband, in the truck bed; he gave an explanation for his trip that sounded like a cover story; and his demeanor was extremely laid back to the point of stand-offish. 852 F.3d at 745. In a telling passage, the Eighth Circuit acknowledged that *De La Rosa* presented "a close question" on the issue of reasonable suspicion because the indicators were weaker than in previous cases. *Id.* at 747. If the level of suspicion in *De La Rosa* is essentially the floor, then Payton's meager justification must fail. Whereas the trooper in *De La Rosa* pointed to "objective, particular facts and explained why these facts led him to conclude" the driver was engaged in drug-related activity, Payton offers only his subjective opinions about how nervous Humphrey seemed and the "normal" way to move between cities. *Id.* Moreover, Payton fails to tether his

41

hunch about Humphrey stopping for the night in Russellville to any objective indication of drug crimes.

In sum, none of the cases relied upon by Payton is on par. Instead, this case is much more akin to the Eighth Circuit's decisions in *Jones* and *Beck*, each addressed above. In *Beck*, the Eighth Circuit held that there was no reasonable, articulable suspicion that Beck was carrying contraband where the government relied on the following factors:

> (1) Beck was driving a rental car which had been rented by an absent third party; (2) the car was licensed in California; (3) there was fast food trash on the passenger side floorboard; (4) no visible luggage in the passenger compartment of the automobile; (5) Beck's nervous demeanor; (6) Beck's trip from a drug source state to a drug demand state; and (7) Officer Taylor's disbelief of Beck's explanation for the trip.

140 F.3d at 1137. The Court analyzed the factors, finding them all "entirely consistent with innocent travel" when considered in context. *Id.* at 1138. For example, there was nothing suspicious about Beck driving a car rented for him by his wife, as the rental agreement confirmed. *Id.* at 1137. Likewise, having fast-food wrappers in a car during a road trip does not indicate criminal activity, nor could it "be deemed unusual for a motorist to exhibit signs of nervousness when confronted by the law enforcement officer." *Id.* at 1139. Moreover, "it is eminently reasonable to store luggage in the trunk of an automobile when traveling" rather in the passenger compartment. *Id.* at 1139. In fact, "motorists are specifically advised by law enforcement agencies, as a crime prevention tip, not to leave their luggage in view." *Id.* The Court concluded that "the seven factors, whether viewed individually or in combination, do not generate reasonable suspicion." *Id.* at 1140. Similarly, in *Jones*, the Eighth Circuit held:

42

The facts presented in this case—minimal nervousness and an inconsistent answer as to prior arrests—whether viewed alone or in combination, amount to little. When an officer can cite only one or two facts, including a generic claim of nervousness, as supporting his determination of reasonable suspicion, then we may conclude that his suspicion was not reasonable, for it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.

269 F.3d at 929 (internal quotation marks and citations omitted).

Like in *Beck* and *Jones*, the two factors Payton relied upon as a basis for his suspicion are more susceptible to an innocent explanation than a criminal one when viewed in context. *See United States v. Brown*, No. 4:21-CR-40066-01-KES, 2022 WL 292939, at *7-8 (D.S.D. Feb. 1, 2022) ("Viewing [potentially suspicious] facts in context, however, shows that they are less suspicious than they may first appear" where "[t]here are explanations . . . that are consistent with innocent conduct"). These two factors, "whether viewed alone or in combination, amount to little." *Jones*, 269 F.3d at 929; *see also* Santos Report ¶¶ 193, 243, 245, 274-76. Humphrey was nervous when dealing with a police officer—which both *Beck* and *Jones* found adds little to the suspicion analysis. As aforementioned, Payton admits that a reasonable officer would expect a Black man stopped by a white law-enforcement officer to exhibit some level of nervousness in the wake of the murder of George Floyd.[10] *Payton 81:6-13.* Furthermore, stopping for the evening to avoid driving a large, rented vehicle in an unfamiliar area at the end of a long day moving

---

[10] If anything, Humphrey's candor about his nervousness and rational explanation for feeling that way would cause a reasonable officer to become less suspicious. A jury could certainly infer that most drug traffickers do not confide in a police officer that they are feeling a little bit nervous. Dashcam 00:05:46-50, 00:09:51-59.

