UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

---

Marion Andrew Humphrey, Jr.,

      Plaintiff,

v.

Steven Payton, acting in his individual
capacity as an Arkansas State Police
trooper,

      Defendant.

Case No. 4:21-CV-00194 LPR

**PLAINTIFF HUMPHREY'S RESPONSE TO DEFENDANT PAYTON'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS**

---

COMES NOW, Plaintiff Marion Andrew Humphrey, Jr., by and through his attorneys, Robins Kaplan LLP and Eldridge Brooks, PLLC, pursuant to Local Rule 56.1 and Judge Rudofsky's Final Scheduling Order, Doc. 13, and provides the following Statement of Disputed Material Facts and response to Defendant Payton's Statement of Undisputed Material Facts:

**PLAINTIFF HUMPHREY'S RESPONSE TO DEFENDANT PAYTON'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.    <u>Defendant</u>: On the evening of August 20, 2020, Defendant, Trooper Steven Payton with the Arkansas State Police, conducted a traffic stop of a U-Haul driven by Plaintiff, Marion Humphrey, Jr., as he drove eastbound on Interstate 40 near mile-marker 81. *See* Exhibit 1, Dashcam Video.

    <u>Response</u>: Plaintiff admits that on the evening of August 20, 2020, Defendant, Trooper Steven Payton with the Arkansas State Police, conducted a traffic stop of a U-Haul driven by Plaintiff, Marion Humphrey, Jr., as he drove eastbound on Interstate 40 near mile-

1

marker 81. *See* Exhibit 1, Dashcam Video.

2.      Defendant: On August 20, 2020, Plaintiff, Marion A. Humphrey, Jr. was thirty-two (32) years old and was attending law school at the University of Arkansas Fayetteville. *See* Exhibit 1, Dashcam Video.

Response:  Plaintiff admits that on August 20, 2020, Plaintiff, Marion A. Humphrey, Jr. was thirty-two (32) years old and was attending law school at the University of Arkansas Fayetteville. *See* Exhibit 1, Dashcam Video.

3.      Defendant: On August 20, 2020, Defendant, Steven Payton, was a trooper with the Arkansas State Police and was assigned to Troop J. *See* Exhibit 1, Dashcam Video.

Response:  Plaintiff admits that On August 20, 2020, Defendant, Steven Payton, was a trooper with the Arkansas State Police and was assigned to Troop J. *See* Exhibit 1, Dashcam Video.

4.      Defendant: On August 20, 2020, Trooper Payton's patrol car was equipped with a dashboard video camera that captures the events beginning one minute prior to when Trooper Payton initiated his blue lights through the entire encounter with Mr. Humphrey, Jr. *See* Exhibit 1, Dashcam Video; *see also* Exhibit 2, Deposition of Steven Payton, 10:2-25 (hereinafter "Exhibit 2, Payton's Depo.").

Response:  Plaintiff admits that on August 20, 2020, Trooper Payton's patrol car was equipped with a dashboard video camera (dash cam) that captures the events about one minute prior to when Trooper Payton initiated his blue lights through the rest of the encounter with Mr. Humphrey, Jr. *See* Exhibit 1, Dashcam Video; *see also* Exhibit 2, Deposition of Steven Payton, 10:2-25 (hereinafter "Exhibit 2, Payton's Depo.").  Plaintiff

denies that this is the beginning of what Payton's dashboard video camera captured of the incident, as the dash cam captured Payton's initial observation of Humphrey's U-Haul while Payton was parked on the median observing traffic near mile marker 70 of Interstate 40, Payton Exhibit 8, ASP Docs, Payton 1147, 1173, as well as Payton racing at speeds over 100 mph to catch up to Humphrey thereafter.  Noel Exhibit 5, Screenshot of Squad Video.

5.    Defendant:  On August 20, 2020, the chain-of-command for Trooper Payton was that he reported to Sergeant Chase Melder, who then reported to Captain Kyle L. Drown, then Major Forrest Marks, then Lieutenant Colonel Shawn Garner, and finally Colonel Bill Bryant. Exhibit 4, Deposition of Chase Melder, 11:1-18 (hereinafter "Exhibit 4, Melder Depo.").

Response:  Plaintiff admits that on August 20, 2020, the chain-of-command for Trooper Payton was that he reported to Sergeant Chase Melder, who then reported to Captain Kyle L. Drown, then Major Forrest Marks, then Lieutenant Colonel Shawn Garner, and finally Colonel Bill Bryant. Exhibit 4, Deposition of Chase Melder, 11:1-18 (hereinafter "Exhibit 4, Melder Depo.").

6.    Defendant: On the evening of August 20, 2020, while traveling eastbound on Interstate 40, Trooper Payton was behind a U-Haul. As the vehicle approached mile-marker 81, the U-Haul signaled at the last second to exit off the interstate. Exhibit 2, Payton's Depo., 16:20—17:6, 44:19—46:18, 47:23—48:4, 50:10—51:3, 118:8-25; *see also* Exhibit 1, Dashcam Video 0:00:47—0:00:53; Exhibit 8, Documents produced by the Arkansas State Police, bates number Payton 4, 1147, 1149, 1174. (hereinafter "Exhibit 8, ASP

Docs.").

Response: Plaintiff admits that on the evening of August 20, 2020, while traveling eastbound on Interstate 40, Trooper Payton was behind a U-Haul. Plaintiff denies that he signaled at the last second to exit off the interstate and further denies that the video evidence supports Payton's self-serving subjective characterization of the video evidence. *See* Exhibit 1, Dashcam Video 0:00:47—0:00:53; *see also* Exhibit 4, Melder Depo, Melder 30:2-6 ("I watched the video. I couldn't – the video was inconclusive to where I couldn't see – I couldn't see the -- the violation."). Determining what the dash cam video shows is a task reserved exclusively for the jury at trial.

7.    Defendant: The U-Haul attempted to take the exit ramp at mile-marker 81, but immediately made another quick action to continue on the interstate without signaling. *Id*.

Response: Plaintiff denies that he attempted to take the exit ramp but immediately made another quick action to continue on the interstate without signaling. Plaintiff turned on his signal, but ultimately decided not to take the exit. So, Plaintiff turned off his signal and continued on the interstate. *See* Exhibit 1, Dashcam Video 0:00:47—0:00:53. Plaintiff denies that the video evidence supports Payton's self-serving subjective characterization of the video evidence. *See* Exhibit 1, Dashcam Video 0:00:47—0:00:53; *see also* Exhibit 4, Melder Depo, Melder 30:2-6 ("I watched the video. I couldn't – the video was inconclusive to where I couldn't see – I couldn't see the -- the violation."). Determining what the dash cam video shows is a task reserved exclusively for the jury at trial.

8.      Defendant: The action by the U-Haul caused the weight of the truck to shift and was observed to cross the fog line again resulting in an improper and unsafe lane change. Exhibit 2, Payton's Depo., 16:20-25, 45:8-12, 118:8-25.

Response: Plaintiff denies that any action he took caused the weight of the U-Haul to shift, and further denies that he crossed the fog line or made any other improper and/or unsafe lane change. *See* Exhibit 1, Dashcam Video 0:00:47—0:00:53. Plaintiff has consistently denied that he committed any traffic violations warranting a traffic stop. *See* Exhibit 3, Humphrey Depo 75:5; 77:11-15; 81:7-11 ("[Payton] lied to me. He said that I wrecked -- I almost wrecked my vehicle and I didn't so much cross a white line, so he lied directly to me."). Plaintiff denies that the video evidence supports Payton's self-serving subjective characterization of the video evidence. *See* Exhibit 4, Melder Depo, Melder 30:2-6 ("I watched the video. I couldn't – the video was inconclusive to where I couldn't see – I couldn't see the -- the violation."). Moreover, determining what the dash cam video shows is a task reserved exclusively for the jury at trial.

9.      Defendant: Based upon this action by the U-Haul, Trooper Payton initiated a traffic stop based upon witnessing the traffic violation of careless and probative driving in violation of Ark. Code Ann. § 27-51-104. Exhibit 2, Payton's Depo., 16:20-25, 50:10-51:6; *see also* Exhibit 8, ASP Docs 1072.