43

is eminently reasonable and bears no rational relationship to drug trafficking.  Once more, Payton agrees that a reasonable officer would expect a U-Haul driver to be unfamiliar with the truck and the route, *Payton 38:2-5; 40:24—41:25*, and that it is therefore reasonable to avoid driving a U-Haul at night.  *Payton 102:11-15*.  Because Payton has no "concrete reasons" for his criminal suspicion based on Humphrey's innocent travel conduct and understandable nervousness, he lacked a reasonable basis to extend the traffic stop.

Finally, the totality of the circumstances must also take into account information Payton received that dispelled any suspicion regarding criminal activity.  For example, Payton learned from dispatch that Humphrey did not have a criminal record or any outstanding warrants.  *Id. 126:17—127:1*; Dashcam 00:16:40-47.  Payton also had Humphrey's rental agreement, which corroborated Humphrey's account that he had rented the U-Haul the day before in Fayetteville and planned to return it the next day in Little Rock.  Noel Exhibit 3, Rental Agreement.  Payton is aware that there is a hotel off exit 81, which supports Humphrey's explanation that he missed the exit for his hotel.  *Payton 69:20-22*.  Plus , if Payton was suspicious about Humphrey's travel plans, he also could have easily spoken to Humphrey's father—who was on the phone for the majority of this encounter—to corroborate Humphrey's plans.  *Melder 62:9-13* (speaking to Humphrey's father was one way to confirm or dispel suspicion about the travel plans); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time").  But Payton was determined to search Humphrey's U-Haul and focused exclusively on finding the justification to do so.

The fact of the matter is that despite the arguments in his brief, even Payton admits the "totality of the circumstances" here did not support extending the traffic stop. He laid that bare in his deposition. By the time he texted Davis eight minutes into the stop, Payton was already alleging that Humphrey was "super nervous" and that it was odd he was stopping for the night in Fayetteville. Dashcam 00:05:45—6:25; Noel Exhibit 6, Davis Text Messages. However, Payton conceded that **he did not have reasonable suspicion to extend the traffic stop for a canine sniff at that point**. *Payton 51:10-15, 63:18—64:7*. Because Payton does not rely on any new or additional information beyond those two factors, Payton has in fact admitted he lacked reasonable suspicion to extend the stop.

To a hammer, everything is a nail. To Payton, every Black man in a U-Haul is trafficking drugs. Indeed, when Payton walked up to the U-Haul and saw a suitcase on the passenger seat—despite knowing only that Payton was a Black man in a moving truck—he *automatically* thought that the suitcase was full of contraband. *Payton 145:14—146:16.* That is patently unreasonable, if not downright outrageous, given that a U-Haul is perhaps most commonly used to convey luggage. Payton had decided long before he pulled Humphrey over that this stop was going to be a big drug bust for him. In the past, Payton had been praised for uncovering narcotics during traffic stops. *Payton 142:1-11*; *Melder 100:19—101:4.* In search of more positive affirmation, and potentially a spot on the interdiction team that he coveted, Payton was on a mission to uncover drugs. *Melder 55:7-24.* And when it turned out he was wrong, Payton felt "frustrated" and left Humphrey's belongings askew, conduct for which Payton was later reprimanded. Payton Exhibit 8, ASP Docs, Payton 8; *Melder 97:11—98:1.* Payton's single-minded focus on making a

45

drug bust clouded his judgment and caused him to see suspicion where an objective, reasonable officer would not.

Evaluating reasonable suspicion involves considering the factors relied upon by the officer in context, alongside any objective factors that dispel suspicion or indicate innocence. The Court must not take at face value Payton's unsupported contention that he found Humphrey suspicious, lest generic and subjective labels like nervousness and "unusual" travel plans become empty vagaries that defeat constitutional rights. *See Chestnut v. Wallace*, 947 F.3d 1085, 1092 (8th Cir. 2020) ("A vague, conclusory statement that a person is suspicious is insufficiently specific to support his detention by the police"). Allowing Payton to detain Humphrey and submit him to a canine search because Humphrey was nervous when Payton pulled him over and because he wanted to spend a night in hotel while moving across Arkansas would promote seizures based on "circumstances [that] describe a very large category of presumably innocent travelers." *Reid*, 488 U.S. at 441. The Fourth Amendment does not permit such unreasonable and unsupported intrusions on liberty.