Response: Plaintiff denies that Payton initiated the traffic stop based upon witnessing a traffic violation of careless and probative driving in violation of Ark. Code Ann. § 27-51-104, because no such violation occurred. Assessing the credibility of Payton's proffered reason for the stop is a task for the jury at trial. This is especially true

5

where Payton's credibility is severely undermined by his repeated false claim to Humphrey that Payton initiated the stop because Humphrey "almost wrecked his truck." *Compare* Dashcam 00:04:23, 00:9:30, 00:31:42-54, 00:35:45, 01:48:41, *with* Exhibit 2, Payton's Depo.,  46:2-23, 48:8-10.

10.     Defendant: At approximately 8:00 p.m., Trooper Payton pulled over Mr. Humphrey. Exhibit 2, Payton Depo., 13:2-5; *see also* Exhibit 1, Dashcam Video 0:01:00—0:01:34.

Response: Plaintiff admits that at approximately 8:00 p.m., Payton pulled him over. Exhibit 2, Payton Depo., 13:2-5; *see also* Exhibit 1, Dashcam Video 0:01:00—0:01:34.

11.     Defendant: The traffic stop of the U-Haul was conducted at the mile-marker 81 eastbound entrance ramp. Exhibit 2, Payton's Depo., 16:20—17:6; *see also* Exhibit 8, ASP Docs, Payton 4, 7, 1147, 1174.

Response: Plaintiff admits that the traffic stop of the U-Haul was conducted at the mile-marker 81 eastbound entrance ramp. Exhibit 2, Payton's Depo., 16:20—17:6; see also Exhibit 8, ASP Docs, Payton 4, 7, 1147, 1174.

12.     Defendant: Trooper Payton approached the passenger side of the vehicle, but was unable to communicate effectively with the driver of the U-Haul. Exhibit 1, Dashcam Video 0:02:04- 0:03:55; Exhibit 2, Payton's Depo., 13:8-10, 121:14-23.

Response:   Plaintiff admits that Trooper Payton approached the passenger side of the vehicle, but was unable to communicate effectively with the driver of the U-Haul. Exhibit 1, Dashcam Video 0:02:04- 0:03:55; Exhibit 2, Payton's Depo., 13:8-10, 121:14-23.  Plaintiff denies any implication that Humphrey intentionally prevented Payton from

communicating through the passenger side.  Although Payton accused Humphrey of doing so, Payton has since conceded that Humphrey did not do anything to prevent him from opening the passenger door or communicating from that side of the U-Haul. *Compare* Dashcam Video 01:21:13-22, *with* Exhibit 2, Payton's Depo., 13:23—14:19, 121:18—122:2, 146:20—147:20.

13.    Defendant: When Trooper Payton saw the driver, the driver was acting nervous and appeared confused; therefore, Trooper Payton asked the driver to step out of the vehicle so that he would be able to communicate with the driver. Exhibit 2, Payton's Depo., 13:8—14:19.

Response: Plaintiff denies that he was acting nervous or appeared confused when Payton approached the vehicle, and further denies that Payton asked him to exit the vehicle for those reasons.  Payton's motivation for asking Humphrey to step out of the vehicle is a disputed fact for the jury to determine.  As Payton testified during his deposition, when he walked up to the U-Haul he *automatically* thought the suitcase on the passenger seat was full of contraband, before he even observed Humphrey's demeanor. Exhibit 2, Payton's Depo., 145:14—146:16.  Payton prejudged Humphrey because he was a Black man driving a U-Haul, and the rest of his decisions followed from there.

14.    Defendant: The individual, later identified as Mr. Humphrey, was already on the phone with a person later identified as Mr. Humphrey's father when he exited the U-Haul. Exhibit 3, Deposition of Marion Humphrey, Jr., 72:19—74:7 (hereinafter "Exhibit 3, Humphrey Depo.").

Response:   Plaintiff admits he was on the phone with his father when he

exited the U-Haul.  Exhibit 3, Humphrey Depo., 72:19—74:7.

15.    Defendant: Once the driver was out of the vehicle, Trooper Payton noticed that the driver's voice and hands were shaking.  Exhibit 2, Payton's Depo., 34:13-15, 92:4-15; *see also* Exhibit 8, ASP Docs, Payton 1147, 1149, 1174.

Response: Plaintiff denies that his voice and hands were shaking and submits that this contention by Payton is belied by the uncontroverted dash cam video that shows Humphrey speaking in clear and steady voice, without any notable trembling in his hands. Exhibit 1, Dashcam Video 0:04:10- 0:05:59.  Even Payton's own supervisor, Sergeant Melder, concedes that he cannot see Humphrey's hands shaking, artery pulsing, or "even really the chest rising a whole lot" on the dashcam video.  Exhibit 4, Melder Depo., 25:66-18.

16.    Defendant: Trooper Payton asked for and received the individual's license and the rental agreement for the vehicle, which the individual provided. Exhibit 2, Payton's Depo., 56:10-16; *see also* Exhibit 8, ASP Docs, Payton 1147, 1174. The documents identified the individual as Mr. Humphrey.

Response: Plaintiff admits that Trooper Payton asked for and received his license and the rental agreement for the vehicle, which Plaintiff provided. Exhibit 2, Payton's Depo., 56:10-16; see also Exhibit 8, ASP Docs, Payton 1147, 1174. Plaintiff admits that the documents identified him as Mr. Humphrey.

17.    Defendant: Trooper Payton then asked Mr. Humphry to move to the area between the U-Haul and his patrol car.  Exhibit 1, Dashcam Video 0:04:04.

Response: Plaintiff admits that Trooper Payton then asked him to move to the

area between the U-Haul and his patrol car. Exhibit 1, Dashcam Video 0:04:04.

18.    Defendant: Trooper Payton's dashcam captured footage of the stop. As Trooper Payton and Mr. Humphrey walked to the back of the U-Haul, Mr. Humphrey is heard on the video telling someone that "he is making me go towards his vehicle" and Mr. Humphrey has his hands in the air with his palms out. Exhibit 1, Dashcam Video 0:04:04—0:04:19.

Response: Plaintiff admits that Trooper Payton's dashcam captured footage of the stop, that as Trooper Payton and he walked to the back of the U-Haul, Plaintiff is heard on the video telling someone that "he is making me go towards his vehicle" and that he has his hands in the air with his palms out. Exhibit 1, Dashcam Video 0:04:04—0:04:19.

19.    Defendant: Trooper Payton told Mr. Humphrey that he can put his hands down. Exhibit 1, Dashcam Video 0:04:20.

Response: Plaintiff admits that Payton told him he could put his hands down. Exhibit 1, Dashcam Video 0:04:20.

20.    Defendant: Mr. Humphrey admits that Trooper Payton never ordered him to raise his hands in the air. Exhibit 3, Humphrey Depo., 75:2-17.

Response: Plaintiff admits that Payton never ordered him to raise his hands in the air. Exhibit 3, Humphrey Depo., 75:2-17.

21.    Defendant: At this point, Trooper Payton began to ask Mr. Humphrey standard questions about his trip and his travel plans. Exhibit 1, Dashcam Video 0:04:23; Exhibit 2, Payton's Depo., 70:14- 22.

Response: Plaintiff admits that Payton began to ask him questions about his

trip and his travel plans but denies Payton's characterization that such questions were "standard" where Payton had already decided he believed Humphrey was trafficking narcotics and was determined to confirm his unjustified hunch that Humphrey was a criminal. Exhibit 1, Dashcam Video 0:04:23.

22.     Defendant: Mr. Humphrey responded saying that he is "going to Little Rock…I wanted to stop the night here and but I am going to Little Rock…I do want to stay here now, but I missed the turn and I was trying to figure out how I get back here to [Exit] 81." Exhibit 1, Dashcam Video 0:04:24—0:04:42.

        Response: Plaintiff denies the accuracy of Payton's self-serving transcription of the dash cam video, which speaks for itself. Exhibit 1, Dashcam Video 0:04:24—0:04:42. Viewing and interpreting the dash cam footage is the role of the jury, and not the Defendant on summary judgment.

23.     Defendant: Mr. Humphrey attempted to explain his travel plans to Trooper Payton and that Mr. Humphrey was going to stop and get a hotel room in Russellville, but then Mr. Humphrey states that he may just drive all the way to Little Rock. Exhibit 1, Dashcam Video 0:04:22—0:05:35; Exhibit 2, Payton's Depo., 70:14-22.

        Response: Plaintiff admits that he explained his travel plans to Payton. Exhibit 1, Dashcam Video 0:04:22—0:05:35. Plaintiff denies Payton's pejorative characterization that he "attempted" to explain his travel plans to Payton. The jury will decide for itself what the dash cam video shows.