### C. Payton violated Humphrey's Fourth Amendment rights by keeping him handcuffed for an unreasonably prolonged period.

Payton also violated Humphrey's Fourth Amendment rights by keeping him restrained in handcuffs without a reasonable belief Humphrey was armed or dangerous, long after any initial justification for the restraints had dissipated. Even assuming that Payton could reasonably handcuff Humphrey after the canine alert, there was no reasonable law-enforcement purpose for leaving Humphrey handcuffed after the U-Haul search failed

46

to uncover any drugs, and even after Payton decided Humphrey would be released with just a traffic warning. Doc. 1, ¶¶ 107, 109, 125-26. Payton has not moved for summary judgment on this issue, and Humphrey should therefore be allowed to present this claim at trial.

"During an investigative stop, officers should use the least intrusive means of detention and investigation reasonably necessary to achieve the purpose of the detention." *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006). The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). In order to use handcuffs during an investigative detention, "the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011); *see also Martinez*, 462 F.3d at 907 (explaining that officers are authorized to use handcuffs when it is "reasonably necessary to protect their personal safety and to maintain the status quo during the stop").

The Eighth Circuit provided guidance on the use of handcuffs during an investigative detention in *El-Ghazzawy*, where the Eighth Circuit denied qualified immunity to an officer who violated El-Ghazzawy's Fourth Amendment rights by unreasonably handcuffing him. *Id.* at 455. The officer handcuffed El-Ghazzawy when she arrived at Pawn America to investigate a claim that he was selling counterfeit watches, which, if true, would constitute theft by swindle. *Id.* at 455. The Eighth Circuit held that, "[v]iewing the circumstances in the light most favorable to El–Ghazzawy," handcuffing

him "was not reasonably necessary to protect [the officer's] personal safety and to maintain the status quo during the investigatory stop." *Id.* at 459. Thus, handcuffing El-Ghazzawy violated his Fourth Amendment rights because it "was not 'reasonably related in scope to the circumstances which justified the [stop] in the first place.'" *Id.* (quoting *Terry*, 392 U.S. at 19-20). In reaching this conclusion, the Court identified several factors that weighed against the use of handcuffs under the circumstances: 1) nothing in the dispatch indicated El-Ghazzawy could be armed or dangerous; 2) theft by swindle was not a dangerous crime which would cause concern of him being armed and dangerous; 3) El–Ghazzawy exhibited no erratic or suspicious behavior prior to or during the officer's arrival on scene; 4) the officer handcuffed El–Ghazzawy without making a proper investigation into the facts of the accusation; and 5) the officer had "plenty of opportunity to make the stop in a less threatening manner because there were no exigent circumstances." *Id.* at 457-59. Under these circumstances, the officer "fail[ed] to point to specific facts supporting her concern for officer safety." *Id.* at 458.

Even when the use of handcuffs is initially reasonable, "[t]he duration of a detention can, of course, affect the balance of interests" and weigh in favor of their removal. *Muehler v. Mena*, 544 U.S. 93, 100 (2005). As the Eighth Circuit held in *Haynes v. Minnehan,* 14 F.4th 830, 836 (8th Cir. 2021), "as new information flows in, a reasonable belief can dissolve into an unreasonable one." In *Haynes*, officers reasonably (but incorrectly) believed Haynes conducted a hand-to-hand drug deal. *Id.* But "the initially lawful *Terry* stop ultimately violated Haynes's Fourth Amendment rights" when officers kept him handcuffed in the road with his pants unzipped for over five minutes, despite uncovering

48

information that undermined the initial justification for handcuffing him. *Id.* Haynes was polite and cooperative; the officers failed to locate any drugs or weapons on his person; they declined to investigate readily available additional sources of information; and they demonstrated their lack of safety concerns by waving away an additional squad car and not requesting back-up. *Id.* The court also noted that "the officers outnumbered Haynes, who neither officer described as a large or imposing figure." *Id.* Applying *El-Ghazzawy*, the court denied qualified immunity to the officers who failed to reasonably tailor Haynes' detention to the changing circumstances. *Id.* at 836-37.