24.     Defendant: In his deposition, Mr. Humphrey admitted that his travel plans were unclear even to him, because he testified that "so there were a lot of different things

going through my mind. Should I go all the way down to Little Rock? Would it be better just to get a hotel room?" Exhibit 3, Humphrey Depo., 77:8-11.

Response: Plaintiff denies that he admitted his travel plans were unclear even to him, which is Payton's subjective characterization of Humphrey's deposition testimony that Payton has taken out of context.  Exhibit 3, Humphrey Depo., 77:1-15.

25.    Defendant: Trooper Payton told Mr. Humphrey to hang tight for a second and then Trooper Payton asked Mr. Humphrey "are you still nervous, you look nervous." Mr. Humphrey replied, "I am still nervous." Trooper Payton then inquired if there is anything illegal in the vehicle and then stated to Mr. Humphrey, "there is nothing to be nervous about you are not even going to get a ticket." Exhibit 1, Dashcam Video 0:05:41—0:05:59.

Response: Plaintiff admits that Trooper Payton told him to hang tight for a second and then Trooper Payton asked him "are you still nervous, you look nervous;" that Plaintiff replied, "I am still nervous;" and that Trooper Payton then inquired if there is anything illegal in the vehicle—to which plaintiff responded in the negative—and then stated to Plaintiff, "there is nothing to be nervous about you are not even going to get a ticket." Exhibit 1, Dashcam Video 0:05:41—0:05:59.

26.    Defendant: Trooper Payton returned to his patrol car and began to run Mr. Humphrey's information through his in-car system, which checks the validity of the driver's license and the validity of the vehicle's registration.  Exhibit 1, Dashcam Video 0:06:00; Exhibit 2, Payton's Depo., 88:16—90:9.

Response: Plaintiff admits that Trooper Payton returned to his patrol car and

11

began to run Plaintiff's information through his in-car system, which checks the validity of the driver's license and the validity of the vehicle's registration. Exhibit 1, Dashcam Video 0:06:00; Exhibit 2, Payton's Depo., 88:16—90:9

27.    Defendant: Once inside his patrol car, Trooper Payton can be heard saying that Mr. Humphrey still was "super nervous" and that his voice was shaky. Exhibit 1, Dashcam Video 0:06:09; Exhibit 2, Payton's Depo., 71:1-22, 83:3-9, 85:10-23.

Response: Plaintiff admits that Payton can be heard saying, once inside his patrol car, that Plaintiff  still was "super nervous" and that his voice was shaky, but Plaintiff denies the truth of these statements or that Payton made these statements in good faith. Exhibit 1, Dashcam Video 0:06:09.

28.    Defendant: Trooper Payton found it odd that he would be getting a room with only one hour left in his trip. Exhibit 1, Dashcam Video 0:06:10—0:06:25; Exhibit 2, Payton's Depo., 76:6— 77:20.

Response: Plaintiff denies that Payton actually found it odd that Humphrey would be getting a hotel room with one hour left in the trip, or that any objectively reasonable officer would find this odd or suspicious.  Indeed, Payton conceded in his deposition that it would be reasonable to expect that a person driving a large and unfamiliar rented vehicle would want to stop at nightfall.  Exhibit 2, Payton's Depo., 38:2-5, 40:24—41:25, 102:11-15.  Moreover, Payton made no mention of Humphrey's allegedly odd travel plans in the first summary of the stop he wrote at the insistence of his supervisors, on August 22, 2020.  Exhibit 8, ASP Documents, Payton 1149.  Even in the detailed summary Payton's supervisors requested thereafter, Humphrey's travel plans are of limited significance and

Payton does not argue that they were "odd." *Id.* at Payton 1173-75.

29.     Defendant: After about three minutes in his patrol car, Trooper Payton left his vehicle and again went to speak with Mr. Humphrey. Exhibit 1, Dashcam Video 0:09:09.

        Response: Plaintiff admits that after about three minutes in his patrol car, Trooper Payton left his vehicle and again went to speak with Plaintiff. Exhibit 1, Dashcam Video 0:09:09.

30.     Defendant: At some point, Trooper Payton requested that dispatch to run a criminal history check on Mr. Humphrey. Exhibit 2, Payton's Depo., 89:8—91:8.

        Response: Plaintiff admits that at some point, Trooper Payton requested that dispatch to run a criminal history check on Plaintiff. Exhibit 2, Payton's Depo., 89:8—91:8.

31.     Defendant: While speaking with Mr. Humphrey, Trooper Payton visited with Mr. Humphrey about who rented the truck and they discussed the traffic stop. Exhibit 1, Dashcam Video 0:09:15—0:12:38.

        Response: Plaintiff admits that while speaking with Plaintiff, Trooper Payton asked him questions about who rented the truck and they discussed the traffic stop. Exhibit 1, Dashcam Video 0:09:15—0:12:38. Plaintiff denies the innocuous description that Payton merely "visited with" him as Payton interrogated him and attempted to coerce a consent to search.

32.     Defendant: During this conversation, after Trooper Payton asked about anything illegal being in the U-Haul, Mr. Humphrey took a noticeably deep breath. Exhibit 1, Dashcam Video 0:10:25.

Response: Plaintiff denies that during this conversation Plaintiff took a noticeably or unusually deep breath. Exhibit 1, Dashcam Video 0:10:25. Nor did Payton mention any such deep breath in his summaries and memoranda following the stop. Payton Exhibit 8, ASP Docs. The dash cam video speaks for itself, and it is for the jury to determine whether Plaintiff's breathing pattern noticeably changed and to draw inferences based on those observations.

33.    Defendant: Sergeant Melder testified regarding Mr. Humphrey being nervous that "there's a really deep breath taken by him [Mr. Humphrey] when Trooper Payton asked if there was drugs in the car. He made a really deep breath, which was different than the rest of the time that he was talking to Trooper Payton. And he looked back at the vehicle when he - - when he did that." Exhibit 4, Melder Depo., 24:24—25:4.

Response: Plaintiff admits that this was Melder's testimony but denies the truth of the matters testified to. Moreover, interpreting the uncontroverted video evidence is a task for the jury at trial, which is fully capable of analyzing the same objective evidence.

34.    Defendant: At another point during the conversation, Mr. Humphrey told Trooper Payton that his mother did not want him driving at night, which is one of the reasons he was going to stop in Russellville. Trooper Payton responds that "it is confusing as to why you would not have just drive on to Little Rock it is an hour away." Exhibit 1, Dashcam Video 0:10:55—0:11:07.

Response: Plaintiff admits that he told Trooper Payton that his mother did not want him driving at night, which is one of the reasons he was going to stop in Russellville. Plaintiff admits that Payton responded that "it is confusing as to why you would

14

not have just drive on to Little Rock it is an hour away." Exhibit 1, Dashcam Video 0:10:55—0:11:07.  Plaintiff denies that this interaction was cause for confusion, as Plaintiff offered a rational explanation for why he would not drive to Little Rock that evening in the dark. *See also* Exhibit 2, Payton's Depo., 38:2-5, 40:24—41:2, 102:11-15.

35.    Defendant: Mr. Humphrey at one point told Trooper Payton, "Honestly, I just don't want to get shot…and I am sorry about that." Exhibit 1, Dashcam Video 0:11:18—0:11:22; Exhibit 3, Humphrey Depo., 81:14-22.

Response: Plaintiff admits that he told Payton,  "Honestly, I just don't want to get shot…and I am sorry about that." Exhibit 1, Dashcam Video 0:11:18—0:11:22; Exhibit 3, Humphrey Depo., 81:14-22.

36.    Defendant: After Mr. Humphrey refused to give consent to Trooper Payton to allow him to search the U-Haul, Trooper Payton tells Mr. Humphrey to "have a seat right there [motioning to the back bumper of the U-Haul] I am going to get a dog." Exhibit 1, Dashcam Video 0:11:38— 0:11:46.

Response: Plaintiff admits that after Plaintiff refused to give consent to Trooper Payton to allow him to search the U-Haul, Trooper Payton told him to "have a seat right there [motioning to the back bumper of the U-Haul] I am going to get a dog." Exhibit 1, Dashcam Video 0:11:38— 0:11:46.

37.    Defendant: Based upon his experience as a law enforcement officer, Trooper Payton thought that Mr. Humphrey was way more nervous than an average person that Trooper Payton had previously stopped for a traffic violation. Exhibit 2, Payton's Depo., 92:25—93:4; *see also* Exhibit 8, ASP Docs, Payton 1148, 1149, 1174.