Payton trampled Humphrey's Fourth Amendment rights by keeping him handcuffed in the squad car for nine minutes after the unsuccessful U-Haul search while Payton lectured Humphrey as he issued a traffic warning. Payton had no objectively reasonable belief that Humphrey was armed and dangerous, or that handcuffs were necessary for a legitimate law enforcement purpose. *See* Santos Report ¶¶ 285, 314. Worse than *El-Ghazzawy*, where the officer "fail[ed] to point to specific facts supporting her concern for officer safety," 636 F.3d at 458, Payton expressly disclaims that he was concerned for his safety or the safety of others when dealing with Humphrey. *Payton 25:14-17, 124:2-5*. Payton told Humphrey that evening: "if it makes you feel better, I'm not a bit nervous about you." Dashcam 00:21:33-50. Payton further testified that he had no safety reasons to keep Humphrey handcuffed after Payton returned to the squad car to write him a warning. *Payton 161:5-25, 162:14-18*. Payton has never alleged that he believed Humphrey was armed and testified that Humphrey was never violent, which the dashcam video confirms.

49

*Payton 6:23-25; 113:14-17.* According to Payton, there was nothing preventing him from taking off Humphrey's handcuffs while he wrote the citation. *Payton 164:10-24.*

Beyond the lack of any purported concern for officer safety, other factors in *El-Ghazzawy* and *Haynes* also militate strongly in favor of removing Humphrey's handcuffs. The same as in *Haynes*, the officers here failed to uncover any drugs in Humphrey's U-Haul. Also like the officers in *Haynes*, who declined to keep searching Haynes or his car for drugs, Payton declined to continue searching the U-Haul for drugs—*e.g.*, by towing the U-Haul to find a supposed secret compartment, bringing a drill or scope to the scene, or following up about the truck at the Little Rock U-Haul location—choosing instead to release Humphrey with a traffic warning.[11] *Payton 141:1-19, 142:12-15.* Humphrey is not "a large or imposing figure" compared to Payton, who demonstrated a lack of safety concerns about Humphrey by allowing the officers who helped search the U-Haul to leave the scene while he issued Humphrey a warning. *Haynes,* 14 F.4th at 836-37. It was unreasonable for Payton to keep Humphrey in handcuffs after thanking the other officers for their help and waving them away. Dashcam 1:42:00.

---

[11] The very fact that the officers came to suspect that the hypothetical drugs were hidden in a secret compartment built into the U-Haul casts suspicion *away from Humphrey*. As Davis testified, U-Hauls change hands frequently and drugs in a secret compartment could reasonably belong to a previous renter. *Davis 30:21-24, 31:3-6, 34:15-20.* Payton speculated during the search that any hypothetical drugs could belong to someone else, since the U-Haul was a rental. Dashcam 01:34:50—35:35, 01:40:15-25, 01:49:47. According to the rental agreement, which Payton possessed, Humphrey had only picked up the U-Haul the day before and it was due in Little Rock the next day. It would be unreasonable to believe that Humphrey had built a secret compartment, packed all his belongings in the U-Haul, would unpack in Little Rock, disassemble the compartment, return the U-Haul to its original form, and return it—all by the next day. Of course, that is not what happened, because Humphrey was simply a law student moving home.

50

After the failed search, Payton wrote Humphrey a warning (not even a ticket) for careless driving, which "was not a dangerous crime which would cause concern of him being armed and dangerous." *El-Ghazzawy*, 636 F.3d at 457. Plus, Payton had already frisked Humphrey for weapons and verbally confirmed Humphrey did not have anything on him. Dashcam 00:29:30—30:17. Like El-Ghazzawy and Haynes, Humphrey was polite and cooperative and exhibited no erratic or suspicious behavior. *See Payton 6:19-22, 8:3-5*. He was not violent or non-compliant. The circumstances are nothing like those in *Waters v. Madson*, 921 F.3d 725, 738 (8th Cir. 2019), where the Eighth Circuit held that a suspect's "unpredictability, evasiveness, argumentative demeanor, refusal to []obey legitimate officer commands, and the size difference between [the suspect] and the officers," when viewed as a whole, could cause officers "to reasonably believe they needed to handcuff [the suspect] and place him in the squad car to preserve the status quo." *See also Garcia*, 984 F.3d at 668 (distinguishing *El-Ghazzawy* because it was undisputed Garcia refused to comply with the officer's multiple demands for his license and insurance, ignored the officer's requests to get out of his vehicle, and was verbally combative from the beginning of the stop). Furthermore, like in *El-Ghazzawy*, Payton had the opportunity to detain Humphrey "in a less threatening manner because there were no exigent circumstances." *Payton 144:18-145:1* (agreeing that this was not a tense and rapidly evolving situation).