Response: Plaintiff denies this statement in its entirety.  Payton's self-serving claim that Plaintiff "was way more nervous than an average person that Trooper Payton had previously stopped for a traffic violation" is belied by the video evidence depicting Plaintiff interacting with Payton in a calm and respectful manner.  Exhibit 1, Dashcam Video, 00:4:25—00:6:00; 00:9:12—00:12:30.  The credibility of Payton's claim that Plaintiff was unusually nervous must be determined by the jury at trial.  Moreover, Payton's subjective belief about Plaintiff's nervousness is irrelevant as the issue at trial is whether an objectively reasonable officer would interpret Plaintiff's nervousness as suspicious under the totality of the circumstances, which includes the fact that Plaintiff was a Black man stopped in an unfamiliar area at dusk just a few months after the murder of George Floyd at the hands of a white law enforcement officer.  *See* Exhibit 2, Payton's Depo., 80:5-13 (testifying that a Black man would be reasonably expected to have some level of nervousness when stopped by law enforcement three months after the murder of George Floyd). Interpreting Plaintiff's objective signs of nervousness and evaluating the credibility of Payton's claim regarding Plaintiff's nervousness are both tasks reserved for the jury at trial.

38.    Defendant: Trooper Payton thought he had reasonable suspicion that additional criminal activity was afoot considering everything he had observed from Mr. Humphrey, and combined with his training and experience, believed Mr. Humphrey was concealing something from him. Exhibit 2, Payton's Depo., 93:24—95:1, 105:14-25.

Response:  Plaintiff denies this statement in its entirety.  Plaintiff denies Payton's self-serving and conclusory claim that Payton thought he had reasonable suspicion that additional criminal activity was afoot considering everything he had

16

observed from Mr. Humphrey, and combined with his training and experience, believed Mr. Humphrey was concealing something from him. Exhibit 2, Payton's Depo., 93:24—95:1, 105:14-25.   Matters of credibility must be determined by the jury. And as aforementioned,  Payton's  subjective belief about whether he thought he had reasonable suspicion is irrelevant to the objective Fourth  Amendment inquiry.

39.     Defendant: Sergeant Melder testified that he believed that Trooper Payton had reasonable suspicion sufficient to extend the traffic stop to request a K-9. Exhibit 4, Melder Depo., 80:1-6, 144:15-18.

Response: Plaintiff admits that Melder—who was not present for the traffic stop or search—testified as such. Plaintiff denies that an objectively reasonable officer under the totality of the circumstances, and actually present for the stop, would agree. Plaintiff also challenges the credibility of this testimony, as Melder told Payton on the night of August 20 that, in Melder's assessment, Plaintiff was *not* carrying a load of narcotics. Exhibit 4, Melder Depo., 47:16-25; 51:13-53:7.  Melder, who is trained in drug interdiction, would not have searched Humphrey's U-Haul based on the evidence relayed to him by Payton.  *Id.* at 99:11-17; 113:6-11.   What weight to assign Melder's contradictory testimony is for the jury to decide.

40.     Defendant: Roughly eleven (11) minutes into the traffic stop, Trooper Payton then returned to his patrol car to request a K-9 unit. Exhibit 1, Dashcam Video 0:12:40—0:14:51.

Response: Plaintiff admits that roughly eleven (11) minutes into the traffic stop, Trooper Payton returned to his patrol car to request a K-9 unit. Exhibit 1, Dashcam

Video 0:12:40—0:14:51. Plaintiff denies any implicit suggestion that it was reasonable or lawful for Payton to do so.

41.    Defendant: Trooper Payton then made contact with Hugh Davis with the United States Forest Service who said he would respond with his K-9. Exhibit 1, Dashcam Video 0:13:11—0:14:51; *see also* Exhibit 5, Deposition of Hugh Davis, 10:1-24 (hereinafter "Exhibit 5, Davis Depo.").

Response: Plaintiff admits that Trooper Payton made contact with Hugh Davis with the United States Forest Service who said he would respond with his K-9. Exhibit 1, Dashcam Video 0:13:11—0:14:51; *see also* Exhibit 5, Deposition of Hugh Davis, 10:1-24 (hereinafter "Exhibit 5, Davis Depo."). Plaintiff notes that this was the *second* contact with Davis, however, since Payton had texted Davis less than eight minutes into the stop making sure Davis was available to bring a dog out to sniff Plaintiff's vehicle that evening.  Exhibit 2, Payton Depo., 51:10—52:25.  Notably, Payton concedes that he did not have reasonable suspicion to justify a canine sniff at the time he sent this text message. *Id.* 51:10—15, 63:18—64:7.

42.    Defendant: Dispatch advised Trooper Payton that Mr. Humphrey had no warrants and his license was active. Exhibit 1, Dashcam Video 0:16:32—0:16:47.

Response: Plaintiff admits that dispatch advised Trooper Payton that Mr. Humphrey had no warrants and his license was active. Exhibit 1, Dashcam Video 0:16:32—0:16:47.

43.    Defendant: Throughout the entire traffic stop up to this point, Mr. Humphrey was able to speak with his father, Marion Humphrey, Sr., a lawyer and former judge.

Exhibit 3, Humphrey Depo., 51—52:7, 6:25—7:1.

Response: Plaintiff admits that he was able to speak with his father, Marion Humphrey, Sr., a lawyer and former judge, up to that point of the traffic stop. Exhibit 3, Humphrey Depo., 51—52:7, 6:25—7:1.

44.    Defendant: Likewise, Mr. Humphrey was able to make Facebook posts using his cell phone during the traffic stop to this point. Exhibit 3, Humphrey Depo., 38:16—39:16, Exhibit 3 of Humphrey Depo., bates number HUMPHREY_000100-01.

Response: Plaintiff admits he was able to make Facebook posts using his cell phone during the traffic stop to this point. Exhibit 3, Humphrey Depo., 38:16—39:16, Exhibit 3 of Humphrey Depo., bates number HUMPHREY_000100-01.

45.    Defendant: Approximately nine (9) minutes after being requested, Hugh Davis and his K-9, Dunja arrived on scene and within thirty (30) minutes of the initiation of the traffic stop. Exhibit 1, Dashcam Video 0:27:43—0:28:30; Exhibit 2, Payton's Depo., 127:12-23; *see also* Exhibit 5, Davis Depo., 11:1-7.

Response: Plaintiff admits that approximately nine (9) minutes after Payton's direct request—excluding his text message from his personal phone to Davis asking Davis to make himself available that evening—and within thirty (30) minutes of the initiation of the traffic stop, Hugh Davis and his K-9, Dunja arrived on scene.  Exhibit 1, Dashcam Video 0:27:43—0:28:30; Exhibit 2, Payton's Depo., 127:12-23; *see also* Exhibit 5, Davis Depo., 11:1-7.

46.    Defendant: Prior to initiating the search with Dunja, Officer Hugh Davis thought that Trooper Payton had reasonable suspicion sufficient for him to initiate the

search with Dunja. Exhibit 5, Davis Depo., 65:6-11.

Response:   Plaintiff admits that Davis *testified* that prior to initiating the search with Dunja, Davis thought that Trooper Payton had reasonable suspicion sufficient for him to initiate the search with Dunja, Exhibit 5, Davis Depo., 65:6-11, but Plaintiff denies the credibility of that testimony or that reasonable suspicion for a canine sniff existed. Plaintiff asserts that it will be for the jury to determine what weight to assign this testimony as Davis testified that all the information he relied on to determine there was reasonable suspicion was received second-hand through Payton. *Id.* at 39:11-25.

47.    Defendant: Hugh Davis let his K-9 out of his vehicle and almost immediately the K-9 began to alert as to the odor of narcotics from the U-Haul. Exhibit 1, Dashcam Video 0:28:28—0:29:07; Exhibit 5, Davis Depo., 47:5-8, 49:1—50:9; Exhibit 6, Body-Cam Video of Hugh Davis, 0:00:54.

Response: Plaintiff admits that, according to Davis, the K-9 began to alert as to the odor of narcotics from the U-Haul. Exhibit 5, Davis Depo., 47:5-8, 49:1—50:9. Plaintiff denies that K-9 alert can be seen from the dashcam video and further denies Payton's subjective characterization that the alert occurred "almost immediately." Exhibit 1, Dashcam Video 0:28:28—0:29:07.