Even if Payton could reasonably handcuff Humphrey at the outset of the search, the duration of his detention became unreasonable long before Payton removed the handcuffs and released him. Changes in circumstances during the nearly hour and a half that

51

Humphrey was handcuffed shifted the balance of interests far in favor of removing the handcuffs after the unsuccessful search. The only justification Payton offered for handcuffing Humphrey was that he was nervous and Payton wanted to keep him away from traffic. *Payton 163:1-7.* That dubious justification dissipated completely once the search was over.[12] Payton concedes that he was done searching the U-Haul and had determined he would let Humphrey go with just a warning by 1:42:05 in the dashcam video. *Payton 159:2-24.* By no stretch of the imagination was handcuffing Humphrey "the least intrusive means of detention . . . reasonably necessary" to write him a traffic citation. *Martinez*, 462 F.3d at 907. Indeed, there is *no reason* that Humphrey could not sit in the backseat of the squad car unhandcuffed while Payton completed the warning. *Payton 164:10-24.*

The Eighth Circuit found a constitutional violation in *Haynes* where Haynes was handcuffed an additional five minutes after the lawful pat down ended. *Haynes*, 14 F.4th at 834. Payton left Humphrey handcuffed in his squad car for approximately nine minutes after the narcotics investigation ended. *Payton 160:7-19.* And these nine minutes were painful and humiliating for Humphrey, who had already been handcuffed for over an hour. Dashcam 1:44:02-15 (begging Payton to do whatever he can, as soon as he can, to restore Humphrey's humanity). During this time, Payton engaged Humphrey in conversation as he issued him a traffic warning, despite Humphrey urging that he had been in handcuffs

---

[12] Because an officer may ask a person to exit the vehicle during a traffic stop, *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977), and just about everyone is nervous when stopped by the police, *Melder 25:23-24; Davis 38:11-18*, by Payton's logic an officer could handcuff just about every driver he stops to issue a warning or ticket. That is undoubtedly incorrect.

for over an hour and complaining about the tightness. *Id.* 1:46:18-23, 1:47:52-56 (notifying Payton the handcuffs were so tight that he thought his wrists might bleed). In a particularly abhorrent exchange, Payton told Humphrey that maybe he should go to trooper school to see where Payton was coming from and (untruthfully) claimed he "had no idea" Humphrey was Black when he about wrecked his truck off the road. *Id.* 1:47:16—1:48:42. The latter is doubly false. Payton knew Humphrey was Black because he had chased him down for miles at speeds over 100 mph, and Payton admits that Humphrey *never* almost wrecked the U-Haul. *Payton 21:3-10, 167:24-168:1, 172:14-25.*[13] What could be more unreasonable than complaining about the difficulties of your job to the innocent Black man handcuffed in the back of your squad car?

In sum, any hypothetical reasonable belief that Humphrey needed to be handcuffed during the search quickly dissolved into an unreasonable one as new information about Humphrey and his non-existent drug activity flowed in. *Haynes*, 14 F.4th at 836. Payton therefore violated Humphrey's Fourth Amendment rights by leaving him handcuffed when it was not reasonably necessary to achieve the purpose of his detention.

### D. PAYTON'S RIGHTS WERE CLEARLY ESTABLISHED.

Payton argues that, even if he did violate Humphrey's Fourth Amendment rights, he is entitled to qualified immunity because those rights were not clearly established at the

---

[13] Payton also testified: "I was a little bit aggravated due to the fact that I felt like he was insinuating that I was being racist just because I was a White cop." *Payton 171:7-15.* A reasonable jury could infer from this statement that Payton left Humphrey in handcuffs because he was irritated with him, rather than for a legitimate law-enforcement or safety purpose.

time of the violation. A right is clearly established where "[t]he contours of the right [are] sufficiently clear that a reasonable offic[er] would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This requires the Court to examine precedent to determine if the law "gave fair warning to [Payton] that [his] conduct crossed the line of what is constitutionally permissible." *Hope v. Pelzer*, 536 U.S. 730, 743 (2002); *see also Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) ("[T]he issue is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice" that the conduct would violate a person's constitutional rights).