48.    Defendant: The K-9 gave a strong indication that the source of the narcotics odor was the passenger-side directly behind the cab of the U-Haul. Exhibit 2, Payton's Depo., 150:5-15; Exhibit 5, Davis Depo., 42:18-23, Exhibit 6, Body-Cam Video of Hugh Davis, 0:01:14-0:01:28; Exhibit 7, Hugh Davis's Incident Report, bates number Humphrey_002326 (hereinafter "Exhibit 7, Davis Report").

20

Response: Plaintiff admits that, according to Davis and Payton, the K-9 gave a strong indication that the source of the narcotics odor was the passenger-side directly behind the cab of the U-Haul.

49.    Defendant: Officer Davis then gave Trooper Payton a thumbs-up indicating that there was a positive alert for the odor of narcotics. Exhibit 1, Dashcam Video 0:29:07; Exhibit 2, Payton's Depo., 130:6—131:24; Exhibit 5, Davis Depo., 53:25—54:7.

Response: Plaintiff admits that Officer Davis then gave Trooper Payton a thumbs-up indicating that there was a positive alert for the odor of narcotics. Exhibit 1, Dashcam Video 0:29:07; Exhibit 2, Payton's Depo., 130:6—131:24; Exhibit 5, Davis Depo., 53:25—54:7.

50.    Defendant: Trooper Payton then placed Mr. Humphrey into handcuffs to detain him while he conducted a search of the U-Haul and Mr. Humphrey was placed into the back of Trooper Payton's patrol car. Exhibit 1, Dashcam Video 0:29:12—0:30:10; Exhibit 2, Payton's Depo., 131:25—132:2; Exhibit 5, Davis Depo., 40:20-25.

Response: Plaintiff admits that Payton then placed him into handcuffs while he and other officers conducted a search of the U-Haul and Plaintiff was placed into the back of Payton's patrol car. Exhibit 1, Dashcam Video 0:29:12—0:30:10; Exhibit 2, Payton's Depo., 131:25—132:2; Exhibit 5, Davis Depo., 40:20-25. As Payton concedes, Plaintiff had been seized long before he was handcuffs—Plaintiff was not free to leave from the moment Payton approached the U-Haul until Payton removed the handcuffs. Payton Depo., 13:11-22.

51.    Defendant: The K-9 was brought out several additional times in order to

confirm and pinpoint the source of the odor, which the K-9 continued to alert to the same area which was between the cab and the box area of the truck on the passenger side. Exhibit 1, Dashcam Video 0:49:35— 0:50:52, 1:21:30—1:21:49; Exhibit 2, Payton's Depo., 138:17—139:16; Exhibit 7, Davis Report, bates number Humphrey_002326.

Response: Plaintiff admits that the K-9 was brought out several additional times, and that according to Payton and Davis the K-9 continued to alert to the same area which was between the cab and the box area of the truck on the passenger side. Exhibit 2, Payton's Depo., 138:17—139:16; Exhibit 7, Davis Report, bates number Humphrey_002326. Plaintiff denies that the K-9 alerts on the front passenger side can be seen on the dashcam video, as Davis and the K-9 are both out of sight. Exhibit 1, Dashcam Video 0:49:35— 0:50:52, 1:21:30—1:21:49.

52.    Defendant: The area of the U-Haul in which the dog alerted appeared to have recent body work done. Exhibit 5, Davis Depo., 30:10-24, 56:19—57:17; Exhibit 7, Davis Report, bates number Humphrey_002326.

Response:    Plaintiff admits that Davis testified that, in his opinion, it looked like the U-Haul had recent body work done, but Plaintiff denies that he noticed or became aware of any recent body work on the outside of the U-Haul. Plaintiff denies that the area of the K-9 alerts can be seen on the dashcam video, as Davis and the K-9 are both out of sight. Exhibit 1, Dashcam Video 0:49:35— 0:50:52, 1:21:30—1:21:49.

53.    Defendant: Even though the officers were unable to locate any drugs in the U-Haul, Trooper Payton and Hugh Davis still believed that drugs were hidden somewhere within the U-Haul. Exhibit 2, Payton's Depo., 139:20—140:4, 140:23—141:1; Exhibit

5, Davis Depo., 30:10-24, 54:8—55:2.

Response: Plaintiff admits that the officers engaged in the search were unable to locate any drugs in the U-Haul, despite four officers searching the U-Haul for over an hour. Exhibit 2, Payton's Depo., 136:4-25. Plaintiff denies that either Payton or Davis believed – let alone reasonably believed – that drugs were hidden in the U-Haul at any point after the search concluded, a claim which is undermined by the decision not to take any further investigative measures to locate this imaginary contraband. For example, Payton declined to bring a drill to the scene, did not tow the vehicle to search for a supposed hidden compartment, and never followed-up with the U-Haul store after Plaintiff returned the truck. *Id.* at 141:1-19; 142:12-15.  Furthermore, Payton never told Melder that he allegedly still believed there was contraband in the truck.  Exhibit 4, Melder Depo., 18:4-8.  The credibility of Payton's claim that he still believed there were drugs hidden in the U-Haul is a question for the jury.

54.     Defendant: While Mr. Humphrey was alone in Trooper Payton's patrol car, and unbeknownst to Trooper Payton at the time, Mr. Humphrey is heard stating to himself that he has an open container in the U-Haul. Exhibit 1, Dashcam Video 1:23:35—1:23:52; Exhibit 3, Humphrey Depo., 94:10—95:19.

Response: Plaintiff denies this claim as the audio on this portion of the dashcam video is too low quality to make out what Plaintiff is saying, and Plaintiff does not recall what he was muttering or whether he had an open container in a suitcase in the U-Haul.  Exhibit 1, Dashcam Video 1:23:35—1:23.  Interpreting ambiguous video evidence is a task for the jury at trial.  Plaintiff denies any implication that he was

drinking that evening.  Exhibit 3, Humphrey Depo., 95:18-19.

55.   Defendant: After searching for approximately an hour and twenty minutes, which produced negative results, Trooper Payton returned to his unit and issued Mr. Humphrey a warning for careless and prohibited driving and released him. Exhibit 2, Payton's Depo., 85:3-5; Exhibit 8, ASP Docs, Payton 1072; *see also* Exhibit 1, Dashcam Video 1:49:53—1:51:38.

Response: Plaintiff admits that after searching for approximately an hour and twenty minutes, which produced negative results, Trooper Payton returned to his unit and issued Mr. Humphrey a warning for careless and prohibited driving and released him, but Payton only removed Plaintiff from the back of the squad car and removed the handcuffs once the written warning was complete. Exhibit 2, Payton's Depo., 85:3-5; Exhibit 8, ASP Docs, Payton 1072; *see also* Exhibit 1, Dashcam Video 1:49:53—1:51:38.

56.   Defendant: Captain Drown reviewed the traffic stop. In a memorandum to Major Marks dated September 4, 2020, Captain Drown following his review of the traffic stop of Mr. Humphrey explained that "[i]n my experiences I often found individuals looking for or at signs, places, or other items of identification to quickly develop a response for a destination when trying to conceal something from me. It was also odd that a short trip from Fayetteville to Little Rock would require an overnight stay. He then said he wasn't even sure if he was going to get a room or not. The driver said his mother did not want him traveling at night. Trp. Payton found these responses odd and so do I." Exhibit 8, ASP Docs, Payton 7.

Response: Plaintiff admits that this accurately portrays the contents of Drown's memorandum but denies the truth, relevance and credibility of the statements therein. Drown was not present for the stop and search, therefore his opinions are based on evidence the jury is capable of viewing and evaluating independently.  Payton's conduct caused public outrage and drew a flood of complaints.  Exhibit 4, Melder Depo., 13:18-22, 15: 10-13, 32:25—33:5, 106:15-25.  Drown drafted this memo only after Payton and the Arkansas State Police came under fire for the stop and search of Plaintiff's vehicle, and after Drown's superior officer had called him to inquire about the incident.  *Id.* at 19:9—20:8.  Even a deputy prosecutor had asked to view the video of the stop because of the public backlash.  Exhibit 2, Payton Depo., 174:16-22.  By the time Drown wrote this memorandum, litigation against Payton and ASP was reasonably foreseeable. The context in which this memorandum was written calls into the question of the credibility of Drown's statements.