Because a court cannot resolve disputed issues of material fact or assess the credibility of witnesses, summary judgment must be denied "if a genuine issue of material fact exists as to whether a reasonable officer could have believed his actions to be lawful." *Nance*, 586 F.3d at 609 (cleaned up); *see also Torres v. City of St. Louis*, No. 21-1761, 2022 WL 2374560, at *5 (8th Cir. July 1, 2022) (dismissing appeal for lack of jurisdiction where the district court denied summary judgment on qualified immunity grounds because there was a genuine issue of fact "material to the question of whether it was clearly established that the officers could not use deadly force in this situation"). Accordingly, the same factual disputes outlined above preclude the Court from granting Payton qualified immunity on the clearly established prong. Payton's arguments about reasonable, though mistaken, judgments about the contours of Humphrey's Fourth Amendment rights must be rejected because they are premised on disputed facts. That is, Payton asks the Court to find that he is entitled to qualified immunity based on *his version* of the facts: that he reasonably

believed Humphrey crossed the fog line; that Humphrey was extremely and unusually nervous; that Humphrey's travel plans were "odd," etc. None of these disputed facts are entitled to belief. Accepting Humphrey's version of events and reading the record in the light most favorable to him, Payton violated Humphrey's clearly established right to be free from unreasonable seizures under the Fourth Amendment.

First, it is clearly established that a traffic stop is a Fourth Amendment seizure for which there must be an objectively reasonable basis. *Whren*, 517 U.S. at 809-10. The Eighth Circuit has affirmed this principle time and again. *See, e.g., Garcia*, 984 F.3d at 667 (officer not entitled to qualified immunity because Garcia's right to be free from an unreasonable traffic stop without probable cause was clearly established); *Duffie v. City of Lincoln*, 834 F.3d 877, 884 (8th Cir. 2016) (finding clearly established prong satisfied where officers conducted a traffic stop even though the plaintiff did not violate a traffic law). Payton does not, and cannot, show that any reasonable officer could believe it was constitutionally sound to fabricate a traffic justification for a stop in order to investigate drug-related activity. Yet, that is exactly what Humphrey alleges occurred here. As in *Garcia*, an officer is not entitled to qualified immunity where the basis for the traffic stop is a disputed question of fact for the jury. *Garcia*, 984 F.3d at 667. Because a reasonable jury could agree that Humphrey did not violate any traffic laws and therefore Payton lacked probable cause to stop him, qualified immunity must be denied.

The same is true for Humphrey's claim that Payton prolonged the traffic stop to conduct a canine sniff without reasonable suspicion of criminal activity. Viewing the facts in the light most favorable to Humphrey, Payton did not even have *arguable* reasonable

55

suspicion that would protect a reasonable mistake of judgment.[14]  A reasonable jury could find, as Humphrey maintains and the video shows, that he was *not* unusually or exceptionally nervous under the circumstances, and that his travel plans were perfectly normal for a person driving an unfamiliar rental vehicle at night after a long day of moving. At summary judgment, this leaves Payton with no objective and particularized facts to justify the extension of the stop. *De La Rosa*, 852 F.3d at 747.  It is clearly established that an officer cannot extend a traffic stop based on nothing more than a subjective and unsupported hunch that criminal activity is afoot. *See, e.g., Terry*, 392 U.S. at 27; *Riley*, 684 F.3d at 763; *Chestnut*, 947 F.3d at 1092 ("A vague, conclusory statement that a person is suspicious is insufficiently specific to support his detention by the police").  It is likewise clearly established that an officer cannot rely exclusively on "circumstances [that] describe a very large category of presumably innocent travelers" to justify a seizure, *De La Rosa*, 852 F.3d at 744 (quoting *Reid*, 448 U.S. at 441), and that nervousness alone cannot provide the basis to extend a traffic stop.  *See, e.g., Beck*, 140 F.3d at 1139; *Jones*, 269 F.3d at 989;