57.    Defendant: In addition, regarding Mr. Humphrey's nervousness, Captain Drown explained that "everyone is a bit nervous or apprehensive when stopped by the police, including myself. The nervousness subsides and either goes away mostly or completely after initial contact is made and there is nothing other than the traffic violation to conceal. In this case the nervousness continued to increase up and to detainment." Exhibit 8, ASP Docs., Payton 7.

Response: Plaintiff admits that this accurately portrays the contents of Drown's memorandum but denies the truth, relevance, and credibility of the statements therein.  Drown was not present for the stop and search, therefore his opinions are based

25

on evidence the jury is capable of viewing and evaluating independently—including whether Plaintiff shows increased signs of nervousness *before* Payton decided to call out the K-9 (which it is undisputed Payton needed reasonable suspicion to do). Plaintiff also denies that Drown's subjective opinion that nervousness tends to decrease over time is relevant, as an objectively reasonable officer would conclude that a person becomes *more nervous* the longer an officer detains him on the side of the road, in an unfamiliar area, at dusk, and questions him about criminal activity unrelated to the traffic stop. Moreover, the same credibility issues regarding the timing of Drown's statements apply here as above.

## PLAINTIFF HUMPHREY'S STATEMENT OF DISPUTED MATERIAL FACTS

In addition to the disputes set forth in the Responses above, and the Factual Background included in his Brief in Opposition to Defendant's Motion for Summary Judgment, Humphrey provides the following statement of the material facts as to which he contends a genuine dispute exists to be tried, in compliance with Local Rule 56.1(b):

1. On August 20, 2020, Marion A. Humphrey, Jr. (Humphrey) was moving from Fayetteville, Arkansas to Little Rock, Arkansas using a U-Haul box truck. Exhibit 1, Dashcam Video 00:05:06.

2. Humphrey's classes had moved to an online format due to the COVID-19 pandemic, and he decided to move home to Little Rock to take his courses online. Exhibit 1, Dashcam Video 02:50—3:14, 00:04:45—5:20.

3. He picked up a rented U-Haul just before 5:30 p.m. on August 19, 2020, at the Fayetteville U-Haul store. Noel Exhibit 3, Rental Agreement. He spent the next day packing all of his belongings neatly into the truck. Exhibit 3, Humphrey Depo., 77:1-

9.

4.    Because Humphrey tries not to drive at night, his initial plan was to make the approximately three-hour drive from Fayetteville to Little Rock before nightfall. *Id.* Packing and loading the U-Haul took longer than expected, and Humphrey got on the road later than intended. *Id.*

5.    Humphrey realized he likely would not make it to Little Rock before nightfall, and he was unsure that his friend would be available to help him unload that late. *Id.* So, Humphrey decided that he would spend the night at a hotel in Russellville. Exhibit 1, Dashcam Video 00:04:22-40.

6.    Around 8:00 p.m. on August 20, 2020, Defendant Steven Payton was parked on the median observing traffic near mile marker 70 of Interstate 40. Payton Exhibit 8, ASP Docs, Payton 1147, 1173.

7.    Payton was a highway trooper with ASP, but he aspired to join—and had applied for an open position with—ASP's drug interdiction team. Exhibit 4, Melder Depo., 55:7-24. Payton was gratified by the praise he received from other ASP troopers and his supervisors for a few narcotics busts he made during previous traffic stops. *Id.* at *100:19—101:4*; Exhibit 2, Payton Depo., 142:1-15.

8.    When Payton saw a black Cadillac Escalade SUV drive by, followed by another smaller car, and then a U-Haul box truck—he believed the SUV and box truck to be traveling together. Payton Exhibit 8, ASP docs, Payton 1173. He thought this might indicate drug-trafficking activity, and saw an opportunity for another potential drug bust. *Id.*

27

9. Payton gave chase. Payton Exhibit 8, ASP docs, Payton 1173. First, he pulled up next to the U-Haul truck. *Id.* Payton noted that the U-Haul was driven by a Black man—later identified as Humphrey—who was sitting upright with his hands at ten-and-two on the steering wheel. *Id.* Humphrey was looking forward and did not look over or acknowledge Payton. *Id.* Holding the steering wheel at ten-and-two is normal, and recommended, driving behavior. Noel Exhibit 2, Expert Report of Shaun Santos, ¶¶ 136-38, 173 (hereinafter, "Santos Report"); Exhibit 2, Payton Depo., 40:2-17; Exhibit 4, Melder Depo., 36:22—37:5.

10. Although Payton also observed the SUV and thereby eliminated any initial suspicion that the Escalade and U-Haul were traveling together, Payton pursued the Black man driving the U-Haul truck. Payton Exhibit 8, ASP docs, Payton 1173.

11. Payton's suspicion was based on nothing other than Humphrey's race and the fact that Humphrey was driving in a manner that even Payton now concedes is reasonable under the circumstances. Exhibit 2, Payton Depo., 37:16—38:5, 40:24—41:22. U-Haul trucks are generally rented vehicles with which drivers are not familiar, and U-Haul drivers are often in unfamiliar areas. *Id.* Thus, a driver can reasonably be expected to drive a large and unfamiliar rental vehicle with additional caution. Santos Report ¶¶ 136-38, 173.

12. Payton disclaims that his reasonable suspicion to later extend the traffic stop for a canine sniff was based on his initial observations of Humphrey. Exhibit 2, Payton Depo., 44:6-9. Yet, Payton was so set on investigating Humphrey that he raced at speeds over 100 mph to chase Humphrey down. Exhibit 4, Melder Depo., 86:10—

28

87:4;  Noel Exhibit 5, Screenshot of Squad Video.

13.    After chasing Humphrey down at high speed, Payton nearly caught up to Humphrey as he approached the mile 81 marker on Interstate 40.  Exhibit 1, Dashcam Video, 00:00:20-50.  However, Payton was still hundreds of feet behind Humphrey at the time the U-Haul approached and passed the exit.  *Id.*

14.    Humphrey was planning to stop for the evening in a hotel.  *Id.* 00:02:50—3:14.  He knew that the hotel he was looking for was near the Cracker Barrel, but he was not familiar with this area as he had never stayed in Russellville before.  *Id.*  Humphrey put on his turn signal and moved slightly towards the exit.  *Id.* 00:00:45-55. Unsure that this was the correct exit, Humphrey changed his mind.  *Id.*  He turned off his signal and continued straight on the highway.  *Id.*

15.    Humphrey did not dramatically veer towards or away from the exit, or come anywhere close to causing an accident.  *Id.*  Any  movement of the U-Haul is nearly imperceptible from the vantage point of  Payton's dashcam video—which, of course, is where Payton was viewing what transpired.  *Id.*

16.    Humphrey did not cross the white fog line.  Exhibit 3, Humphrey Depo.,  81:7-11.

17.    Still, Payton saw this innocuous driving behavior as an opportunity to seize Humphrey, who had been in his sights for miles.  Exhibit 8, ASP Docs.  He engaged his flashing lights and pulled Humphrey over.  Dashcam 00:1:06-25.  Humphrey pulled over onto the shoulder immediately.  *Id.*

18.    For the rest of the encounter, Payton told everyone around him—including Humphrey

himself—that he pulled Humphrey over because he almost wrecked the U-Haul truck or about wrecked the truck. *See, e.g.,* Exhibit 1, Dashcam Video 00:04:23, 00:9:30, 00:31:42-54, 00:35:45, 01:48:41.    Payton has since abandoned this debunked pretextual justification for his stop.  Exhibit 2, Payton Depo., 46:2-23, 48:8-10.

19.    Payton exited his squad car and approached the passenger side of Humphrey's U-Haul, but Humphrey could not roll down the window or open the door because his bags were in the way.  Exhibit 2, Payton Depo., 13:23—14:19, 121:18—122:2, 147:1-4.  Although Payton told other officers that evening that Humphrey did not want him near the passenger side of the U-Haul, Exhibit 1, Dashcam Video 01:21:13-22 and 01:32:49, Payton now admits the Humphrey never refused to open the passenger door. Exhibit 2, Payton Depo., 13:23—14:19, 146:20—147:20.

20.    Payton saw a suitcase on the passenger seat and—despite knowing only that Humphrey was a Black man in a moving truck—he *automatically* thought that the suitcase was full of contraband.  *Id.* at 145:14—146:16.   This is an unreasonable assumption because U-Hauls are often used for moving personal belongings, including suitcases.  *Id*. at 37:20-38:1; Exhibit 4, Melder Depo., 84:6-9.