---

[14] Payton's reliance on the deposition testimony of Melder and Davis to support his claim that he had arguable reasonable suspicion is inapposite. Payton Br. at 18. Reasonableness is assessed from the viewpoint of a hypothetical, objectively reasonable officer—not from the viewpoint of the defendant's fellow officers in the context of litigation. Relying on this testimony would introduce the forms of bias and subjectivity the objective reasonable officer standard is intended to evade. Moreover, Davis and Melder were not on the scene when Payton determined he had reasonable suspicion to extend the stop. Their opinions are thus based on Payton's discredited account of Humphrey's behavior and the same after-the-fact evidence that the jury will be able to evaluate. *Davis 39:11-25*. Payton's fellow officers cannot usurp the role of the jury by, predictably, siding with Payton. Under similar circumstances, the Eighth Circuit explained in *Garcia* that the testimony of an officer who was not present for the stop about whether there was probable cause "provides nothing to the analysis of [defendant's] perception of the license plate at the time she stopped Garcia." 984 F.3d at 665.

*Guerrero*, 374 F.3d at 590.  Furthermore, the Eighth Circuit decisions in *Jones* and *Beck* are particularly apt and placed Payton on notice that prolonging the stop under these circumstances would violate Humphrey's constitutional rights.  *See Jones*, 269 F.3d at 929 (holding that suspicion is not reasonable "[w]hen an officer can cite only one or two facts, including a generic claim of nervousness, as supporting his determination of reasonable suspicion"); *Beck*, 140 F. 3d at 1137 (holding that a combination of factors that are innocent when viewed in context cannot combine into reasonable suspicion ).

Finally, Payton is not entitled to qualified immunity on Humphrey's claim that Payton violated his Fourth Amendment rights by unreasonably detaining him in handcuffs because, as the Eighth Circuit explained in *El-Ghazzawy*, "it is well established that if suspects are cooperative and officers have no objective concerns for safety, the officers may not use intrusive tactics such as handcuffing absent any extraordinary circumstances." *El-Ghazzawy*, 636 F.3d at 460; *see also, e.g., id.* ("[A] reasonable officer could not have believed it was lawful to handcuff . . . a suspect absent any concern for safety."); *Haynes*, 14 F.4th at 837-38 ("Because [the defendants] had fair notice that they could not handcuff Haynes without an objective safety concern, we conclude that the district court erred in granting qualified immunity."); *Chestnut*, 947 F.3d at 1091 ("[W]e think that it was also beyond debate that Wallace should not have believed that Chestnut was armed and dangerous, which would have justified him being frisked and handcuffed."). Furthermore, it is clearly established law that officers must consider the duration of the detention in determining whether handcuffs should be removed, *Mena*, 544 U.S. at 100, and must

reasonably tailor the use of handcuffs to changing circumstances during the course of a detention.[15] *Haynes*, 14 F.4th at 837-38.

## CONCLUSION

For the foregoing reasons, Payton is not entitled to qualified immunity at the summary-judgment stage. Viewing the record in the light most favorable to Humphrey, a reasonable jury could find that Payton violated his clearly established Fourth Amendment rights when he: 1) stopped his U-Haul without probable cause that he committed a traffic violation; 2) unreasonably prolonged the traffic stop for a canine sniff absent reasonable suspicion; and 3) left Humphrey restrained in handcuffs without an objectively reasonable justification while he completed the traffic warning. Humphrey respectfully requests that the Court deny Payton's motion for summary judgment and allow him to proceed to trial.

---

[15] In any event, Payton has not moved for summary judgment on this claim.

Respectfully submitted,

**ROBINS KAPLAN, LLP**

Dated:  7/26/2022

By:    s/Andrew J. Noel
Robert Bennett, pro hac vice
Andrew J. Noel, pro hac vice
Marc E. Betinsky, pro hac vice
800 LaSalle Ave, Suite 2800
Minneapolis, MN  55402
(612) 349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
mbetinsky@robinskaplan.com

**ELDRIDGE BROOKS, PLLC**
Conner Eldridge, Arkansas Bar No. 2003155
Emily Neal, Arkansas Bar No. 2003087
5100 West J.B. Hunt Drive
Suite 840
Rogers, AR 72758
(479) 553-7678
conner@eldridgebrooks.com
emily@eldridgebrooks.com
Attorneys for Plaintiff

93117038.1

59