21.    As Humphrey walked to the back of the U-Haul with Payton, he kept his hands in the air until Payton said he could put them down. Exhibit 1, Dashcam Video 00:04:05-20.   The hands-up position is a sign of deference and compliance towards law-enforcement officials.  Santos Report ¶ 194, 311.

22.    Payton asked Humphrey where he was headed.   Exhibit 1, Dashcam Video 00:04:22-45.  Humphrey calmly and clearly explained that his final destination was Little Rock,

but that he was planning to spend the night in Russellville. *Id.* He had just missed the turn for his hotel, and now he needed to figure out how to get back to Exit 81. *Id.*

23. Payton knew there was a hotel off of Exit 81 and told Humphrey he could direct him. Exhibit 1, Dashcam Video 00:04:45; Exhibit 2, Payton Depo. 69:20-22.

24. Humphrey also explained that he was coming from Fayetteville, where he went to school, and headed to Little Rock, where he lives. Exhibit 1, Dashcam Video 00:04:45—5:20. His classes would be remote in the fall, so he was moving home to Little Rock to take them online. *Id.*

25. As a precaution to protect his older parents, Humphrey was planning to quarantine at his parent's rental home when he arrived. *Id.*; Exhibit 3, Humphrey Depo., 78:15—79:12. Quarantining during the COVID-19 pandemic was a well-known practice, recommended by the Center for Disease Control (CDC), that does not suggest criminal activity. Exhibit 2, Payton Depo., 76:14—77:1; Exhibit 4, Melder Depo., 59:8-23; Santos Report ¶¶ 167-68.

26. As can be seen on the dashcam video, it was dusk when Payton stopped Humphrey just after 8:00 p.m.. Exhibit 1, Dashcam Video. It is common for a person driving an unfamiliar vehicle—such as a rented U-Haul—in an unfamiliar area to avoid driving at night. Exhibit 2, Payton Depo., 38:2-5; 40:24—41:2, 102:11-15; Santos Report ¶¶ 136-40.

27. Payton asked if Humphrey had anything illegal in the U-Haul, and Humphrey firmly and unequivocally answered that he did not. Exhibit 1, Dashcam Video 00:05:38-59.

31

28. During this initial interaction with Payton, Humphrey does not appear outwardly nervous on the dashcam video. *Id.* at 00:04:21—5:59. The video does not portray Humphrey shaking or trembling. *Id.*; Exhibit 4, Melder Depo., 25:6-18. He is calm and respectful, and answers all of Payton's questions in a clear and even tone. *Id.*

29. Even so, shaking hands and a cracking voice are consistent with a normal level of nervousness exhibited by a large number of motorists stopped by a law enforcement officer for a motor vehicle violation. Santos Report ¶¶161-62.

30. Payton told Humphrey there was nothing to be nervous about because he would not even be getting a ticket that evening, to which Humphrey smiled and joked, "I hope not." Exhibit 1, Dashcam Video 00:05:59.

31. Payton had never met Humphrey before August 20, 2020, and therefore had no baseline to determine if Humphrey was more or less nervous than he would usually be under similar circumstances. Exhibit 2, Payton Depo., 125:19—130:1.

32. From the squad car, Payton texted Hugh Davis of the U.S. Forestry Service from his personal cell phone to ask if he was available that evening for a potential canine sniff. *Id.* at 52:18-25, 91:9-16. He sent this text less than eight minutes into the traffic stop when, by his own assessment, he did not have reasonable suspicion to extend the stop. *Id.* at 51:10—15, 63:18—64:7. At this point, Payton had already registered his subjective perceptions that Humphrey was "super nervous," that his hands and voice were shaking, and that it was unusual that he was stopping in Russellville with only an hour left in his trip. Exhibit 1, Dashcam Video 00:05:45—6:25.

33. Payton approached Humphrey again and asked about the U-Haul rental. *Id.* at

00:09:15-25. Consistent with the rental agreement—which Payton had in his possession—Humphrey responded that he had rented the truck in Fayetteville the day prior. *Id.* The rental agreement corroborated Humphrey's stated travel plans: the agreement was in his name; he picked up the U-Haul up in Fayetteville at 5:22 p.m. on August 19, 2020; it was due to be returned the next day in Little Rock. Noel Exhibit 3, Rental Agreement.

34. Payton confronted Humphrey about being nervous. Exhibit 1, Dashcam Video 00:09:50-58. Humphrey candidly explained that he was nervous because he was stopped by the police, which is very rare for him. *Id.*

35. Being nervous during a traffic stop is not unusual or suspicious because almost everyone is nervous when this occurs—even police officers and innocent travelers. *See, e.g.,* Exhibit 4, Melder Depo. 25:23-24; Exhibit 5, Davis Depo., 38:11-18; Exhibit 2, Payton Depo., 81:4-13, 129:13-17; Payton Exhibit 8, ASP Docs., Payton 7; Santos Report ¶ 123.

36. In particular, it is understandable for a Black man to be nervous when stopped by police just a few months after George Floyd was murdered by a police officer during a routine stop gone horrifically wrong. Exhibit 2, Payton Depo., 80:5-13.

37. Payton attempted to coerce Humphrey into consenting to a search of his U-Haul. Exhibit 1, Dashboard Video 0:10:20—11:54. First he asked if anything illegal was in the U-Haul; Humphrey said there was not. *Id.*

38. Then, Payton asked if Humphrey minded if he took a look inside; Humphrey said that he did mind. *Id.*

39. Next, Payton asked if a dog would alert if Payton brought one out; Humphrey insisted it would not alert on anything and told Payton he "promised" it would not. *Id.*

40. Humphrey told Payton he did not believe that bringing out a dog was fair to him as a citizen. *Id.* Payton responded that if Humphrey would just let him take a look in the U-Haul, then he would not have to bring a dog and Humphrey could be on his way down the road. *Id.*

41. Humphrey reluctantly relented to Payton's pressure tactics—stating that although he thinks it is invasive of his rights, Payton could have a look inside the U-Haul. *Id.* Payton declined to look inside, and instead returned to his squad car to call for a canine. *Id.* at 00:12:29.

42. Although Payton accused Humphrey of having shaking hands and a shaky voice, the objective video evidence does not support these subjective perceptions. *Id.* at 00:10:40—11:10; Exhibit 4, Melder Depo., 25:6-25.

43. Consistent with his previous statements that he was planning to spend one night in Russellville on his way to Little Rock, Humphrey informed Payton that his mom does not like him driving at night. *Id.* at 00:10:56—11:03.

44. Moreover, Humphrey firmly denied that he "almost wrecked" his U-Haul before Payton pulled him over. *Id.* at 00:11:31—35. Humphrey has consistently denied that he almost wrecked his vehicle, or that he committed any lane or traffic violation justifying a traffic stop. *Id.* at 00:09:30-40, 00:11:34; Exhibit 3, Humphrey Depo., 75:5, 77:11-15, 81:7-11.

45. While Payton waited in his squad car for Davis to arrive with the canine, dispatch informed him that Humphrey had a valid license, no warrants, and no criminal history. Exhibit 1, Dashboard Video 00:16:40-47.

46. After about eight minutes of waiting, Payton returned to speak with Humphrey outside. *Id.* 00:21:11-25. Payton told Humphrey the dog was on the way, and that Humphrey would be on his way if the dog did not alert. *Id.* Payton volunteered that he was "not a bit nervous about" Humphrey. *Id.* at 00:21:33-50.

47. When Davis arrived with the canine about fifteen minutes after Payton requested him, Humphrey moved towards the squad car to allow for the sniff. *Id.* at 00:27:45—28:08. Davis gave Payton a thumbs-up sign about forty seconds into the canine sniff—most of which is not captured on the dashboard camera as the front right passenger side is out of view. *Id.*

48. Payton asked Humphrey to come around to the front of the squad car, patted him down, and placed him in handcuffs. *Id.* at 00:28:20-59.

49. Humphrey complied with the handcuffing process despite his distress. *Id.* Humphrey promised that there was nothing in the vehicle and stated twice that he "didn't do anything." *Id.* 00:29:54—30:17. He verbally confirmed that he did not have any weapons on him. *Id.*

50. Humphrey remained handcuffed in the back of the squad car for the next hour and twenty minutes, while four officers conducted a search of the U-Haul. *Id.* at 00:29:50—01:51:39.

51. During the search, the dashcam captured Payton disparaging Humphrey for being "obnoxious," *id.* at 00:33:57, "calling his daddy" at age thirty-two, *id.* at 00:34:47, and for still being a student. *Id.* at 00:34:55.

52. Payton described Humphrey to Davis as "going ballistic," which Payton conceded at his deposition never happened. *Compare id.* at 01:01:19, *with* Exhibit 2, Payton Depo., 130:2-5, 144:2-17.

53. The nearly hour-and-a-half long search did not uncover any narcotics. Exhibit 1, Dashboard Video 00:32:00—1:42:50.

54. Although the officers speculated at length about the possibility that there was a false compartment near the front passenger side of the U-Haul, they did not find one. *Id.* at 01:01:52—01:22:59.

55. Payton declined to bring out a drill or scope to keep searching the front passenger side of the U-Haul, and he did not have the U-Haul towed for a more thorough examination. Exhibit 2, Payton Depo., 142:12-15; Exhibit 5, Davis Depo. 34:21—35:5. Payton never followed up with the Little Rock U-Haul store about this vehicle and the supposed compartment. Exhibit 2, Payton Depo., 141:1-19.

56. Payton never told his supervisor, Sergeant Chase Melder, that he still believed there were drugs in the U-Haul when Humphrey drove away. Exhibit 4, Melder Depo., 18:4-8.

57. Because the U-Haul was a two-day rental, the officers' belief that any hypothetical drugs were in an elaborate secret compartment cast suspicion away from Humphrey.

Exhibit 1, Dashcam Video 01:34:50—35:35, 01:40:15-25, 01:49:47; *see also* Exhibit 5, Davis Depo., 30:21-24, 34:15-20.

58.  For the entirety of the search, Humphrey sat in the back of the squad car with his arms handcuffed behind his back. Humphrey begged to be let out of the handcuffs and cried out that his hands hurt so bad. Exhibit 1, Dashcam Video 00:57:50—58:12. Again later, he repeated that his hands hurt so much. *Id.* at 1:17:50.

59.  After an hour of unsuccessful searching, Payton called Melder on the phone for advice about the stop. *Id.* at 01:32:25—36:33. After Payton gave Melder details about the stop—including that it was U-Haul box truck full of personal belongings traveling from Fayetteville to Little Rock and that the driver seemed "super nervous" to Payton—Melder told Payton that this was not  load of narcotics. *Id.* at 1:36:31; Exhibit 4, Melder Depo.,  47:16—48:11; 51:13—53:7; Exhibit 2, Payton Depo., 155:3-23.

60.  Payton said the *biggest reason* for his desire to search the truck was Humphrey's nervousness. Exhibit 1, Dashboard Video 1:32:43.

61.  According to Melder, who is trained in drug interdiction, Fayetteville to Little Rock was not a likely drug trafficking corridor. Exhibit 4, Melder Depo.,  47:16—48:11. Melder would not have searched Humphrey's U-Haul based on the evidence relayed to him by Payton. *Id.* at 99:11-17; 113:6-11.

62.  Despite ransacking Humphrey's personal items in the back of the truck, Payton did not return the belonging to their original condition. Payton Exhibit 8, ASP Docs, Payton 8. Payton failed to do so because he was *frustrated* that he did not find drugs.

*Id.* Melder later reprimanded Payton for this conduct. Exhibit 4, Melder Depo., 97:11—98:1.

63. After about an hour and ten minutes of searching, Payton decided to end the search. Exhibit 1, Dashboard Video 01:42:02. He told Davis he appreciated him and sent him on his way. *Id.* By this point, Payton had decided Humphrey would receive a traffic warning and be released. Exhibit 2, Payton Depo., 159:2-24.

64. Yet, Payton left Humphrey in handcuffs in the back of the squad car for another approximately nine minutes. Exhibit 1, Dashcam Video 01:42:23—01:51:39; Exhibit 2, Payton Depo. 160:7-19.

65. During these nine minutes, Humphrey reminded Payton that he had been in handcuffs for over an hour, and he complained that they were very tight. Exhibit 1, Dashcam Video 1:45:55, 1:46:18-23. He told Payton the handcuffs were so tight that he thought his wrists might bleed. *Id.* at 1:47:52-56.

66. Beyond his physical pain, Humphrey was humiliated and dehumanized by Payton leaving him handcuffed in the squad car; he asked Payton, as soon as he can, to do what he could to restore Humphrey's humanity. *Id.* at 1:44:02-15.

67. Because Humphrey had already been frisked for weapons, Payton knew he was unarmed. Exhibit 1, Dashboard Video 29:30-59. Payton never feared for his safety or the safety of others during his time with Humphrey, and likewise was not concerned about his safety with Humphrey in the backseat. Exhibit 2, Payton Depo., 161:5-25, 162:14-18.

68. Humphrey had never been violent or aggressive during the encounter. *Id.* at 6:23-25; 113:14-17. Humphrey was respectful and cooperative during the stop and search. *Id.* at 6:19-22; 8:3-5.

69. There was nothing preventing Payton from taking off Humphrey's handcuffs while he completed the traffic warning. *Id.* at *164:10-24*.

70. While he was completing the traffic warning, Payton told Humphrey that maybe he should go to trooper school. Exhibit 1, Dashcam Video 1:47:17. He scolded Humphrey for supposedly telling him how to do his job. *Id.* at 1:49:26-33.

71. Payton became aggravated that he thought Humphrey was insinuating race had played a role in the stop. Exhibit 2, Payton Depo., 171:7-15. Payton told Humphrey that "there's nothing wrong with being Black in Russellville," and claimed he "had no idea" Humphrey was Black until he pulled him over. Exhibit 1, Dashcam Video 1:48:32-42. The latter statement was not true—Payton knew Humphrey was Black since he first pulled up next to him near mile marker 71. Exhibit 2, Payton Depo., 167:24-168:13; 172:14-25.

72. In total, Humphrey was seized by Payton for about an hour and fifty minutes. Exhibit 1, Dashcam Video. He spent about an hour and twenty minutes of that time in handcuffs. Exhibit 1, Dashcam Video 00:29:45—01:51:39. In the end, Payton issued Humphrey a traffic warning for careless driving—reiterating that he was "not even getting a ticket." *Id.* at 01:49:58.

73. Humphrey was in physical pain during the week following the incident. Exhibit 4, Humphrey Depo., 32:23—33:6. He had back pain from sitting handcuffed in the

back of the squad car; he had trouble bending over and using the restroom. *Id.* The handcuffs were so tight that they left rings and bruising on his wrists. *Id*. at 33:7-17.

74. Humphrey also suffered long-lasting mental anguish and emotional distress because of Payton's conduct that evening. *Id.* at 21:14—20, 24:1—32:13. Humphrey had trouble focusing and completing his law school coursework, and he sought professional mental health treatment. *Id.*

75. Starting the day after the incident, the Arkansas State Police was inundated with phone calls and emails from outraged citizens. Exhibit 4, Melder Depo., 13:18-22, 15:10-13, 32:25—33:5, 106:15-25. Because the prosecutor's office was likewise receiving calls, a deputy prosecutor asked to review the video of the stop. *Id.* at 102:15—103:2.

76. Due to the public outcry, Payton's entire chain of command became involved in reviewing and responding to the stop. *Id.* at 11:8-18, 13:16-22, 19:19—20:5, 32:25—33:5.

77. Although it was not standard procedure for a traffic stop, Payton's supervisors directed him to complete a written summary of the stop, and, later, to revise the summary several times to provide a more detailed account of the events. *Id.* at 19:2—22:11, 32:17—33:5; Payton Exhibit 8, ASP Docs.

78. Aside from a reprimand for failing to reorder Humphrey's belongings, ASP never disciplined Payton for his conduct. Exhibit 2, Payton Depo., 35:12-15; Exhibit 4, Melder Depo., 9:19—10:1.

Respectfully submitted

**ROBINS KAPLAN, LLP**

Dated: 7/26/2022

By:    s/Andrew J. Noel
Robert Bennett, pro hac vice
Andrew J. Noel, pro hac vice
Marc E. Betinsky, pro hac vice
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
(612) 349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
mbetinsky@robinskaplan.com

**ELDRIDGE BROOKS, PLLC**
Conner Eldridge, Arkansas Bar No. 2003155
Emily Neal, Arkansas Bar No. 2003087
5100 West J.B. Hunt Drive
Suite 840
Rogers, AR 72758
(479) 553-7678
conner@eldridgebrooks.com
emily@eldridgebrooks.com
Attorneys for Plaintiff

93117041.1