## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**MARION ANDREW HUMPHREY, JR.**                                      **PLAINTIFF**

**v.**                                    **Case No. 4:21-CV-00194-LPR**

**STEVEN PAYTON, in his individual capacity**
**as an Arkansas State Police Trooper**                                **DEFENDANT**

### <u>ORDER</u>

This is a § 1983 traffic stop case.  While driving a U-Haul moving truck from Fayetteville to Little Rock on I-40, Marion A. Humphrey, Jr. was pulled over by Arkansas State Trooper Steven Payton.  Trooper Payton says he stopped Mr. Humphrey because (1) the U-Haul began to exit the interstate but then jerked back onto the roadway, (2) during this maneuver, the U-Haul's passenger-side wheels touched the solid white fog line that runs along the right side of the interstate, and (3) the maneuver caused the U-Haul's weight to shift in a manner that can make large vehicles swerve uncontrollably or crash.  Mr. Humphrey disputes all of this.  He says that Trooper Payton completely made up a reason to stop him because (1) Mr. Humphrey was a Black man driving a U-Haul at dusk and (2) Trooper Payton therefore assumed Mr. Humphrey might be trafficking drugs.  Given Mr. Humphrey's position, it is not surprising that he says the stop violated his rights under the Fourth Amendment to the United States Constitution.[1]

---

[1] What is surprising, however, is that Mr. Humphrey does not allege a violation of the Equal Protection Clause. The Equal Protection Clause prohibits racially motivated enforcement of the laws.  *See Johnson v. Crooks*, 326 F.3d 995, 999–1000 (8th Cir. 2003).  It is unclear why Mr. Humphrey has chosen to present this case exclusively as a Fourth Amendment case and forego an Equal Protection Clause claim.  When asked at oral argument why Mr. Humphrey did not bring such a claim, his counsel could not provide any answer.  *See* Oct. 25, 2022 Hr'g Tr. at 94:21–95:5. Nonetheless, Mr. Humphrey has made this choice and it is a choice that has consequences.  Unlike the Equal Protection Clause analysis, in which Trooper Payton's subjective motivations would be relevant, the Fourth Amendment analysis is an objective one.  Even assuming Trooper Payton's subjective motivations were race-based, the Court's Fourth Amendment analysis must focus solely on whether the race-neutral facts known to Trooper Payton provided sufficient justification for the traffic stop.  *See Whren v. United States*, 517 U.S. 806, 810–13 (1996).

Whatever the propriety of the initial traffic stop, the interaction eventually became something more. Trooper Payton found Mr. Humphrey to be unusually nervous for someone being stopped for a minor traffic violation. And he thought Mr. Humphrey's answers to some basic travel-related questions were confusing and inconsistent. Concluding this gave rise to reasonable suspicion that Mr. Humphrey was trafficking drugs or committing some other drug crime, Trooper Payton called for a drug dog. Mr. Humphrey challenges this decision. He says he was (and acted) no more nervous than any Black man would have been (and acted) in an interaction with the police three months after the murder of George Floyd. He also says that his answers to Trooper Payton's questions were neither confusing nor inconsistent. And, in any event, he says that nothing about his nervousness or his answers gave Trooper Payton any grounds to reasonably suspect the trafficking or possession of drugs. Accordingly, Mr. Humphrey claims that Trooper Payton violated the Fourth Amendment by unreasonably extending the traffic stop to call for a drug dog.

Everyone agrees that the dog alerted to the scent of narcotics and that this created probable cause for a search of the U-Haul. At that point, Trooper Payton handcuffed Mr. Humphrey and placed him in the back seat of the police car. Mr. Humphrey sat there handcuffed for over an hour while he watched Trooper Payton and other law enforcement officers rifle through his possessions in the U-Haul. The search revealed no drugs. At the conclusion of the search, Trooper Payton determined he was going to let Mr. Humphrey go. But Trooper Payton left Mr. Humphrey handcuffed in the back seat of the police car for an additional nine minutes. Mr. Humphrey claims that keeping him handcuffed for this last nine minutes was unreasonable, thus constituting excessive force in violation of the Fourth Amendment. Trooper Payton seems to acknowledge that he made a mistake by not uncuffing Mr. Humphrey immediately after the search concluded.

2

But he says it was a reasonable mistake and therefore not an actionable violation of the Constitution.

Pending before the Court is Trooper Payton's Motion for Summary Judgment. This is a hard case and a hard motion. After reviewing the entire record, including the video of the traffic stop, it is difficult to believe that Trooper Payton acted with a pure heart and honest motivations. Even his lawyer concedes that Trooper Payton's actions don't represent the "best practices" of the Arkansas State Police.[2] On the other side of the ledger, however, § 1983 Fourth Amendment claims present daunting hurdles for plaintiffs. The Fourth Amendment doesn't require police officers to be perfect. It doesn't require them to be great. It doesn't even require them to be good. It only requires that police officers make decisions that are objectively reasonable. Basically, if there are race-neutral facts that sufficiently support a police officer's decisions, then that officer's subjective motivations—even potentially racist motivations—don't affect the Fourth Amendment analysis.[3] Whether or not that's a good rule, or one consonant with the original understanding of the Fourth Amendment, is above my pay grade. It's the rule that binding precedent requires me to follow.

Moreover, the Fourth Amendment's objective reasonableness rule is not the only challenge facing Mr. Humphrey. His task is made even more difficult because Trooper Payton invokes a defense known as qualified immunity. Qualified immunity provides government officials like Trooper Payton an additional layer of protection against lawsuits like this one. Essentially, even if Trooper Payton did violate the Constitution, the doctrine of qualified immunity can prevent Mr.

---

[2] Oct. 25, 2022 Hr'g Tr. at 110:9–10, 112:18–25.

[3] That isn't to say the Constitution approves race-based policing—it doesn't. But the protection against such discrimination is found elsewhere in the Constitution. *See Wren*, 517 U.S. at 813 ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."); *Johnson*, 326 F.3d at 999–1000 (analyzing an equal-protection claim arising from a traffic stop). As explained above, Mr. Humphrey chose not to bring such a claim. *See supra* note 1.

Humphrey from successfully suing Trooper Payton. That may seem unfair or illogical. But the Supreme Court has recognized that, because human beings (police officers) enforce our laws, human errors (constitutional violations) are bound to occur; and those tasked with enforcing our laws need latitude to make on-the-spot decisions without fear of enormous civil liability for making a reasonable mistake.[4] The historical, structural, and other legal justifications for the qualified-immunity doctrine need not be repeated here.[5] The long and short of the precedent is that a police officer can be successfully sued only if the applicable law is so clearly established that the police officer is either utterly incompetent or must have known that his or her conduct violated the law.[6] An officer who makes a reasonable mistake of fact or law will not be subject to a lawsuit—even if that reasonable mistake led to a violation of someone's constitutional rights.[7]

The Court discusses the facts of this case and the merits of Mr. Humphrey's claims in great detail below. But here's the bottom line. Binding Fourth Amendment and qualified-immunity precedents set the bar so low for police officers that Trooper Payton is entitled—by the skin of his teeth—to summary judgment on the claims concerning the propriety of the initial stop and the extension of the stop to bring a drug dog. Mr. Humphrey's handcuffing claim, however, is a different story. Trooper Payton must stand trial on that claim because (1) he forfeited any summary-judgment argument on the issue, and (2) it was clear to everyone—including Trooper

---

[4] *See Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.").

[5] To be sure, there is an ongoing scholarly debate concerning the validity and scope of the qualified-immunity doctrine. *See, e.g.*, Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337 (2021); William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018); Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 Notre Dame L. Rev. 1853 (2018); Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. ___ (forthcoming), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4179628. Unless and until the Supreme Court abrogates its current precedent, however, it is my job to faithfully apply the doctrine.

[6] *E.g.*, *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[7] *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Payton at the time—that the Constitution required Mr. Humphrey to be uncuffed as soon as possible after the search of his U-Haul was finished.

## BACKGROUND

At around 8:00 p.m. on August 20, 2020, Trooper Payton was parked in the median of I-40.[8]  He saw a black Cadillac Escalade and a white U-Haul moving truck driving in close proximity to one another.[9]  Trooper Payton thought the two vehicles may have been traveling together, so he decided to catch up to them and investigate.[10]  Trooper Payton never explained why an Escalade and a U-Haul traveling together was suspicious.[11]

Trooper Payton caught up to the U-Haul, which was driven by Mr. Humphrey.[12]  At that time, the U-Haul was in the righthand lane.[13]  While driving in the lefthand lane alongside Mr. Humphrey, Trooper Payton made the following observations.[14]  Mr. Humphrey was sitting "as far back in his seat as he could get," such that it "appeared that he was trying to stay behind the . . .

---

[8] Ex. 4 (Pre-Stop Dashcam) to Noel Decl. (Doc. 38-4).

[9] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 65:3–18.

[10] *See id.* at 65:3–66:10.  There was also "a small black car" driving between the Escalade and the U-Haul.  *Id.* at 65:19–21.  Trooper Payton testified that he did not think the small black car was traveling with the Escalade and the U-Haul.  *Id.* at 65:22–24.  He did not give any reason as to why he was not suspicious of the small black car.  *Id.*

[11] *See id.* at 64:18–65:24; *see also* Ex. 4 (Payton Narrative Report) to Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2).

[12] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 9:13–15.

[13] *See id.* at 36:9–12.  Trooper Payton testified that, as he was catching up to the U-Haul, he saw the truck's wheels "cross[] onto the white fog line on the right."  *Id.*  Trooper Payton does not presently argue that this particular fog-line violation provided probable cause to stop Mr. Humphrey or added anything in the way of reasonable suspicion to call for a drug dog.  But he has gone back and forth on these points over time.  He first testified that this alleged fog-line violation at least somewhat factored into his conclusion that Mr. Humphrey was unusually nervous.  *Id.* at 35:24–36:24.  He later walked that back, conceding that this particular fog-line violation did not "in any way" factor into his "calculus of whether [he] had reasonable suspicion that other criminal activity may be afoot."  *Id.* at 43:15–44:9.  In any event, for purposes of summary judgment, the Court treats this alleged fog-line violation as non-existent.  Not only does Trooper Payton disclaim any reliance on it, but its occurrence is contested, and there isn't enough evidence in the record to determine whether Trooper Payton could have reasonably believed this particular fog-line violation occurred.

[14] Trooper Payton made these initial observations within "[a] couple of seconds, maybe," as he "just passed" Mr. Humphrey.  *Id.* at 11:6–9; *see also id.* at 16:11–16, 38:21–23.

edge of the door . . . ."[15]  Mr. Humphrey was looking straight ahead without moving his head or

eyes, as if "he was trying to avoid making any eye contact" with Trooper Payton.[16]  Mr. Humphrey

"had an obvious tight grip on the steering wheel at the 10-and-2 position, and his arms were locked

out straight."[17]  Trooper Payton testified that Mr. Humphrey's behavior and body language made

him think Mr. Humphrey was nervous.[18]  It was also at this time that Trooper Payton first observed

that Mr. Humphrey is Black.[19]

Trooper Payton then drove on to pull even with the Escalade.  He determined the Escalade's

driver did not appear nervous because that driver "look[ed] over and acknowledge[d]" him.[20]  To

Trooper Payton, this acknowledgement was "a signal that [the Escalade's driver] wasn't trying to

hide from" him.[21]  Trooper Payton was satisfied that the Escalade and U-Haul were not traveling

together.[22]  But he wanted to keep observing Mr. Humphrey.  To do that, he needed to get back

behind the U-Haul without raising Mr. Humphrey's suspicions.  So Trooper Payton got off I-40 at

the next exit and then re-entered I-40 after Mr. Humphrey had passed.[23]

---

[15] *Id.* at 37:1–8.

[16] *Id.* at 37:8–12.

[17] *Id.* at 39:13–18.  When questioned about how he could tell that Mr. Humphrey had a tight grip on the steering wheel, Trooper Payton said, "Well, just by looking . . . ."  *Id.* at 39:19–24.

[18] *Id.* at 38:16–20, 42:5–11.

[19] *Id.* at 20:24–21:2.  Trooper Payton said (and still says) that Mr. Humphrey's race played no role in his decisions to initiate the traffic stop, to call for a drug dog, and to leave handcuffs on Mr. Humphrey while writing the traffic warning.  *Id.* at 171:10–15; Answer (Doc. 10) ¶ 9.  Mr. Humphrey thinks otherwise.  *See* Compl. (Doc. 1) ¶ 9; Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 45.  As explained above, that is not a dispute the Court needs to resolve in a Fourth Amendment case, where the analysis is an objective one.  *See supra* notes 1, 3.  Trooper Payton's subjective motivations are beside the point, given the specific type of claims Mr. Humphrey brings.

[20] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 38:24–39:5.

[21] *Id.* at 39:6–8.  It is worth noting, given the racial undertones of this case, that Trooper Payton stated in a post-traffic-stop report that a "Hispanic female" was driving the Escalade.  Ex. 4 (Payton Narrative Report) to Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2).

[22] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 66:11–25.

[23] *See* Ex. 1 (Traffic Stop Dashcam Video) to Def.'s Mot. for Summ. J. (Doc. 28-1) at 0:13:30–0:13:45 [*hereinafter* Traffic Stop Dashcam]; Ex. 4 (Payton Narrative Report) to Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2).

Once Trooper Payton re-entered I-40, he raced to catch up to Mr. Humphrey. Trooper Payton reached speeds over 100 miles per hour.[24] It is during this catch-up driving that Trooper Payton's dashcam video begins.[25] As Trooper Payton was catching up to the U-Haul, but with a significant distance left to go, Mr. Humphrey turned on the U-Haul's righthand turn signal to indicate that he would be turning off the interstate at an upcoming exit.[26] It was Exit 81 in Russellville.[27] Mr. Humphrey—traveling in the righthand lane—made a slight rightward movement toward the exit.[28] Mr. Humphrey then decided not to take the exit and made an equally slight movement back to the left.[29] Trooper Payton testified that, as Mr. Humphrey began driving toward the exit, the U-Haul's wheels crossed the fog line.[30] Trooper Payton also said that Mr. Humphrey's maneuver back to the interstate caused the U-Haul's wheels to cross the fog line again and caused "an unusual weight shift of the [U-Haul]."[31] According to Trooper Payton, the aborted exit maneuver, the fog-line violation, and the weight shift "gave [Trooper Payton] a reason to stop

---

[24] Ex. 5 (Video Still Frame) to Noel Decl. (Doc. 38-5).

[25] Arkansas State Police dashcams are always recording, but only some footage is permanently saved. Generally speaking, all dashcam footage is deleted at regular intervals throughout the day. *See* Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 10:21–11:5. The dashcam system permanently saves footage in a few situations. The police officer can manually turn on the recording, for example. *Id.* at 10:11–12. There are also two scenarios in which the dashcam system automatically begins to save footage. One such scenario is called a "speed activation." *Id.* at 10:2–4. In a speed activation, the dashcam system goes into footage-saving mode when the police car reaches a speed of 85 miles per hour. *Id.* at 10:2–11. Additionally, the dashcam system begins saving footage after a police officer turns on the vehicle's blue lights to initiate a traffic stop. *Id.* at 10:11–13. In both the speed-activation and the blue-light scenarios, the dashcam system saves the footage starting at one minute before the triggering event (i.e., one minute before the police car reached 85 miles per hour or one minute before the police officer turned on the blue lights). *Id.* at 10:21–25. Here, the dashcam video begins one minute and two seconds before Trooper Payton's blue lights were activated. *See* Traffic Stop Dashcam at 0:01:02. So it's unclear whether his dashcam began saving footage because of the high speeds he reached in pursuit of Mr. Humphrey or because he turned on his blue lights.

[26] Traffic Stop Dashcam at 0:00:45–0:01:00.

[27] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 17:1–3.

[28] Traffic Stop Dashcam at 0:00:45–0:01:00.

[29] *Id.*

[30] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 45:6–8.

[31] *Id.* at 46:16–18.

[Mr. Humphrey]."[32]   Shortly thereafter, Trooper Payton flipped on his blue lights and pulled Mr. Humphrey over.[33]

Trooper Payton and Mr. Humphrey came to a stop on the righthand shoulder of I-40.[34] Trooper Payton exited his police car and approached the passenger side of the U-Haul.[35]   As he arrived at the passenger-side door, Trooper Payton noticed a suitcase in the passenger seat.[36] Trooper Payton "automatically thought that suitcase was full" of contraband.[37]   Trooper Payton's hunch was based on his theory that "people that have drugs or narcotics or contraband . . . will keep it up front with them.  Keep it close to them.  So that was . . . in [his] mind when [he] first saw" the suitcase.[38]

Trooper Payton first tried to communicate with Mr. Humphrey through the passenger window.[39]   That didn't work because Mr. Humphrey's luggage on the passenger seat made it

---

[32] *Id.* at 45:6–12.  Trooper Payton engaged in some hyperbole throughout the traffic stop, repeatedly saying that Mr. Humphrey "almost wrecked" the U-Haul.  *See, e.g.*, Traffic Stop Dashcam at 0:04:00–0:04:25, 0:09:20–0:10:00. Trooper Payton conceded in his deposition that Mr. Humphrey "didn't almost wreck," and that Trooper Payton "didn't think [Mr. Humphrey] was going to wreck the truck . . . ."  Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 46:2–23.  Trooper Payton did, however, maintain his belief that Mr. Humphrey's maneuver back to the interstate caused an "unusual weight shift" of the U-Haul, which was severe enough to potentially "cause a crash . . . ."  *Id.* at 46:16–18, 47:23–48:1.

[33] Traffic Stop Dashcam at 0:01:00–0:01:30.  In the Court's view, the traffic stop began at the moment Trooper Payton turned on his blue lights.  Accordingly, there is an approximately one-minute differential between the start of the dashcam video and the start of the traffic stop.  *See supra* note 25.  However, as illustrated by their briefing and oral presentations, the parties think the traffic stop began when Trooper Payton exited his police car after the U-Haul was pulled over.  This occurred approximately two minutes into the dashcam video.  In general, when the parties discuss an event that took place a certain amount of time "into the stop," there is a two-minute gap between the parties' clock and the video's timestamp.  *See, e.g.*, Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 29–32 (arguing that Trooper Payton needed reasonable suspicion "about ten and a half minutes into the stop" and citing the dashcam video at the 00:12:30 timestamp).

[34] Traffic Stop Dashcam at 0:02:00–0:02:15.

[35] *Id.*

[36] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 145:14–20.

[37] *Id.* at 145:5–146:19.

[38] *Id.*

[39] *Id.* at 13:23–14:19.

difficult for him to reach the passenger-side door in order to roll down the window.[40]   So Trooper

Payton then moved toward the driver's side, and Mr. Humphrey exited the U-Haul.[41]   There is no

indication that Mr. Humphrey purposefully prevented Trooper Payton from remaining on the

passenger side of the U-Haul.[42]

Trooper Payton and Mr. Humphrey began to converse.   It appears from the video and

testimony that Mr. Humphrey was the first to speak, telling Trooper Payton that he "missed [his]

turn" and was trying to take the exit he had just passed.[43]   Trooper Payton responded, "Yeah, that's

why I stopped you.  I didn't know what you were doing."[44]   Mr. Humphrey explained that he was

looking for a hotel and specified that the hotel was near a Cracker Barrel restaurant.[45]   (A Cracker

Barrel was within sight of the location where Trooper Payton and Mr. Humphrey stopped.[46])

Trooper Payton asked where Mr. Humphrey was heading.[47]   Mr. Humphrey said he was traveling

to Little Rock, but that he was staying one night at a hotel in Russellville.[48]   Trooper Payton found

---

[40] *Id.*

[41] Traffic Stop Dashcam at 0:02:30–0:03:00.

[42] Trooper Payton at some points has said that Mr. Humphrey waved Trooper Payton over to the driver's side of the U-Haul and that this made Trooper Payton suspicious that Mr. Humphrey did not want Trooper Payton to be around the passenger side of the U-Haul.  *See* Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 148:3–13, 156:19–22.  But Trooper Payton also testified that he did not suspect that Mr. Humphrey was trying to avoid rolling down the passenger-side window or otherwise "trying to keep [Trooper Payton] from talking to [Mr. Humphrey] through that window."  *Id.* at 14:12–19.  And, at another point in his deposition, Trooper Payton said that he was the one who "motioned [Mr. Humphrey] to step to the front of the vehicle."  *Id.* at 121:13–23.  The Court resolves this inconsistency in Mr. Humphrey's favor at this stage of the litigation.  Accordingly, for purposes of summary judgment, Trooper Payton did not have any reason to suspect that Mr. Humphrey was purposefully keeping Trooper Payton away from the passenger side of the U-Haul.

[43] Traffic Stop Dashcam at 0:02:45–0:03:15; Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 69:1–5.

[44] Traffic Stop Dashcam at 0:02:45–0:03:15; Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 69:6–9.

[45] Traffic Stop Dashcam at 0:02:45–0:03:15.

[46] *Id.* at 0:01:10–0:01:30.  In the video, there was a large Cracker Barrel sign visible as Mr. Humphrey pulled over to the right side of the road.  *Id.*  Then, as Mr. Humphrey came to a stop, the restaurant itself was visible.  *Id.*

[47] *Id.* at 0:02:45–0:03:15.

[48] *Id.*

Mr. Humphrey's explanation odd because it is only "about an hour from Russellville . . . to Little Rock . . . ."[49]

Trooper Payton asked for Mr. Humphrey's driver's license and the rental agreement to the U-Haul.[50]  Mr. Humphrey complied.[51]  Mr. Humphrey repeated that he was looking for a hotel but did not remember which exit he was supposed to take.[52]  Trooper Payton asked Mr. Humphrey to wait at the back of the U-Haul—in between the U-Haul and Trooper Payton's police car—while Trooper Payton checked Mr. Humphrey's license and rental agreement.[53]  Mr. Humphrey, unprompted by Trooper Payton, put his hands in the air as he walked to the back of the U-Haul.[54]  Trooper Payton asked, "What are you so nervous for?"[55]  Mr. Humphrey responded, "I don't know."[56]  Mr. Humphrey then said, "He's making me go towards the vehicle."[57]  This last statement was not directed toward Trooper Payton.  Throughout the traffic stop, Mr. Humphrey was talking to someone on his cell phone.  Trooper Payton said, "You can calm down, you're on camera . . . you almost [wrecked] your truck so I'm checking on you."[58]

---

[49] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 77:2–14; *see also id.* at 71:19–22.

[50] Traffic Stop Dashcam at 0:03:10–0:04:15.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*  Mr. Humphrey testified that he put his hands up because Trooper Payton "pulled [him] over for no reason"; Trooper Payton did not order Mr. Humphrey to put his hands in the air.  Ex. 3 (Humphrey Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-3) at 75:3–17.

[55] Traffic Stop Dashcam at 0:03:15–0:04:15.

[56] *Id.*

[57] *Id.*

[58] *Id.*

Trooper Payton again asked where Mr. Humphrey was headed.[59]  Mr. Humphrey replied, "I wanted to stop [for] the night [in Russellville], but I am going to Little Rock."[60]  Trooper Payton questioned further, "So you don't want to stay [in Russellville] now?"[61]  Mr. Humphrey said that he did want to stay in Russellville, but he just "missed the turn" and needed to "figure out how [to] get back" to the exit.[62]  Trooper Payton said he could give Mr. Humphrey directions when the traffic stop was completed.[63]  During this exchange, Mr. Humphrey quickly looked down toward his phone and said "Daddy."[64]

Trooper Payton then asked where Mr. Humphrey was coming from.[65]  Mr. Humphrey said that he was traveling from Fayetteville.[66]  Mr. Humphrey explained that he was in school in Fayetteville but was returning home to Little Rock to live with his parents because all of his classes had moved online.[67]  (The traffic stop occurred in August of 2020, when many schools were still conducting classes online as a COVID-19 safety precaution.[68])  Mr. Humphrey tried to give Trooper Payton a more thorough explanation of his travel plans.  He told Trooper Payton, "My parents don't want me to stay tonight.  Because of COVID-19, they don't want me to be in the house, so I'm staying at another place for two weeks, but I can't move into that, [so] I'm staying in another apartment, then my parents' [house]."[69]  Trooper Payton did not understand what Mr.

---

[59] *Id.* at 0:04:15–0:04:45.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.* at 0:04:45–0:05:35.

[66] *Id.*

[67] *Id.*

[68] *See* Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 75:14–20, 76:14–18.

[69] Traffic Stop Dashcam at 0:04:45–0:05:35.

Humphrey was trying to say.[70]  Trooper Payton asked, "Why don't you just go all the way to Little Rock today?"[71]  Mr. Humphrey answered, "I can't move in tonight . . . I can go all the way tonight, and I just might now.  I just have to stay in a hotel tonight and thought it'd be cheaper [in Russellville]."[72]

Trooper Payton pointed toward the U-Haul and asked, "What's in here, like your furniture and stuff?"[73]  Mr. Humphrey answered, "Everything."[74]  Trooper Payton told Mr. Humphrey, "Hang tight right there, it'll be just a second."[75]  Trooper Payton then began to turn around, presumably to return to the police car and check Mr. Humphrey's license.[76]  Before turning around completely, he spun back toward Mr. Humphrey and said, "You still nervous?  You still look nervous."[77]  Mr. Humphrey responded, "Still nervous."[78]  Trooper Payton motioned toward the U-Haul and asked, "Anything illegal in there?"[79] Mr. Humphrey answered, "Not at all."[80]  Trooper Payton kept going, "No guns, no drugs?"[81]  Mr. Humphrey told Trooper Payton again that there was nothing illegal in the U-Haul.[82]  Trooper Payton, purportedly in an attempt to "calm [Mr.

---

[70] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 75:21–77:1.  Trooper Payton said that it did not "cross [his] mind" that Mr. Humphrey was talking about quarantining himself for two weeks as a COVID-19 safety precaution before moving into his parents' house.  *Id.* at 75:21–76:13.

[71] Traffic Stop Dashcam at 0:04:45–0:05:35.

[72] *Id.*

[73] *Id.* at 0:05:35–0:06:00.

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

Humphrey's] nerves,"[83] responded, "All right, nothing to be nervous about, you're not even going to get a ticket."[84]

Trooper Payton then returned to his police car.  While Trooper Payton was in the police car, Mr. Humphrey continued talking into his cell phone—somewhat awkwardly, because he kept both hands down by his waist.[85]  Trooper Payton later testified that it appeared to him as if Mr. Humphrey was trying to "hide that he was talking to somebody on the phone."[86]

Immediately upon returning to his police car, Trooper Payton began speaking into the police car's microphone, "Guy is super nervous, hands are trembling, voice is shaky, he's got his dad on the phone.  I don't know why you wouldn't just go all the way to Little Rock from Fayetteville, instead of stopping one hour before."[87]  Trooper Payton then ran Mr. Humphrey's license through the "Arkansas Criminal Information Center."[88]  There were no issues with Mr. Humphrey's license.[89]  Trooper Payton also examined Mr. Humphrey's U-Haul rental agreement. He noted that the rental agreement identified the renter merely as "Marion Humphrey," while Mr. Humphrey's driver's license has the suffix "Jr."  Trooper Payton later testified that this made him

---

[83] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 85:7–9.

[84] Traffic Stop Dashcam at 0:05:35–0:06:00.

[85] *Id.* at 0:06:00–0:09:00.

[86] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 94:7–13.

[87] Traffic Stop Dashcam at 0:06:00–0:06:30.

[88] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 88:16–25.  The version of ACIC that Trooper Payton had in his police car allowed him to receive "driver information from a license" and "vehicle registration" information. *Id.* at 89:17–23.  It did not provide criminal-history information.  *Id.* at 89:4–13.  Trooper Payton called the Arkansas State Police dispatch center later in the traffic stop for that information. *See infra* notes 151–52 and accompanying text.  With respect to arrest warrants, Trooper Payton said that "[s]ome could come back through . . . my terminal in my car," while others could only come through dispatch.  Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 91:2–8.  In any event, Mr. Humphrey did not have any criminal history or arrest warrants.

[89] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 90:4–9.

wonder whether the renter was Mr. Humphrey or his father.[90]  Before returning to Mr. Humphrey,

Trooper Payton contacted United States Department of Agriculture Forest Service Officer Hugh

Davis to see if Officer Davis (a drug-dog handler) was working that evening.[91]  Officer Davis

indicated that he was available.[92]  Trooper Payton told Officer Davis, "I'll let you know if I need

you."[93]

Trooper Payton returned to Mr. Humphrey and asked who rented the U-Haul.[94]  Mr.

Humphrey responded, "I did."[95]  Trooper Payton asked, "When did you rent the truck?"[96]  Mr.

Humphrey responded, "Yesterday."[97]  Trooper Payton began to ask another question, but Mr.

Humphrey interjected with a question of his own, "I'm sorry, sir.  I'm trying to figure out, do you

have probable cause to stop me?"[98]  Trooper Payton, pointing back toward Exit 81, replied, "Yeah,

you about wrecked your truck back there, that's why I stopped you."[99]  Mr. Humphrey pushed

back, saying that he did not wreck and that he simply decided not to take the exit.[100]  Trooper

Payton said that it is his job to make sure people are driving safely.[101]  Mr. Humphrey replied,

---

[90] *Id.* at 125:16–19; *see also* Traffic Stop Dashcam at 0:19:00–0:20:30 (Trooper Payton recounting the traffic stop thus far).

[91] Ex. 7 (Payton-Davis Texts) to Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2); Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 87:9–88:4; Ex. 5 (Davis Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-5) at 5:16–19, 11:1–24.

[92] Ex. 7 (Payton-Davis Texts) to Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2); Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 91:9–16.

[93] Ex. 7 (Payton-Davis Texts) to Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2).

[94] Traffic Stop Dashcam at 0:09:00–0:10:00.

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

"Okay, well now you're asking all these other questions."[102]  Trooper Payton said, "Yeah, because you're super nervous.  So I'm trying to figure out why you're so nervous."[103]  Mr. Humphrey replied, "Because it's a police-, you're the police-, I don't get stopped."[104]

Mr. Humphrey gave his cell phone to Trooper Payton, asked Trooper Payton to speak with his father, and noted that his father is an attorney.[105]  Trooper Payton took the phone but did not immediately address Mr. Humphrey's father.[106]  Trooper Payton first asked Mr. Humphrey why he needed to speak with Mr. Humphrey's father.[107]  Mr. Humphrey said he wanted Trooper Payton to talk to his father because Mr. Humphrey didn't understand why he had been stopped.[108]  Trooper Payton said, "I told you why you're stopped."[109]  Trooper Payton continued, "I'll talk to him," and then began to turn away from Mr. Humphrey.[110]  But Mr. Humphrey reached for his cell phone and took it back from Trooper Payton.[111]  Trooper Payton asked, "Do you want me to talk to him or not?"[112]  Mr. Humphrey answered, "It's fine," and then asked "What do I need to do?"[113]

Trooper Payton motioned toward the U-Haul and asked again, "Is there anything illegal in there?"[114]  Mr. Humphrey began to answer—it appears from the video that Mr. Humphrey began

---

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.* at 0:10:00–0:10:20.

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.* at 0:10:20–0:10:30.

to say the word "nothing"—but then stopped and took a deep breath.[115]  In the same moment, Trooper Payton asked, "Do you mind if I look real quick?"[116]  Mr. Humphrey said that he did mind.[117]

Trooper Payton then asked Mr. Humphrey, "What if I bring a dog out here?"[118]  Mr. Humphrey responded, "No-, I can't-, I just-, you said-, it doesn't have anything to do with a potential wreck."[119]  Trooper Payton then said: "Here's how it works.  I get probable cause to stop you.  I did that.  When I get up here and make contact with you, you're super nervous, your hands are shaking, they're still shaking, your voice is shaky.  So then that makes me suspicious it's more than just you missed your exit, okay?"[120]

Mr. Humphrey replied, "My mom does not want me to be driving at night and that's why . . . I am trying to stop in Russellville."[121]  Trooper Payton expressed confusion as to why Mr. Humphrey wouldn't just drive one more hour and go to Little Rock that night.[122]  Mr. Humphrey again gave his cell phone to Trooper Payton so that Trooper Payton would talk to Mr. Humphrey's father.[123]  Trooper Payton took the phone but did not address Mr. Humphrey's father.  He instead asked Mr. Humphrey, "If I bring a dog, is it going to alert on anything?"[124]  Mr. Humphrey's reply further raised Trooper Payton's suspicion: "Ye-, no.  It's not going to alert on anything.  I promise

---

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.* at 0:10:30–0:10:55.

[119] *Id.*

[120] *Id.*

[121] *Id.* at 0:10:55–0:11:35.

[122] *Id.*

[123] *Id.*

[124] *Id.*

you."[125]   Trooper Payton later testified that he considered Mr. Humphrey's "ye-, no" to be an accidental admission that a dog would alert to the presence of contraband.[126]   Mr. Humphrey continued, "I just don't want to get shot.  That's all.  And I'm sorry about that.  It's just, it happens, and I know it happens."[127]   Trooper Payton took this to be a reference to violent police incidents, most notably the murder of George Floyd in Minneapolis, Minnesota, which had occurred just a few months before the traffic stop.[128]   Mr. Humphrey concluded, "So honestly, I don't want you to bring a dog because I don't think that's fair to me as a citizen.  The only thing I did was-, I did not almost wreck my car."[129]

Trooper Payton kept pressing, "If you don't want me to bring a dog, just let me look in here real quick and I'll get you down the road.  I don't have to bring a dog."[130]   Mr. Humphrey responded, "I just think that is so invasive of my rights, but you can look in [the U-Haul] if you'd like to."[131]   Trooper Payton did not consider this to be valid consent to a search.[132]   Trooper Payton pointed toward the U-Haul's rear bumper and ordered Mr. Humphrey to "have a seat right there and I'm going to get a dog."[133]   Mr. Humphrey protested and asked, "Is it 'just look,' or is it a dog?"[134]   Mr. Humphrey then tried to take his phone back from Trooper Payton, who had still not

---

[125] *Id.*

[126] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 97:16–98:4; *see also* Traffic Stop Dashcam at 0:14:00–0:14:20 (Trooper Payton recounting the traffic stop to another officer); *id.* at 1:38:20–1:38:30 (same).

[127] Traffic Stop Dashcam at 0:10:55–0:11:35.

[128] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 19:23–20:2, 115:4–116:10.

[129] Traffic Stop Dashcam at 0:10:55–0:11:35.

[130] *Id.* at 0:11:35–0:11:45.

[131] *Id.*

[132] *See id.* at 0:27:45–0:28:00 (Trooper Payton saying he isn't going to "play that game" in regard to Mr. Humphrey "talking about his rights" while giving consent to search the U-Haul).

[133] Traffic Stop Dashcam at 0:11:45–0:12:00.

[134] *Id.*

17

spoken to Mr. Humphrey's father.[135]  Trooper Payton, clearly frustrated, noted that Mr. Humphrey had "asked [Trooper Payton] to talk to him twice now."[136]  Mr. Humphrey said that he wanted Trooper Payton to talk on the phone in front of Mr. Humphrey.[137]  Mr. Humphrey said, "I'm just really nervous now . . . I know I've done nothing."[138]  Trooper Payton's frustration with Mr. Humphrey continued to build.  He asked Mr. Humphrey, "How old are you?"[139]  Mr. Humphrey replied that he was thirty-two years old.[140]  Trooper Payton said, "You're a grown man."[141]  Trooper Payton later testified that this statement referred to Mr. Humphrey's repeated efforts to involve his father in the traffic stop.[142]

Trooper Payton asked whether Mr. Humphrey had ever had any negative interactions with police officers.[143]  Mr. Humphrey started to speak, "I have not, honestly."[144]  Trooper Payton cut in, "Okay . . . well we're in Arkansas."[145]  Apparently, this comment was a response to Mr. Humphrey's stated anxiety about getting shot, which Trooper Payton took as a reference to the murder of George Floyd in Minnesota.[146]  Trooper Payton's point seemed to be that the present

---

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] *Id.*  To the Court's ear, it sounds like Mr. Humphrey said "I know I've done it" instead of "I know I've done nothing."  Mr. Humphrey disputes this and implies that, at the very least, it is not entirely clear from the video whether Mr. Humphrey said he had "done nothing" or "done it."  *See* Ex. 3 (Humphrey Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-3) at 84:1–85:1.  Giving Mr. Humphrey all favorable inferences, the Court finds that, for purposes of summary judgment, Mr. Humphrey actually said he had "done nothing."  Of course, what Mr. Humphrey actually said may be different from what a police officer could have reasonably heard.  *See infra* note 340.

[139] Traffic Stop Dashcam at 0:11:45–0:12:00.

[140] *Id.* at 0:12:00–0:12:10.

[141] *Id.*

[142] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 109:20–110:6.

[143] Traffic Stop Dashcam at 0:12:05–0:12:30.

[144] *Id.*

[145] *Id.*

[146] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 114:19–116:10.

traffic stop in Arkansas had nothing to do with what happened in Minnesota.  Mr. Humphrey then took his cell phone back from Trooper Payton as the two men bickered over whether Trooper Payton had probable cause to pull Mr. Humphrey over.[147]  Trooper Payton ended the conversation by telling Mr. Humphrey to sit on the bumper of the U-Haul and wait for the drug dog to arrive.[148]

Trooper Payton returned to his police car and called Officer Davis.[149]  Trooper Payton gave Officer Davis a brief recap of the stop thus far, and Officer Davis agreed to bring his drug dog, Dunja, to the scene.[150]  While waiting for Officer Davis to arrive, Trooper Payton called dispatch for the first time.[151]  Dispatch informed Trooper Payton that Mr. Humphrey had no criminal history and no warrants.[152]  For his part, Mr. Humphrey remained seated on the rear bumper of the U-Haul.  He spent the time speaking with his father and posting updates about the traffic stop to Facebook.[153]

Trooper Payton, still waiting for Officer Davis to arrive, got out of the police car and approached Mr. Humphrey.[154]  He told Mr. Humphrey that a "dog [was] on its way."[155]  Mr. Humphrey responded, "Yes, sir."[156]  Trooper Payton told Mr. Humphrey, "If it makes you feel

---

[147] Traffic Stop Dashcam at 0:12:05–0:12:30.

[148] *Id.*

[149] Traffic Stop Dashcam at 0:12:45–0:15:00; Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 116:20–117:10.

[150] Traffic Stop Dashcam at 0:12:45–0:15:00; *see* Ex. 5 (Davis Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-5) at 11:1–3.

[151] Traffic Stop Dashcam at 0:15:00–0:17:00; Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 119:13–120:14.

[152] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 124:14–17; Traffic Stop Dashcam at 0:16:30–0:16:50 (dispatch operator stating that the search of Mr. Humphrey "show[ed] no numbers").

[153] *See* Ex. 3 (Humphrey Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-3) at 39:10–16, 86:21–88:11, 90:17–24.

[154] Traffic Stop Dashcam at 0:21:00–0:21:45.

[155] *Id.*

[156] *Id.*

better, I'm not a bit nervous about you."[157]  Mr. Humphrey said that he was "very nervous."[158]

Trooper Payton questioned, "Because police shoot people?"[159]  Mr. Humphrey indicated that he

did not want to continue the conversation.[160]

Trooper Payton kept going, "Well, I apologize if you're nervous, but I'm not nervous about

you."[161]  Mr. Humphrey said, "I think you saw me back there in this [U-Haul] . . . way back there

. . . so why did you catch up to me?  Because-, I don't know, I don't need to talk about it anymore,

I need to be quiet.  I'm sorry."[162]  Trooper Payton tried to downplay Mr. Humphrey's concern and

said "it [isn't a] big deal."[163]  Mr. Humphrey disagreed, "It is a big deal.  It's a very big deal."[164]

Trooper Payton responded that it was "not a big deal to [him]."[165]  Mr. Humphrey stopped

responding, but Trooper Payton kept pushing.  He asked, "Am I treating you bad or something?"[166]

Mr. Humphrey stayed silent.  Trooper Payton then asked, "Would you prefer me to stand out here

with you or be in the car?"[167]  Mr. Humphrey replied, "I want to do whatever is safest."[168]  After

a little more back and forth of this nature, Trooper Payton decided to wait in his police car.

Before returning to the police car, he made another comment that reignited the

conversation: "We are right here in front of Cracker Barrel, so, I mean, there's nothing to worry

---

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *Id.*; Ex. 3 (Humphrey Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-3) at 89:10–90:2.

[161] Traffic Stop Dashcam at 0:21:45–0:23:20.

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.*

about."[169]   Mr. Humphrey said that he was worried; Trooper Payton repeated that he wasn't worried about Mr. Humphrey.[170]   Mr. Humphrey explained that he was worried because he was a law student and had read about police canines being unreliable.[171]   He then said, "I just hope I make it home."[172]   Trooper Payton told Mr. Humphrey that he was going to make it home and suggested that he take a deep breath.[173]   He then returned to his police car to wait for Officer Davis.[174]

Officer Davis arrived with Dunja approximately twenty-six minutes into the traffic stop.[175] Trooper Payton asked Mr. Humphrey to stand to the side of Trooper Payton's police car while the canine sniff took place.[176]   Dunja began by sniffing along the righthand side of the U-Haul, first at the right side of the rear bumper, next up along the right side of the truck itself, and then on the right side of the front bumper.[177]   Dunja then started to work back down the right side of the truck, eventually laying down in the area where the driver's cab connects to the box trailer.[178]   Officer Davis repeatedly told Dunja to "show me" or asked "where is it," to which Dunja responded by staying put and whimpering.[179]   Officer Davis then praised Dunja, headed back toward Trooper

---

[169] *Id.* at 0:23:20–0:24:20.

[170] *Id.*

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.* at 0:27:30–0:28:00; Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 127:14–128:4.

[176] Traffic Stop Dashcam at 0:28:00–0:28:30.

[177] Ex. 6 (Davis Bodycam) to Def.'s Mot. for Summ. J. (Doc. 28-6) at 00:50–01:05 [*hereinafter* Davis Bodycam].

[178] *Id.* at 01:05–01:15.

[179] *Id.* at 01:15–01:30.

Payton and Mr. Humphrey, and gave Trooper Payton a thumbs-up signal to indicate that Dunja had alerted to the presence of narcotics in the U-Haul.[180]

Trooper Payton told Mr. Humphrey to place his hands on the front of Trooper Payton's police car.[181]  Trooper Payton handcuffed (but did not frisk or otherwise physically search) Mr. Humphrey and placed Mr. Humphrey in the back seat of Trooper Payton's police car.[182]  Over the next seventy minutes, Mr. Humphrey watched Trooper Payton, Officer Davis, and multiple other law enforcement officers rifle through, stomp on, and toss around Mr. Humphrey's possessions.[183] He also watched Officer Davis conduct two more canine sniffs (during which Dunja alerted to the same spot on the U-Haul as before).[184]

The search was fruitless.  Still convinced there were drugs in the U-Haul, Trooper Payton called his direct supervisor, Sergeant Chase Melder.[185]  Trooper Payton thought that Sergeant Melder may have had some "words of wisdom" on how to find exceptionally well-hidden narcotics.[186]  Instead, Sergeant Melder told Trooper Payton that a U-Haul traveling from

---

[180] *Id.* at 01:30–01:45; Traffic Stop Dashcam at 0:29:00–0:29:10; Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 131:22–132:2; Ex. 5 (Davis Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-5) at 54:2–7.

[181] Traffic Stop Dashcam at 0:29:00–0:30:45.

[182] *Id.*

[183] Traffic Stop Dashcam at 0:30:45–1:43:00; *see* Ex. 3 (Humphrey Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-3) at 46:20–21 ("[F]rom my position in the [police] car, I could see them going through everything . . . .").  The only portions of the search that would not have been visible to Mr. Humphrey were the officers' search of the driver's cab of the U-Haul and the U-Haul's undercarriage.  It is unclear why the other officers, aside from Trooper Payton and Officer Davis, arrived at the scene and aided in the search.  Trooper Payton testified that the additional officers "came on their own," perhaps after they saw Trooper Payton on the stop or heard about the stop on the police radio.  Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 136:4–22.

[184] Traffic Stop Dashcam at 0:49:30–0:50:55, 1:21:30–1:23:00; Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 138:17–139:10.

[185] Traffic Stop Dashcam at 01:31:50–01:36:30; Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 153:12–23.

[186] Traffic Stop Dashcam at 1:34:00–1:34:30; *see also* Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 154:12–25.

Fayetteville to Little Rock was unlikely to be carrying drugs.[187]  At this point, Trooper Payton decided to let Mr. Humphrey go with a warning.[188]  He closed the doors of the U-Haul—leaving Mr. Humphrey's belongings strewn about the U-Haul's box trailer—and returned to his police car.[189]  Mr. Humphrey asked Trooper Payton whether he was under arrest.[190]  Trooper Payton replied, "Well, not when I get those handcuffs off of you, you won't be."[191]

Over the next nine minutes—with Mr. Humphrey still handcuffed in the back seat—Trooper Payton and Mr. Humphrey traded verbal barbs.  The conversation began with Trooper Payton recounting the search of the U-Haul to Mr. Humphrey.[192]  Mr. Humphrey interrupted, "I'm so sorry, just as soon as you can . . . ."[193]  Trooper Payton, confused, asked Mr. Humphrey to clarify what he was trying to say.[194]  Mr. Humphrey responded, "Whatever you can do sir, just to restore some humanity."[195]  Trooper Payton retorted, "You haven't lost any humanity."[196]  Mr. Humphrey disagreed, "I have.  I've been in the back seat of this car.  You could have searched [the U-Haul] while I was standing with my arms . . . ."[197]  Trooper Payton cut in, "From my point of view, the way you were acting, the way you were getting excited, it was safer for you to be [in the back seat] than to be out here and get hit by a car.  For us, it's hard to search a vehicle when . . .

---

[187] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 155:1–20.

[188] *See id.* at 159:10–19.

[189] Traffic Stop Dashcam at 1:42:30–1:43:00.

[190] *Id.* at 1:43:30–1:43:45.

[191] *Id.*

[192] *Id.* at 1:43:45–1:45:15.

[193] *Id.*

[194] *Id.*

[195] *Id.*

[196] *Id.*

[197] *Id.*

."[198]  Mr. Humphrey didn't want to hear the rest of whatever Trooper Payton was going to say: "I'm sorry, sir . . . I just want to get to Little Rock . . . I won't say another word."[199]  The conversation didn't end there.  Trooper Payton said that, given Dunja's multiple alerts, he was still confident there were drugs in the U-Haul: "If it's not your dope, there's somebody else's in there . . . we just can't get to it."[200]  Mr. Humphrey replied, "Okay."[201]  He then said something (it's unclear what from the video) that prompted Trooper Payton to say, "You are not going to die, so you can quit acting like that."[202]

Around two minutes into this post-search conversation, Mr. Humphrey remarked that the handcuffs were "on so tight."[203]  Trooper Payton didn't respond.  Mr. Humphrey then noted that he had "been in handcuffs for over an hour."[204]  After this second comment, Trooper Payton asked, "What's that?"[205]  Mr. Humphrey said, "I've been in handcuffs for over an hour for a warning.  I know that just can't be regular protocol."[206]  Trooper Payton dismissed Mr. Humphrey's complaint, "Well, it is."[207]

Mr. Humphrey continued speaking at a low mumble, to which Trooper Payton responded, "If you've got something to say then say it.  You're not going to hurt my feelings."[208]  Mr. Humphrey replied, "I just really want to go home.  I told you I'm moving from Fayetteville.  You

---

[198] *Id.*

[199] *Id.*

[200] *Id.*

[201] *Id.*

[202] *Id.*

[203] *Id.* at 1:45:45–1:46:15.

[204] *Id.* at 1:46:15–1:47:30.

[205] *Id.*

[206] *Id.*

[207] *Id.*

[208] *Id.*

see how well I packed that car.  I just don't understand something like this happening."[209]  Trooper Payton began, "If the dog's alerting-," but he was cut off by Mr. Humphrey saying that he "didn't even deserve the dog."[210]  Mr. Humphrey continued, "You know that.  And I know you know that."[211]  Trooper Payton disagreed, "The dog gave me probable cause, and before [that] I had reasonable suspicion.  So there's nothing going on wrong or illegal here."[212]  Mr. Humphrey retorted that Trooper Payton should ask Mr. Humphrey's criminal procedure professor about the law.[213]  Trooper Payton countered that Mr. Humphrey should consider going to trooper school because "there's a lot of difference between being a lawyer and a police officer.  And police officers get shot, too."[214]

The conversation further devolved, with each man repeatedly interrupting the other.  Mr. Humphrey continued to express his disbelief: "Look what I had, look what I did.  Nothing.  You searched me for an hour and a half. . . .  Because I almost turned off of an interstate the wrong way."[215]  Trooper Payton said that Mr. Humphrey's driving was "illegal."[216]  Mr. Humphrey replied, "I know it's illegal, but do you think that's fair?  Would you like if your son was behind bars like this, with handcuffs this tight that my wrists are probably being-."[217]  Trooper Payton interjected, "Well, if you hadn't acted-."[218]  Mr. Humphrey cut in, "How was I acting? . . . I was

---

[209] *Id.*

[210] *Id.*

[211] *Id.*

[212] *Id.*

[213] *Id.*

[214] *Id.*

[215] *Id.* at 1:47:30–1:48:30.

[216] *Id.*

[217] *Id.*

[218] *Id.*

nervous . . . ."[219]  As Mr. Humphrey was midway through his sentence, Trooper Payton shouted over him, "You were screaming out there."[220]  Mr. Humphrey rejected that idea: "I wasn't screaming at all.  You know I didn't scream."[221]  Mr. Humphrey continued on, "You searched my car for an hour and a half and didn't find anything like I told you.  I gave you great reasons.  And your reasonable suspicion, I have no idea where it comes from, because you said 'nervousness' . . . ."[222]  Trooper Payton cut in to say that his reasonable suspicion was not based only on Mr. Humphrey's nervousness, but he did not explain any other factors.[223]

Mr. Humphrey pivoted the conversation slightly.  He said, "You know what Russellville is like for people like me."[224]  Trooper Payton, taking offense at what he perceived to be the racial implication of Mr. Humphrey's comment, replied, "I grew up in Russellville.  There's nothing wrong with being Black in Russellville if that's what you're trying to say, that I stopped you because you're Black.  And I ha[d] no idea that you're Black when I [saw] you [a]bout wreck off the road."[225]  Mr. Humphrey called out Trooper Payton on what Mr. Humphrey felt was obviously a lie, "You said you saw me five miles before that. . . .  You distinguished me as a person then."[226]  Trooper Payton retorted that he also stops white people: "I got a white person with meth

---

[219] *Id.*

[220] *Id.*

[221] *Id.* Mr. Humphrey acknowledged that he screamed while being put in handcuffs.  *Id.*  He did note, however, that a post-handcuffing scream could obviously not have been a factor in Trooper Payton's decision to handcuff Mr. Humphrey in the first place.  *Id.*

[222] *Id.*

[223] *Id.*

[224] *Id.* at 1:48:30–1:49:00.

[225] *Id.*  Trooper Payton conceded in his deposition that this statement was untrue and said that he "misspoke."  Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 21:3–10, 167:24–168:21, 179:10–22.  He knew Mr. Humphrey was Black before initiating the traffic stop.  *Id.*

[226] Traffic Stop Dashcam at 1:48:30–1:49:00.

yesterday."[227]  Mr. Humphrey asked whether the white person with meth was held in the police car for an hour.[228]  Trooper Payton said that person was in the car "for like two hours."[229]

Mr. Humphrey said he was "losing it right now."[230]   Trooper Payton responded sarcastically, "Well, if you don't get pulled over, you won't get your vehicle searched."[231]  Mr. Humphrey, understandably exasperated, responded, "Okay."[232]  Trooper Payton continued trying to justify his conduct—this time with a fair bit of exaggeration—claiming that Dunja alerted "ten times" to the scent of narcotics.[233]  Mr. Humphrey said that he barely heard Dunja bark at all.[234]  Trooper Payton, even more frustrated, rhetorically asked Mr. Humphrey, "So you're a canine handler too now?  So you know how I should do my job?"[235]  Mr. Humphrey, with some sarcasm of his own, apologized and said that he thought Trooper Payton was "doing a great job."[236]  Trooper Payton didn't let up: "I was trying to tell you the dog wasn't alerting to your stuff, it was alerting to the vehicle, which is a rental, so it could possibly be that someone had something in there before you picked it up. . . . Is that not possible?"[237]

Mr. Humphrey "thank[ed]" Trooper Payton "for this experience."[238]  Trooper Payton didn't feel the gratitude: "I don't appreciate it being insinuated that I'm being racist because I searched

---

[227] Id.

[228] Id.

[229] Id.

[230] Id. at 1:49:00–1:50:00.

[231] Id.

[232] Id.

[233] Id.

[234] Id.

[235] Id.

[236] Id.

[237] Id.

[238] Id. at 1:50:00–1:52:43

your car, when the dog doesn't even know who you are.  The dog alerts to the narcotics."[239]  Mr. Humphrey, increasingly upset by Trooper Payton's comments, began to speak a few different times but stopped himself each time.  Trooper Payton then repeated his sarcastic advice, "Next time, don't get pulled over.  Just take the exit or don't take it."[240]  After this, Trooper Payton got out of the police car, uncuffed Mr. Humphrey, and let him go with a warning for "careless and prohibited driving" under Arkansas Code Annotated § 27-51-104.[241]

## DISCUSSION

As a general matter, § 1983 authorizes citizens to bring lawsuits against state-government officials who violate their rights under federal law, including the United States Constitution:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .[242]

The alleged constitutional violations in this case concern rights protected by the Fourth Amendment.  The Fourth Amendment declares that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[243]  As everyone agrees, a traffic stop counts as a seizure.[244]  But a seizure does not in and of itself violate the Fourth Amendment—for that, the seizure must be unreasonable.

---

[239] *Id.*

[240] *Id.*

[241] *Id.*; Ex. 10 (Humphrey Warning) to Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2).

[242] 42 U.S.C. § 1983.

[243] U.S. Const. amend. IV.  The Fourth Amendment applies to the conduct of state-government officials by dint of the Fourteenth Amendment and the doctrine of incorporation.  *E.g.*, *Metro. Omaha Prop. Owners Ass'n, Inc. v. City of Omaha*, 991 F.3d 880, 884 (8th Cir. 2021).

[244] *Wren*, 517 U.S. at 809–10.

As explained above, Mr. Humphrey points to three aspects of the traffic stop that, in his view, render the traffic stop an unreasonable seizure.  First, Mr. Humphrey says that Trooper Payton's decision to pull him over was unreasonable.  Second, Mr. Humphrey contends that Trooper Payton did not have any good reason to call for a drug dog, and that calling for the drug dog thus unreasonably prolonged the traffic stop.  Finally, Mr. Humphrey argues that it was unreasonable to keep him in handcuffs for nine minutes after Trooper Payton finished his search of the U-Haul.  Who decides—and how—whether it was reasonable for a police officer to pull someone over, or to call for a drug dog, or to keep someone in handcuffs?  It's a bit complicated.

The first step is to determine what actually happened between the parties—in other words, the true story of what took place.  The true story is often referred to as "predicate facts" or "historical facts."[245]  In most cases, each side has a different version of the historical facts.  When that happens, there are usually genuine disputes of fact.  On summary judgment, the nonmoving party gets the benefit of the doubt as to any genuinely disputed historical facts.[246]  So, for the purposes of summary judgment, the Court adopts Mr. Humphrey's version of any genuinely disputed historical facts.  If he could win the case under his version of the genuinely disputed historical facts, then those genuinely disputed historical facts are "material" to the outcome and a trial is necessary.[247]  Conversely, there is no need for a trial if (1) there are no genuinely disputed historical facts, or (2) Mr. Humphrey cannot possibly win even with all genuine disputes of historical fact resolved in his favor.

---

[245] *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995); *Hoyland v. McMenomy*, 869 F.3d 644, 651 (8th Cir. 2017).

[246] *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 760 (8th Cir. 1998).

[247] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment.").

Accordingly, the next step is to determine whether, based on the historical facts taken in the light most favorable to Mr. Humphrey, Trooper Payton's challenged decisions were objectively reasonable.  Mr. Humphrey argues that reasonableness is a question for a jury to resolve.[248] Trooper Payton says that a judge is supposed to make this call.[249]  Trooper Payton is right.  In Fourth Amendment cases, reasonableness is a question of law that is decided by a judge.[250]

Mr. Humphrey argues that a jury is necessary because (he thinks) there are genuine disputes of material historical fact that directly impact (and are thus intertwined with) the reasonableness analysis.[251]  And, to Mr. Humphrey, that means the jury gets to decide both the historical facts and the ultimate question of reasonableness.  The Eighth Circuit has made statements that seemingly support this theory.  In *Linn v. Garcia*, for example, it said that "[w]here the facts are in dispute . . . the question of [reasonableness] is for the jury . . . ."[252]  So Mr. Humphrey's argument has some curb appeal.  Digging deeper, however, reveals cracks in the foundation of Mr. Humphrey's theory.

The Eighth Circuit has not read *Linn* as a directive to abandon the distinction between the historical facts and the ultimate legal question of reasonableness.  Consider *Arnott v. Mataya*, where the historical facts were "greatly disputed."[253]  The Eighth Circuit concluded that if the defendants' version of the facts was true, "then defendants had probable cause to arrest [plaintiff]";

---

[248] *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 19–20.

[249] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 29) at 4.

[250] *Peterson*, 60 F.3d at 475 ("[P]robable cause and qualified immunity are ultimately questions of law.  The jury's role is limited to settling disputes as to predicate facts." (citations omitted)); *United States v. Owens*, 101 F.3d 559, 561 (8th Cir. 1996) ("The existence of reasonable suspicion is a question of law, which we review de novo." (citing *Ornelas v. United States*, 517 U.S. 690, 116 S. Ct. 1657, 1663 (1996))).

[251] *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 19–20; Oct. 25, 2022 Hr'g Tr. at 57:4–58:6; *id.* at 60:6–11 (Mr. Humphrey's counsel arguing that "[j]ust the word reasonable" means it "is a question for the jury").

[252] 531 F.2d 855, 861 (8th Cir. 1976).

[253] 995 F.2d 121, 124 (8th Cir. 1993).

if the plaintiff's version was true, "then defendants lacked probable cause . . . ."[254]  A jury was necessary, but only to resolve the dispute over the parties' divergent versions of the critical historical facts.[255]  Consider also *Peterson v. City of Plymouth*, when the plaintiff wanted an expert witness to testify about the reasonableness of police officers' conduct.[256]  The Eighth Circuit excluded the testimony because it would not help the jury perform its sole function—"settling disputes as to predicate facts."[257]  "[T]he reasonableness of the officers' conduct in light of Fourth Amendment standards" remained a "legal conclusion."[258]

In cases where the material historical facts are genuinely disputed, trial courts often use an interrogatory approach, meaning the jury is asked to answer specific questions of historical fact.[259] The trial judge then takes the jury's answers and analyzes reasonableness based on the historical facts found by the jury.[260]  Nothing in *Linn*, *Arnott*, or *Peterson* is to the contrary.  Indeed, in *McCabe v. Parker*, the Eighth Circuit recognized that "*Peterson* indicates the jury should be asked to resolve discrete factual questions to determine what the officers knew at the time of an arrest, with the court thereafter deciding the legal question of [reasonableness] . . . ."[261]  And *McCabe* cited approvingly the trial court's use of "special interrogatories [to be] consistent with the process set forth in *Peterson* . . . ."[262]

---

[254] *Id.*

[255] *See id.* (citing *Linn*, 531 F.2d at 861); *Peterson*, 60 F.3d at 475 (citing *Arnott*, 995 F.2d at 123–24).

[256] 60 F.3d at 475.

[257] *Id.*

[258] *Id.* (internal quotation marks omitted).

[259] *See McCabe v. Parker*, 608 F.3d 1068, 1074 & n.5 (8th Cir. 2010).

[260] *Id.*

[261] *Id.*

[262] *Id.*

Mr. Humphrey relies on three other cases—*Nance v. Sammis*, *Aaron v. Shelley*, and *Torres v. City of St. Louis*—none of which tells the Court to abandon the fact/law distinction.[263]   Each case follows a similar path.   First, the district court denied summary judgment on a Fourth Amendment claim (or claims) because there were genuine disputes of material historical fact that a jury needed to resolve.[264]   Second, the officers took an interlocutory appeal to the Eighth Circuit.[265]   Third, the Eighth Circuit sent the claim (or claims) back to the district court because no reasonableness analysis could occur until a jury resolved the genuine disputes of material historical fact.[266]   But none of these cases sent the claim (or claims) back so that a jury could resolve the ultimate legal question of reasonableness.

In any event, there is a second and independent problem with Mr. Humphrey's position. That problem is the absence of any genuine disputes of material historical fact in the case at bar. The Supreme Court has made clear that video recordings like the dashcam video in this case will often definitively resolve any disputes of historical fact at the summary-judgment stage.[267]   And here the dashcam video does indeed definitively resolve the large majority of disputes of historical fact.   That is, while there might be disputes of historical fact, most of those disputes are not genuine in light of the definitiveness of the video.   Furthermore, and as explained in greater detail later in

---

[263] *See* Oct. 25, 2022 Hr'g Tr. at 57:10–15; *Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009); *Aaron v. Shelley*, 624 F.3d 882 (8th Cir. 2010); *Torres v. City of St. Louis*, 39 F.4th 494 (8th Cir. 2022).

[264] *Nance*, 586 F.3d at 608; *Aaron*, 624 F.3d at 883–84; *Torres*, 39 F.4th at 501.

[265] *Nance*, 586 F.3d at 609; *Aaron*, 624 F.3d at 883–84; *Torres*, 39 F.4th at 501.

[266] *See Nance*, 586 F.3d at 610; *Aaron*, 624 F.3d at 883–84; *Torres*, 39 F.4th at 503–04.   The closest any of these cases come to saying that reasonableness is a question for a jury is when *Aaron* says that "the district court carefully explained the material disputed facts which, when viewed most favorably to [the plaintiff], would permit a reasonable jury to find that the officers lacked objectively reasonable probable cause . . . ."  624 F.3d at 884.   Taken literally, one could read that to mean a jury is responsible for the ultimate finding of reasonableness.   But *Aaron* has not been read as abandoning the clear rule followed in *Arnott*, *Peterson*, *McCabe*, and other cases.   *See New v. Denver*, 787 F.3d 895, 899–900 (8th Cir. 2015).   Instead, *Aaron* was saying the same thing as all the other cases, albeit without the same level of precision: Juries must resolve all genuine disputes of material historical fact before a judge is able to decide the legal question of reasonableness.

[267] *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 379–81 (2007).

32

this Order, the few disputes of historical fact that aren't resolved by the dashcam video are not material to the outcome of the case.[268]

Given the foregoing, there is no need for a jury with respect to the Fourth Amendment reasonableness question.  Of course, the constitutionality of Trooper Payton's conduct is not the only issue.  If the Court concludes that Trooper Payton violated Mr. Humphrey's Fourth Amendment rights, then a new question comes up: Is Trooper Payton immune from suit anyway based on the qualified-immunity defense?  That inquiry is handled very similarly to the Fourth Amendment inquiry.  A jury would resolve any material, genuine disputes about the "historical" or "predicate" facts.[269]  (As explained immediately above, there aren't any in this case, largely thanks to the video of the traffic stop.)  Then, the Court decides if Trooper Payton's conduct was so obviously unconstitutional that he is not entitled to benefit from the qualified-immunity defense.[270]  In the Fourth Amendment context, that essentially requires deciding whether Trooper Payton was reasonable (albeit mistaken) to think his decisions were reasonable.  If so, he gets qualified immunity.  If not, he doesn't.

## I.  Initiating the Traffic Stop

Pulling someone over does not violate the Fourth Amendment if a police officer has "probable cause to believe that a traffic violation has occurred."[271]  "[A]ny traffic violation, no

---

[268] For example, the dashcam video does not definitively show whether the U-Haul's wheels actually touched the fog line.  But that genuine dispute of historical fact is not material.  Trooper Payton still prevails even if the U-Haul's wheels did not actually touch the fog line.  *See infra* pp. 42–45.  For another example, the video is not so refined as to show whether, and, if so, to what extent, Mr. Humphrey's hands were shaking during the traffic stop before Trooper Payton called for a drug dog.  But that genuine dispute of historical fact is not material.  The Court's reasonable-suspicion analysis does not hinge on the resolution of that particular fact.  *See infra* pp. 49–54.

[269] *Peterson*, 60 F.3d at 475 ("[P]robable cause and qualified immunity are ultimately questions of law.  The jury's role is limited to settling disputes as to predicate facts." (citations omitted)).

[270] *New*, 787 F.3d at 899 ("Whether an officer is entitled to qualified immunity because he 'acted reasonably under settled law in the circumstances' is a question of law for the court, both before and after trial." (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991))).

[271] *Whren*, 517 U.S. at 810.

matter how minor, is sufficient to provide an officer with probable cause."[272]  Trooper Payton says that he had probable cause to believe that Mr. Humphrey engaged in "careless and prohibited driving" in violation of Arkansas Code Annotated § 27-51-104.[273]  He says that three different facts, taken together or separately, provided him with probable cause: (1) the U-Haul began to exit the interstate but then jerked back onto the roadway; (2) the U-Haul's wheels touched the fog line during this maneuver; and (3) Mr. Humphrey's maneuver toward and away from the exit ramp caused the weight of the U-Haul to shift in a manner that can cause drivers to lose control of large trucks.[274]  Trooper Payton highlights two portions of the dashcam footage.  The first video clip does not justify summary judgment for Trooper Payton.  But the second one does.

### A.      Video Clip #1

Trooper Payton first points to the portion of the dashcam footage that shows Mr. Humphrey approaching Exit 81, turning on his blinker, deciding not to take the exit, and then turning off his blinker.  Mr. Humphrey makes a slight movement to the right (toward the exit) and an equally slight movement to the left (away from the exit).  Trooper Payton says that, during this time, the U-Haul's wheels went into and out of the exit ramp and also touched the fog line.  Additionally,

---

[272] *United States v. Foster*, 15 F.4th 874, 877 (8th Cir. 2021).

[273] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 29) at 1, 4, 18.  Arkansas Code Annotated § 27-51-104 states, in relevant part:

> (a) It shall be unlawful for any person to drive or operate any vehicle in such a careless manner as to evidence a failure to keep a proper lookout for other traffic, vehicular or otherwise, or in such a manner as to evidence a failure to maintain proper control on the public thoroughfares or private property in the State of Arkansas.

> (b) It shall be unlawful for any person to operate or drive any vehicle on the public thoroughfares or private property in the State of Arkansas in violation of the following prohibited acts:

> (1) Improper or unsafe lane changes on public roadways;

> . . .

> (6) To operate any vehicle in such a manner which would cause a failure to maintain control . . . .

[274] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 29) at 1, 4, 18; Oct. 25, 2022 Hr'g Tr. at 19:19–20:3.

Trooper Payton says that Mr. Humphrey's sudden movements caused the weight of the U-Haul to shift dangerously.  The parties focus primarily on the fog-line issue.  So the Court will start there.

### 1.    The Fog Line

Arkansas state courts have interpreted Arkansas's traffic laws to mean that a traffic violation occurs if a vehicle's wheels so much as touch the white fog line.[275]  Trooper Payton says that he saw the U-Haul's wheels touch the fog line and therefore he had probable cause to pull Mr. Humphrey over.  Mr. Humphrey disputes that the wheels of the U-Haul touched the fog line.  The dashcam video does not definitively resolve the question.  So whether the U-Haul's wheels actually touched the fog line is a genuinely disputed question of historical fact.  At summary judgment, Mr. Humphrey gets the benefit of that doubt.  Accordingly, for purposes of summary judgment, the U-Haul's wheels did not actually touch the fog line.

That's not the end of the analysis, though.  If Trooper Payton reasonably (but mistakenly) believed that the U-Haul's wheels touched the fog line, then the initial stop did not violate the Fourth Amendment.[276]   That is because the Fourth Amendment's "probable cause standard

---

[275] *See Baker v. Arkansas*, 2022 Ark. App. 53, 640 S.W.3d 431 (2022).  *Baker* was decided nearly two years after Trooper Payton stopped Mr. Humphrey.  Prior to *Baker*, it was an open question as to whether, under Arkansas's traffic laws, a wheel had to completely cross over a fog line or merely touch it.  *See United States v. Martin*, 4:19-CR-00686, 2021 WL 3868376, at *5 (E.D. Ark. Aug. 30, 2021).  Even if Trooper Payton had been wrong, and it was only a traffic violation when a vehicle's wheels completely crossed over a fog line, Trooper Payton's mistake would have been a reasonable mistake of law that did not negate probable cause. *See Heien v. North Carolina*, 574 U.S. 54 (2014); *Martin*, 2021 WL 3868376, at *4–5.

[276] *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) ("[O]fficers do not violate the Fourth Amendment if they act upon a mistake of fact that is objectively reasonable . . . .").  Mr. Humphrey's theory of the case is that Trooper Payton lied about the U-Haul's wheels touching the fog line.  In Fourth Amendment cases, judges are not supposed to pry into the minds of police officers.  Instead, judges are supposed to look at the evidence from a purely objective standpoint.  Because there is a video that captures what an objectively reasonable (and honest) police officer in Trooper Payton's position would have seen, there is no need for a jury to weigh Trooper Payton's credibility about what he could see.  *Cf. Coker v. Ark. State Police*, 734 F.3d 838, 843 (8th Cir. 2013) ("Without the aid of video or an understandable audio recording, it is impossible to determine what happened that night . . . without weighing [the officer's] version of events against [the plaintiff's] story."); *Watkins v. Arkansas*, 725 F. App'x 428, 429 (8th Cir. 2018) (per curiam) (denying summary judgment when only accounts of the traffic stop came from conflicting testimony).

inherently allows room for reasonable mistakes by a reasonable person . . . ."[277]  Likewise, "an officer is entitled to qualified immunity if there is at least arguable probable cause."[278]  When a police officer "act[s] on a mistaken belief that probable cause exists, if that mistake is objectively reasonable, arguable probable cause exists."[279]  Thus, determining whether Trooper Payton violated the Fourth Amendment at all and whether Trooper Payton is entitled to qualified immunity boils down to one question: Was it reasonable for Trooper Payton to believe that the U-Haul's wheels touched the fog line?[280]

Below is a still frame of the point at which Mr. Humphrey is the farthest to the right (and therefore closest to the fog line) during the first video clip.[281]

---

[277] *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013).

[278] *Id.* (quotation marks and citations omitted).

[279] *Brown v. City of St. Louis*, 40 F.4th 895, 900–01 (8th Cir. 2022) (emphasis omitted) (quotation marks and citation omitted).

[280] A few pages above, the Court noted that, as a general matter, the qualified-immunity analysis requires deciding whether Trooper Payton was reasonable (albeit mistaken) to think his decisions were reasonable.  *See supra* p. 33.  In the specific context here, however, the two layers of reasonableness merge together because only one fact gave rise to probable cause and there is no doubt about the governing law.  If Trooper Payton was reasonably mistaken about the historical fact of the U-Haul's wheels touching the fog line, then he had probable cause and therefore did not violate the Fourth Amendment.  On the other hand, if his mistake about the fog-line violation was unreasonable, then he violated the Fourth Amendment because he lacked probable cause.  Moreover, in this latter scenario, because his only reason for thinking the fog-line violation occurred at all was his belief that he saw it happen, his unreasonable mistake could only have been premised on guesswork or speculation.  *See infra* pp. 40–41.  And it is clearly established that police officers can't initiate seizures based on guesswork or speculation.  *See infra* note 295 and accompanying text.  So Trooper Payton is unable to benefit from the qualified-immunity defense if he initiated the traffic stop based on an unreasonable mistake of fact.

[281] Traffic Stop Dashcam at 0:00:52.



Trooper Payton was obviously a considerable distance away from Mr. Humphrey at this point. And, due to that considerable distance, the video is quite blurry.  These problems with the video are so significant that, at oral argument, Trooper Payton's attorney couldn't pinpoint the exact moment of the video that he thought showed the U-Haul's wheels touching the fog line.[282]  All of this raises the question of whether Trooper Payton was even in a place to see if the U-Haul's wheels touched the fog line.

Mr. Humphrey thinks that—at an absolute minimum—a jury should get to decide if Trooper Payton was in a position to see the U-Haul's wheels touch the fog line from this vantage point.[283]  If a jury said yes, then the Court would still have to decide whether it was reasonable for Trooper Payton to believe that he saw the wheels touch the fog line.  But if a jury said no, then the Court's work would be much simpler because it would have been unreasonable *per se* for Trooper Payton to think he saw something that he was never in a position to see.  Mr. Humphrey is wrong. A jury is not necessary to decide whether Trooper Payton could have seen a traffic violation occur.

---

[282] Oct. 25, 2022 Hr'g Tr. at 25:5–34:25.

[283] Of course, Mr. Humphrey also thinks a jury should get to decide the ultimate reasonableness question.  The Court has already squarely addressed this contention and need not repeat that analysis here.  *See supra* pp. 30–33.

That is because the dashcam recording definitively shows what a reasonable police officer in Trooper Payton's position would have seen.  Said another way, the historical facts concerning Trooper Payton's vantage point are not genuinely disputed because of the existence of the video.[284] It is the Court's responsibility to determine—based on the historical facts shown in the dashcam footage—whether it was objectively reasonable for Trooper Payton to believe he witnessed Mr. Humphrey commit a traffic violation.

Mr. Humphrey cites the Eighth Circuit's decision in *Garcia v. City of New Hope* as support for the proposition that a jury is needed to resolve the question of what Trooper Payton could have seen.[285]  But that decision actually lends support to the idea that a jury is not necessary in this case. In *Garcia*, a driver was stopped because the police officer thought the driver's license plate was covered (and therefore not visible) in violation of state law.[286]  The dashcam footage was "too blurry to establish whether [the plaintiff's] license plate was covered."[287]  And the driver disputed that his license plate was covered.[288]  So the driver was given the benefit of the doubt about the actual occurrence of a violation.[289]  The officer then argued that it was a reasonable mistake of fact to believe a violation occurred.[290]  The Eighth Circuit rejected the officer's argument because "the blurry video [did] not show that [the officer's] view of the license plate was hindered.  In fact, the

---

[284] Trooper Payton testified that he had a "better" view of the U-Haul than is shown by the video because he was using his eyes at the time of the traffic stop.  Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 50:3–9.  But Trooper Payton doesn't specify how his view was better than the video.  He doesn't say that "better" means the U-Haul appeared closer, for example.  The Court can't give Trooper Payton's vague testimony any effect without speculating.  So, for purposes of summary judgment, the video is the only evidence of what a reasonable officer in Trooper Payton's position could have seen.

[285] Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 22–28; *see Garcia v. City of New Hope*, 984 F.3d 655 (8th Cir. 2021).

[286] 984 F.3d at 662.

[287] *Id.* at 664.

[288] *Id.*

[289] *Id.*

[290] *Id.* at 664–65.

video depict[ed] a clear day and show[ed] that [the officer]—who was right behind [the driver's] car—had a clear view of the license plate."[291]  There simply was "not enough to show that [the officer] had an objectively reasonable [albeit mistaken] belief—based on the totality of the circumstances—that the license plate was unlawfully covered."[292]

    *Garcia* stands for the proposition that a video (even a blurry one) can be sufficient to resolve disputed historical facts and allow the judge to determine whether an officer's mistake was reasonable.  That's because a video shows the conditions in which the officer made the mistake (e.g., where the officer was in relation to the suspect, or whether it was dark and rainy or sunny with clear skies).  To be sure, there are cases where testimony might be necessary to establish whether a police officer's mistake was reasonable.  But those tend to be cases in which there is no video footage of the traffic stop or where some important fact occurs off video.  So testimony would be necessary to establish the conditions in which the officer made the mistake.[293]  In this case, however, there is a video.  And nobody argues that the video is inaccurate or otherwise unreliable.  So a jury is not necessary to determine what a reasonable officer in Trooper Payton's position would have seen.  Accordingly, the Court will now resolve the legal issue of whether Trooper Payton was reasonable to believe he saw the U-Haul's wheels touch the fog line.[294]

---

[291] *Id.* at 665–66.

[292] *Id.* at 666.

[293] *See United States v. Payne*, 534 F.3d 948, 950–51 (8th Cir. 2008); *United States v. Flores-Sandoval*, 366 F.3d 961, 962–63 (8th Cir. 2004); *cf. Coker*, 734 F.3d at 843.

[294] *Garcia* also helps Trooper Payton's case in other ways.  The logic of *Garcia* is that when it is difficult to see whether a traffic violation occurred, any mistake is more likely to be reasonable.  *See* 984 F.3d at 665–66 (noting that the video did "not show that [the officer's] view of the license plate was hindered" and therefore concluding that there was "not enough to show that [the officer] had an objectively reasonable belief" that a traffic violation occurred); *see also Payne*, 534 F.3d at 950–51 (noting that "it was dark outside, making it difficult for [the officer] to fully scan the vehicle for a front license plate").  So Trooper Payton's argument that his mistake was reasonable is stronger than the *Garcia* officer's argument because Trooper Payton was far behind Mr. Humphrey and the sun was setting.  Those conditions made it more difficult to see whether a traffic violation actually occurred and therefore afforded Trooper Payton more potential room to make a reasonable mistake.

From the vantage point he had in the first video clip, it was objectively unreasonable for Trooper Payton to believe that he saw the U-Haul's wheels touch the fog line.  Trooper Payton says that he saw *part* of a wheel *touch* the *edge* of a line.  But he was simply too far away from the U-Haul to be able to reasonably believe he witnessed such a precise traffic violation.  The Court doesn't doubt that Trooper Payton thought the U-Haul's wheels might have touched the fog line.  But at that distance and angle, Trooper Payton's thought was no more than a guess or speculation.  Guesses or speculation are not probable cause.  They are not even reasonable suspicion.  Caselaw is crystal clear on that point.[295]

### 2.    Aborted Exit Maneuver

Trooper Payton's exit-ramp justification for the traffic stop fails for essentially the same reasons as the purported-fog-line-violation justification fails.  Trooper Payton says that Mr. Humphrey partially entered the exit ramp, changed his mind, and then jerked back onto the interstate.[296]  And, according to Trooper Payton, this violates Arkansas Code Annotated § 27-51-104(b)(1).  Specifically, it's an "[i]mproper lane change . . . ."[297]  To believe that Mr. Humphrey entered the exit ramp at all would require believing that Mr. Humphrey had steered far enough to the right to touch the fog line (or its imaginary extension as the exit ramp becomes available).[298]  Because a reasonable officer couldn't believe that Mr. Humphrey even touched the fog line at this

---

[295] *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987) ("In order to pass Fourth Amendment scrutiny, a *Terry*-type stop must be based on a reasonable articulable suspicion of criminal activity, rather than mere conjecture or hunches."); *see also Clinton v. Garrett*, 49 F.4th 1132, 1143 (8th Cir. 2022) (concluding that it was clearly established in October of 2019 that police officers are constitutionally prohibited from initiating traffic stops when they lack "any positive indicator[s] for their suspicion" that criminal activity is afoot).

[296] Oct. 25, 2022 Hr'g Tr. at 19:19–20:3.

[297] *Id.* at 21:18–22:9.

[298] *See id.* at 19:15–20:3.  The fog line that runs across the righthand side of the interstate breaks at the exit ramp.  So a driver turning into the exit lane doesn't actually cross the fog line because there is no painted line at that particular spot at all.  But if the fog line never broke at the exit lane, then a driver would have no choice but to cross the fog line when taking the exit.

point in the video, a reasonable officer certainly could not believe that Mr. Humphrey had gone so far to the right as to enter the exit ramp.  To be clear, any such belief by Trooper Payton would be unreasonable because it would necessarily be based on a guess or speculation.  And it is clearly established that initiating a traffic stop based on nothing more than guesses or speculation violates the Fourth Amendment.[299]

### 3.    The Weight Shift

The weight-shift justification is even more unreasonable than the other two justifications. Trooper Payton says that Mr. Humphrey's movement toward the exit and the subsequent readjustment to stay on the interstate "could [have] cause[d] a crash" because of "the amount of weight shift" caused by the "sudden movement . . . ."[300]  Thus, according to Trooper Payton, the maneuver was a violation of Arkansas Code Annotated § 27-51-104.

The dashcam footage does not support Trooper Payton.  If anything, it directly contradicts him.[301]  The video shows Mr. Humphrey approaching the exit, turning on his blinker, slightly moving toward the exit, turning off his blinker, and then slightly moving away from the exit.  There was no perceptible "sudden movement" or "weight shift."  Trooper Payton's belief that Mr. Humphrey drove the U-Haul in a way that could have caused the truck to swerve uncontrollably or crash was objectively unreasonable.  Nothing in the record suggests in any way that Mr. Humphrey "operat[ed] [the U-Haul] in such a careless manner . . . as to evidence a failure to maintain proper control," or in "a manner which would cause a failure to maintain control . . . ."[302]

---

[299] *See supra* note 295.

[300] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 47:23–48:4.

[301] *See Scott*, 550 U.S. at 379–81.

[302] Ark. Code Ann. § 27-51-104(a), (b)(6).

### B.      Video Clip #2

During oral argument, Trooper Payton—for the first time in this case—pointed to a second portion of the dashcam video to support his contention that the U-Haul's wheels touched the fog line.[303]  The second portion of the video depicts Mr. Humphrey after he changed his mind about taking the exit and continued driving down the interstate.  At this point, Trooper Payton was much closer to the U-Haul than he was in the first video clip.  The still frame below shows the moment that the U-Haul is farthest toward the fog line on the right side.[304]



The Court has struggled over whether it must, should, or even can consider this argument. Neither Trooper Payton nor his attorney identified this portion of the video as evidence of probable cause or arguable probable cause until the last possible second to do so.  And raising new arguments so late in a case is generally inappropriate.  Still, the purely objective nature of the Fourth Amendment reasonableness analysis makes this a tough call.  The critical question in a Fourth Amendment case is whether an objectively reasonable officer could have pulled Mr.

---

[303] Oct. 25, 2022 Hr'g Tr. at 96:24–98:12.

[304] Traffic Stop Dashcam at 0:00:58.  Trooper Payton activated his police car's lights and initiated the traffic stop four seconds after this still frame.  *Id.* at 0:01:02.

Humphrey over at the time that Trooper Payton pulled Mr. Humphrey over.  If the answer to that question is yes, then it really shouldn't matter at what time Trooper Payton or his lawyer correctly identified the precise facts giving rise to probable cause of a traffic violation.

The Supreme Court's decision in *Devenpeck v. Alford* illustrates the point.[305]  There, a police officer initiated a traffic stop based on his suspicion that the driver was unlawfully impersonating a police officer.[306]  During the stop, a second police officer discovered that the driver was recording the audio of the traffic stop.[307]  Believing this to be illegal, the officers arrested the driver based on the allegedly illegal recording.[308]  That charge was eventually dismissed, and the driver sued the officers for unlawful arrest.[309]  The trial court determined that the officers were unreasonable for thinking that it was illegal to record the audio of a traffic stop, so the officers were denied qualified immunity.[310]  On appeal, and for the first time in that case, the officers argued that there was also probable cause to arrest the driver for obstructing a police officer and impersonating a police officer.[311]  If the officers were correct, that would mean the arrest of the driver was still reasonable, even if the officers had failed to identify the correct crime at the time of arrest.

The Ninth Circuit rejected the argument because neither obstructing a police officer nor impersonating a police officer was sufficiently related to the crime identified at the time of

---

[305] 543 U.S. 146 (2004).

[306] *Id.* at 148–49.

[307] *Id.* at 149–50.

[308] *Id.* at 150–51.

[309] *Id.* at 151.

[310] *Id.*

[311] *Id.* at 152; *Alford v. Haner*, 333 F.3d 972, 976 (9th Cir. 2003) ("Since they did not have probable cause to arrest Alford for violating the Privacy Act, defendants now claim on appeal that they had probable cause to arrest Alford for offenses other than tape recording and therefore, Alford's rights were not violated.").

arrest.[312]  But the Supreme Court reversed the Ninth Circuit and held that the lower courts must consider whether there was probable cause to arrest on the alternative grounds because the "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."[313]  In other words, a seizure does not become unconstitutional just because the police officer or his lawyer initially offered an incorrect justification for the police officer's action.  Instead, it appears courts are instructed to consider all of the information known to the police officer at the time.

Of course, police officers like Trooper Payton can't just keep arguments up their sleeve and unveil them at the last minute.  Litigants generally cannot raise arguments in a manner that is unfairly surprising to the other side.[314]  But Mr. Humphrey was not unfairly surprised by Trooper Payton's last-second argument.  Quite the opposite.  Mr. Humphrey was given the entire video in discovery (or he already had it).  And Mr. Humphrey references this second portion of the video in his summary-judgment Response Brief.[315]  Specifically, Mr. Humphrey includes this time period of the video in his argument that the video doesn't show the U-Haul's wheels touch the fog line and that a reasonable officer would not think that the U-Haul's wheels touched the fog line.[316] The teaching of *Devenpeck*, combined with the fact that Mr. Humphrey has had the opportunity

---

[312] *Devenpeck*, 543 U.S. at 152.

[313] *Id.* at 153.

[314] *Cf. Warner Bros. Ent., Inc. v. X One X Prods.*, 840 F.3d 971, 980 (8th Cir. 2016) (discussing failure to comply with Federal Rule of Civil Procedure 8(c)); *Barham v. Reliance Standard Life Ins. Co.*, 441 F.3d 581, 584 (8th Cir. 2006) (noting the "general rule" that courts "will not consider arguments raised for the first time in a reply brief").

[315] Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 24–26.

[316] *Id.*  In his Response Brief, Mr. Humphrey contends that there is nothing on the dashcam video from 0:00:43–0:00:59 that gives rise to probable cause of a traffic violation.  The still frame above is from the 0:00:58 mark and thus within the timeframe that Mr. Humphrey discusses in his brief.  *See supra* p. 42 & note 304.

(in his Response Brief) to make his arguments about this particular portion of the video, leads the Court to conclude that it should consider Trooper Payton's last-second argument.[317]

As noted above, Trooper Payton was much closer to the U-Haul when this second purported fog-line violation occurred.  The video shows the U-Haul's box trailer hovering directly over the fog line on the right side of the interstate.  From this new and closer vantage point, it was reasonable for Trooper Payton (or any officer) to think that the U-Haul's right wheels—which are nearly, if not equally, as far to the right as the box trailer is—were touching the fog line.  Because such a belief was reasonable (even if mistaken), Trooper Payton did not violate the Fourth Amendment when he pulled Mr. Humphrey over.  For the same reason, Trooper Payton had "arguable probable cause" to initiate a traffic stop and is therefore entitled to qualified immunity on this claim.[318]

## II.    Extending the Traffic Stop

Mr. Humphrey next contends that Trooper Payton violated the Fourth Amendment by unreasonably extending the traffic stop to investigate potential drug possession or trafficking.  In the absence of reasonable suspicion, a police officer violates the Fourth Amendment when he or she adds time to a traffic stop to investigate criminal activity that is unrelated to the initial purpose of the traffic stop.[319]  This is true even if the initial decision to pull somebody over was constitutional.

There's no question that Trooper Payton added time to this traffic stop by investigating potential drug possession or trafficking. And there's no question that Trooper Payton's

---

[317] This issue—whether a trial court should address such a late-breaking argument in the context of a § 1983 Fourth Amendment traffic-stop case—merits close examination by, and additional guidance from, the Eighth Circuit.

[318] *Brown*, 40 F.4th at 900–01.

[319] *United States v. Callison*, 2 F.4th 1128, 1131 (8th Cir. 2021).

investigation of potential drug possession or trafficking was unrelated to Mr. Humphrey's allegedly careless driving. So the only question for purposes of the Fourth Amendment is whether Trooper Payton's decision to investigate potential drug possession or trafficking was reasonable. To be reasonable, Trooper Payton must have had "reasonable suspicion of additional criminal activity" when he extended the traffic stop.[320]

In some cases, it is disputed when exactly a traffic stop was "extended."[321]  Where there is such a dispute, its resolution can meaningfully impact the case. After all, the earlier an extension occurred, the fewer facts there are on which a police officer can rely to prove his or her suspicion was reasonable. But in this case, there's no such fight between the parties. Both sides agree that the relevant point in time is when Trooper Payton returned to his police car for the second time and called for the drug dog; that event occurred approximately eleven-and-a-half-minutes into the traffic stop.[322]

---

[320] *Id.* at 1132. It is unclear from Eighth Circuit precedent whether Trooper Payton needed reasonable suspicion of any criminal activity or reasonable suspicion specifically of drug possession or trafficking. *Compare id.*, *with United States v. Jones*, 269 F.3d 919, 928 (8th Cir. 2001) (concluding that an "inconsistent answer could not generate a reasonable suspicion that Jones was involved in interstate narcotics trafficking"). That distinction doesn't matter in this case. The Court concludes below that Trooper Payton had reasonable suspicion of drug possession or trafficking specifically. *See infra* pp. 49–54.

[321] *See Callison*, 2 F.4th at 1130–31 & n.2; *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017); *United States v. Englehart*, 811 F.3d 1034, 1040–43 (8th Cir. 2016).

[322] Traffic Stop Dashcam at 0:12:35–0:12:40; Oct. 25, 2022 Hr'g Tr. at 6:11–9:3. Recall that the Court pegs the start of the traffic stop to approximately one minute into the dashcam video, while the parties often refer to the traffic stop starting approximately two minutes into the video. *See supra* note 33. During oral argument, Mr. Humphrey's attorney said the purportedly unreasonable extension of the traffic stop occurred "ten and a half minutes from when Mr. Humphrey was pulled over . . . ." Oct. 25, 2022 Hr'g Tr. at 7:4–5. It appears she was using "pulled over" colloquially to refer to what she viewed as the start of the traffic stop. Counsel said that she was "not sure of the exact timestamp," because the dashcam video is "off by something like two minutes . . . ." *Id.* at 7:3–4. To clarify the parties' contentions, the Court asked about a specific event in the video, as opposed to a timestamp: "[Y]our contention is that the extension of the stop that required reasonable suspicion of a crime other than the traffic violation was at the point where the officer walked back to the car for the second time to specifically and formally call for the dog sniff. Is that -- is that fair?" *Id.* at 7:18–22. Mr. Humphrey's counsel replied, "Yes, Your Honor." *Id.* at 7:23. After this colloquy, the Court turned to Trooper Payton's counsel. He stated that he "agree[d] with that position." *Id.* at 9:2.

To be frank, the Court isn't sure this is really the correct point at which to assess reasonable suspicion.  Trooper Payton first asked Mr. Humphrey about drugs in the U-Haul approximately five minutes into the traffic stop.  At that time, Trooper Payton didn't need anything else from Mr. Humphrey to move on with the traffic stop—he had already received Mr. Humphrey's license and rental agreement.  So his questions about drugs undoubtedly added time to the traffic stop.[323]  But Mr. Humphrey has expressly disclaimed any argument that reasonable suspicion was necessary at that point in the traffic stop.[324]  So the Court does not decide whether Trooper Payton had reasonable suspicion at that time.  The Court decides only whether Trooper Payton had reasonable suspicion of drug possession or trafficking when he called for the drug dog.

Reasonable suspicion is more than a mere hunch but is less than probable cause.[325]  It "requires 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant'" investigation of criminal activity.[326]  It is "a fact-specific inquiry, determined by the totality of the circumstances, taking account of an officer's deductions and rational inferences resulting from relevant training and experience."[327]  As explained above, and contrary to Mr. Humphrey's position, the ultimate question of whether the facts known to Trooper Payton add up to reasonable suspicion of drug possession or trafficking is one for the Court.[328]  And as was true of the historical facts bearing on the propriety of the initial traffic stop, there are

---

[323] *See Callison*, 2 F.4th at 1130–31 (agreeing that a traffic stop was extended when the officer asked "if there was anything illegal in the car" and was no longer "handling the matter for which the stop was made" (alteration adopted) (quoting *Rodriguez v. United States*, 575 U.S. 348, 350 (2015))).

[324] Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 21 n.3; Oct. 25, 2022 Hr'g Tr. at 82:10–84:4.

[325] *Navarette v. California*, 572 U.S. 393, 397 (2014).

[326] *Callison*, 2 F.4th at 1132 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

[327] *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021) (citing *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002)).

[328] *See supra* pp. 30–33; *Owens*, 101 F.3d at 561 ("The existence of reasonable suspicion is a question of law, which we review de novo." (citing *Ornelas*, 517 U.S. 690, 116 S. Ct. at 1663)).

no genuine disputes of material historical fact bearing on the propriety of the extension of the traffic stop.[329]   For the most part, that's because the dashcam video definitively resolves all disputes of historical fact that bear upon the reasonable-suspicion analysis.

To analyze reasonable suspicion, the Court considers the historical facts that were available to Trooper Payton at the time he called for a drug dog.  The Court must not consider any fact in isolation.  Rather, the Court considers the totality of the historical facts and must account for the entire picture they paint.  The Supreme Court has emphasized this very point on more than one occasion:

> The panel majority viewed each fact in isolation, rather than as a factor in the totality of the circumstances.  This was mistaken in light of our precedents.  The totality of the circumstances requires courts to consider the whole picture.  Our precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation.  Instead of considering the facts as a whole, the panel majority took them one by one.  For example, it dismissed the fact that the partygoers scattered or hid when the police entered the house because that fact was not sufficient standing alone to create probable cause.  Similarly, it found nothing in the record suggesting that the condition of the house, on its own, should have alerted the partygoers that they were unwelcome.  The totality-of-the-circumstances test precludes this sort of divide-and-conquer analysis.[330]

Moreover, just because a fact has a potentially innocent explanation does not mean it is subtracted from (or discounted in) the reasonable-suspicion calculus.  That is because the Supreme Court has made absolutely clear that a police officer like Trooper Payton does not have to blindly accept potentially innocent explanations from a suspect.[331]  Said differently, in determining whether there is reasonable suspicion, a police officer is "not require[d] . . . to rule out a suspect's innocent explanation for suspicious facts."[332]  Rather, the officer is supposed to consider all the facts at

---

[329] *See supra* pp. 32–33 & note 268.

[330] *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (cleaned up).

[331] *Id.* ("[T]he panel majority mistakenly believed that it could dismiss outright any circumstances that were susceptible of innocent explanation." (internal quotation marks and citation omitted)).

[332] *Id.*

hand, "including the plausibility" of any innocent explanation given for suspicious facts.[333] Correspondingly, unless a suspect's behavior is capable only of an innocent explanation, a judge should not be a Monday-morning quarterback.  That is, a judge should be reticent to second guess a police officer's on-the-spot determination that an innocent explanation was untruthful or did not sufficiently alleviate suspicion raised by the fact or facts known to the officer at the time.

In light of the foregoing guideposts, the Court concludes that, at the time Trooper Payton called for a drug dog, there was reasonable suspicion of drug possession or trafficking to support the traffic stop's extension.  By the time he called for a drug dog, Trooper Payton obviously knew that Mr. Humphrey was driving a rented U-Haul moving truck.  Although on its own this means very little, it is more than nothing, since large, rented trucks like this are sometimes used by drug traffickers to transport narcotics.[334]  Trooper Payton also knew that Mr. Humphrey was nervous. Indeed, Mr. Humphrey readily told Trooper Payton he was nervous.[335]  To be fair, Mr. Humphrey told Trooper Payton that Mr. Humphrey's nervousness arose from the potential for police violence during traffic stops.  And Mr. Humphrey is one-hundred percent right that it can be innocent (and maybe even expected) for a Black man stopped by a white police officer to be nervous throughout a traffic stop—especially a traffic stop that occurred mere months after George Floyd's murder. But that's not the only possible explanation for his nervousness.  Trooper Payton could have reasonably (even if mistakenly) considered the source of Mr. Humphrey's nervousness to be something less innocent.  This is particularly true since there were some signs of more-than-normal nervousness.  While any one of these signs in isolation could easily be explained away, taken together they do leave an impression of heightened nervousness.

---

[333] *Id.*

[334] *See* Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 122:23–123:5.

[335] *See supra* notes 54–56, 77–78, 102–04, 138 and accompanying text.

First, when walking back behind the truck, Mr. Humphrey—unprompted by Trooper Payton—put his hands in the air.  Of course, it could be innocent for a stopped driver to put his or her hands up to make it clear that he or she does not have any weapons and is not a threat.  But it could also suggest that Mr. Humphrey thought he was in trouble for something more serious than a traffic violation.

Second, Mr. Humphrey was on the phone with someone throughout the entire stop.  He said it was his father.  Considering that Mr. Humphrey was thirty-two years old, Trooper Payton was justified for finding the phone call with Dad a little odd in the first place.  Further—and here's the suspicious part—Mr. Humphrey twice asked Trooper Payton to speak with the man on the phone, but both times took the phone back before Trooper Payton could do so.  And Mr. Humphrey seemed wary of Trooper Payton speaking to the man outside Mr. Humphrey's presence.  This could reasonably have led an officer in Trooper Payton's shoes to suspect that the man on the phone was actually someone other than Mr. Humphrey's father, or that the man on the phone was indeed Mr. Humphrey's father but Mr. Humphrey wasn't sure whether his father would corroborate Mr. Humphrey's story.  An officer could reasonably have inferred that Mr. Humphrey wanted to know the details of Trooper Payton's conversation with the man on the phone so that Mr. Humphrey would (1) know whether his own story had fallen apart, and (2) be able to remain consistent with what the man told Trooper Payton.  Whatever the actual reasons Mr. Humphrey had for getting cold feet about Trooper Payton speaking to the man on the phone, a reasonable police officer could suspect that Mr. Humphrey was lying about some aspect of the phone call.

Third, Mr. Humphrey's nervousness did not decrease over time—even after he was told he was not going to get a ticket and even after he had spent considerable time with Trooper Payton

without any whiff of potential police violence.[336]   The Eighth Circuit has repeatedly "found reasonable suspicion to extend a traffic stop where a person exhibited 'unusual nervousness even after the officer advised him that he was issuing only a warning citation.'"[337]  As explained above, even prolonged, continued nervousness could have an innocent explanation in this case.[338]  But it could also have a more nefarious explanation.

Furthermore, the video shows that Mr. Humphrey's nervousness increased (including beginning to stutter) when Trooper Payton subsequently mentioned the possibility of calling for a drug dog.[339]  Trooper Payton could reasonably have believed this increased nervousness was because Mr. Humphrey was worried that the drug dog would alert.  Indeed, Mr. Humphrey made a statement that reasonably could have been heard by Trooper Payton as an admission that this was the source of his nervousness.  Specifically, a reasonable officer could have understood Mr. Humphrey to have said, "I'm just really nervous now . . . I know I've done it."[340]

It was not nervousness alone that gave rise to reasonable suspicion of drug possession or trafficking.  At the time he called for the drug dog, Trooper Payton also had sufficient grounds to conclude that Mr. Humphrey was trying to hide his true travel plans.   First, the travel plan that Mr. Humphrey provided to Trooper Payton was odd.  If Mr. Humphrey's explanation of his trip

---

[336] This was before Mr. Humphrey knew that there would be a drug dog coming to the scene.  *See supra* pp. 12–16.

[337] *United States v. Pacheco*, 996 F.3d 508, 512 (8th Cir. 2021) (alterations adopted) (quoting *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004)).

[338] *See supra* p. 49.

[339] *See supra* notes 118–20 and accompanying text.

[340] *See supra* note 138 and accompanying text.  Even assuming Mr. Humphrey actually said, "I know I've done nothing," there's no genuine dispute as to whether it would have been reasonable for an officer to hear "I know I've done it."  The video and Mr. Humphrey's deposition testimony make clear this would have been reasonable.  *See* Ex. 3 (Humphrey Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-3) at 84:1–85:1 (Mr. Humphrey conceding that it is reasonable to hear his statement to Trooper Payton as "I know I've done it").

For completeness, the Court notes that if this statement was taken out of the reasonable-suspicion analysis entirely, the Court would still conclude that there was reasonable suspicion to extend the traffic stop when Trooper Payton called for a drug dog.

was accurate, it would only take a total of three hours (Fayetteville to Little Rock).  Yet he planned to get a hotel room two hours into the trip with only one hour to go.  Why not stay in Fayetteville and drive to Little Rock in the morning?  Or why not go the full way to Little Rock?  These are perfectly legitimate questions for Trooper Payton to have about Mr. Humphrey's story.

Second, and compounding the suspiciousness of such purported travel plans, Mr. Humphrey gave conflicting—or at least inconsistent—explanations to Trooper Payton for the odd travel plans.  Early on in the traffic stop, Mr. Humphrey told Trooper Payton that he was considering staying in Russellville because (1) he needed a hotel for the night and (2) hotels were cheaper in Russellville than Little Rock.[341]  Subsequently, however, Mr. Humphrey told Trooper Payton that he was trying to stay in Russellville (instead of driving on to Little Rock) because Mr. Humphrey's mother did not want him driving at night.[342]  Maybe both explanations were true.  But they are different enough that Trooper Payton was entitled to consider the inconsistencies suspicious and even evidence of deceit.

Moreover, in addition to the two explanations conflicting or being inconsistent, each explanation was odd in and of itself.  Trooper Payton did not have to believe that a thirty-two-year-old man was stopping for the night because his mom didn't want him to drive after dark.  And the logic of the earlier explanation for stopping in Russellville was next to impossible to follow: Mr. Humphrey was moving in with his parents in Little Rock; but they wanted him to quarantine for two weeks before moving in for COVID-safety purposes; so he was going to stay at another apartment for those two weeks; but that apartment was not ready for him until the following day; so he needed a hotel for the night; and hotels were cheaper in Russellville; so he

---

[341] *See supra* notes 65–72 and accompanying text.

[342] *See supra* note 121 and accompanying text.

was heading to a hotel that he knew was near a Cracker Barrel (which, conveniently, happened to be in eyesight). Maybe all of that was entirely true. But Trooper Payton could reasonably, even if mistakenly, have concluded this explanation was so convoluted as to be not credible and made up on the spot. It was a reasonable, even if mistaken, inference from the foregoing that Mr. Humphrey was hiding his true travel plans because his true travel plans involved criminal conduct.[343]

In addition to Mr. Humphrey's nervousness and suspicious answers to travel-related questions, there was one further indicia of drug possession or trafficking. When asked by Trooper Payton whether a drug dog would alert on the U-Haul, Mr. Humphrey answered, "ye-, no." While the "ye-" part of this answer could have simply been an artifact of speech or a verbal tic, it could also have been an accidental admission of guilt from which Mr. Humphrey quickly backtracked. In light of all the other circumstances in this traffic stop, Trooper Payton could have reasonably gone either way on what Mr. Humphrey's answer meant.[344]

In the Court's view, considering the totality of the circumstances discussed above, Trooper Payton had reasonable suspicion that criminal activity was afoot—specifically drug possession or trafficking. In coming to this conclusion, the Court emphasizes that, definitionally, reasonable

---

[343] *See, e.g.*, *Pacheco*, 996 F.3d at 511–12 (8th Cir. 2021); *United States v. Lebrun*, 261 F.3d 731, 734 (8th Cir. 2001).

[344] Mr. Humphrey wants a jury to decide whether all of these historical facts are actually true. Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 29 (arguing that the "supposed 'grounds' for reasonable suspicion are hotly contested"). But nearly all of them come directly from the dashcam recording. And the accuracy of that recording is not disputed. The only factor listed here that is not indisputably proven by the dashcam footage is whether Mr. Humphrey's plan to spend the night an hour away from his destination was "unusual." But that's not a jury question. It doesn't matter if it is actually unusual to spend the night an hour away from one's destination. What matters is whether Trooper Payton was reasonable for (1) thinking it was unusual and (2) thinking it was suspicious. In the Fourth Amendment context, those questions of reasonableness are questions of law for the Court to resolve. In any event, even if determining whether the travel plan was "unusual" is a question for the jury, and the Court assumes that the jury would find in Mr. Humphrey's favor on that particular question, Trooper Payton would still have had reasonable suspicion based on the other factors listed above. *See infra* p. 55 (noting that "some of Mr. Humphrey's actions that showed nervousness are independently suspicious—meaning they could suggest criminal activity even in the absence of any nervousness").

suspicion is far less than certainty. By the very nature of the term, there are going to be times— perhaps many times—where an officer has reasonable suspicion of criminal activity, but it ultimately turns out that no criminal activity is occurring. This is one of those times.

Mr. Humphrey adamantly disagrees that reasonable suspicion of a drug crime existed. But his arguments are unpersuasive. Aside from his innocent-explanations theory, which the Court has already addressed above, Mr. Humphrey's focus is on a fairly old line of cases from the Eighth Circuit. Specifically, he posits that a police officer's suspicion of criminal activity is never reasonable if that suspicion is based on little to nothing more than nervousness and inconsistent answers to travel-related questions.[345] Mr. Humphrey's argument primarily relies on the Eighth Circuit's decision in *United States v. Jones*.[346] So it's worth exploring that case in some detail.

In *Jones*, the Eighth Circuit said that if "an officer can cite only one or two facts, including a generic claim of nervousness, as supporting his determination of reasonable suspicion, then we may conclude that his suspicion was not reasonable . . . ."[347] *Jones* cited *United States v. Beck*, another case that gave little weight to an officer's perception that a suspect was nervous.[348] Both cases implicitly took the position that a suspect's nervousness is really only relevant if the nervousness is unusual or exceptional.[349] Based on these cases, Mr. Humphrey has constructed an argument that goes something like this: (1) Trooper Payton's suspicion was based solely on two facts—nervousness and answers to travel-related questions, but (2) Mr. Humphrey's nervousness

---

[345] Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 29–30 (quoting *Jones*, 269 F.3d at 928–29).

[346] *Id.* at 28–46.

[347] 269 F.3d at 929.

[348] *Id.* ("We have determined that '[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.'" (quoting *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998))).

[349] *See id.* at 928–29; *Beck*, 140 F.3d at 1139.

did not rise to the level of being "unusual," and so (3) there was not a sufficient basis for reasonable suspicion under the rule of *Jones* and *Beck*.[350]

There are significant weaknesses with Mr. Humphrey's argument.  For starters, even assuming that *Jones* created some mechanical fact-counting rule, that wouldn't automatically preclude reasonable suspicion in this case.  It's at the very least a vast oversimplification to say that Trooper Payton's suspicion was based only on nervousness and travel-related questions.  As discussed above, some of Mr. Humphrey's actions that showed nervousness are independently suspicious—meaning they could suggest criminal activity even in the absence of any nervousness.  For example, Mr. Humphrey putting his hands in the air unprompted could reasonably have been seen as evidence that he considered himself in trouble for something more serious than a traffic violation.  And Mr. Humphrey's behavior with the cell phone—twice asking Trooper Payton to talk to the man on the phone but then taking the cell phone away before Trooper Payton could do so—could reasonably cause one to believe that Mr. Humphrey was not being honest about the phone call.  Moreover, Mr. Humphrey's "ye-, no" answer to whether a drug dog would alert on the U-Haul and his statement that could have been reasonably heard as "I've done it" have independent suspicious qualities completely divorced from nervousness or answers to travel-related questions.

In any event, *Jones* doesn't create Mr. Humphrey's fact-counting rule in the first place. The *Jones* Court simply said that general nervousness and another factor, like inconsistent answers to travel-related questions, "may" not provide reasonable suspicion.[351]  The *Jones* Court didn't say such circumstances would "never" give rise to reasonable suspicion.  Given that reasonable

---

[350]  Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 28–46.

[351]  269 F.3d at 929.

suspicion is necessarily decided on a case-by-case basis, *Jones* and *Beck* at most told trial courts to be extremely wary of an officer's claim of reasonable suspicion when it is based primarily on general, vague, and subjective assertions of a suspect's nervousness, absent "unusual, exceptional, or more objective manifestations of [such] nervousness . . . ."[352]  Long story short, *Jones* and *Beck* don't compel a particular outcome in the case at bar.

It's also worth mentioning that *Jones* and *Beck*'s treatment of nervousness as a low-value factor in the reasonable-suspicion analysis may not adequately represent the current state of the law in the Eighth Circuit.  In the two decades since *Jones* and *Beck* were decided, the Eighth Circuit has "repeatedly distinguished [*Beck*], so much so that *Beck* may be essentially limited to its facts at this point."[353]  And more recent Eighth Circuit precedent indicates that nervousness doesn't have the second-tier status that *Jones* and *Beck* give to it.  In 2008, in *United States v. Hogan*, the Eighth Circuit concluded that an officer reasonably extended a traffic stop to call for a drug dog because "the officer observed nervousness" and the suspect had an "impossible" travel plan.[354]  And in *United States v. Callison*, an officer had "reasonable suspicion of another crime" when

> (1) the car pulled into a residential driveway after [the police officer] followed it for a brief time without activating his lights; (2) it was the middle of the night; (3) [the driver] was avoiding eye contact and behaving nervously during the encounter; (4) no one in the car knew the address or street where they stopped; and (5) the driver said they were dropping off a friend, but the two passengers gave different names for that friend.[355]

It is clear that, in both *Hogan* and *Callison*, nervousness combined with inconsistent or unusual answers to basic travel-related questions predominantly, if not entirely, formed the basis of an

---

[352] *Id.* (internal quotation marks omitted).

[353] *Pacheco*, 996 F.3d at 513 n.3.

[354] *United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008); *see also Callison*, 2 F.4th at 1132 ("In *Hogan*, for example, we held that nervousness and inconsistent answers to questions were enough for reasonable suspicion.").

[355] 2 F.4th at 1132–33.

officer's reasonable suspicion.

At the very least, one must reconcile the *Jones/Beck* cases with the *Hogan/Callison* cases. That reconciliation requires reading cases like *Hogan* and *Callison* as implicitly concluding that the suspect in each case was unusually or exceptionally nervous, or otherwise showed sufficiently objective manifestations of nervousness.[356] And if the suspects in those cases met this nervousness threshold, then so does Mr. Humphrey.[357] In *Hogan*, for example, the discussion of the driver's nervousness was cursory: "shaking, sweating, fidgeting, etc." was "observed" by the officer.[358] The same is true for the *Callison* suspect, whose nervousness was suspicion-inducing because he was sweating and admitted to being nervous.[359] In our case, Mr. Humphrey admitted several times to being nervous. And those admissions are in addition to the other objective manifestations of nervousness that the Court has already discussed above.[360] It's hard to see how Mr. Humphrey's behavior in this case wouldn't at least be on the same level as the behavior of the suspects in *Hogan* and *Callison*.

Finally, Trooper Payton would be entitled to summary judgment even if this Court were to agree that Mr. Humphrey's nervousness was not sufficiently severe under Eighth Circuit precedent to provide reasonable suspicion of criminal activity when combined with the other suspicious

---

[356] *See Jones*, 269 F.3d at 929.

[357] Mr. Humphrey thinks a jury is necessary to decide whether he was "unusually" nervous. Oct. 25, 2022 Hr'g Tr. at 68:13–21. That's incorrect. Mr. Humphrey has provided no case (and the Court has found none on its own) that says whether a suspect was "unusually" nervous is a question of historical fact for a jury. And even if it were a genuinely disputed question of historical fact—such that, for summary-judgment purposes, Mr. Humphrey was not unusually nervous—two things would keep it from being a material dispute. First, the Court would conclude that Trooper Payton was objectively reasonable, albeit mistaken, for thinking that Mr. Humphrey's nervousness was unusually severe. Second, Trooper Payton wins even if (1) he was mistaken as to the "historical fact" of Mr. Humphrey's nervousness *and* (2) the Court agreed with Mr. Humphrey that Trooper Payton's mistake of fact was unreasonable. That's because Trooper Payton would still be entitled to qualified immunity—due to the lack of clarity in Eighth Circuit caselaw concerning the relevance of nervousness in the reasonable-suspicion analysis. *See infra* pp. 57–58.

[358] 539 F.3d at 921.

[359] 2 F.4th at 1130.

[360] *See supra* pp. 49–51.

factors present in this case.  That's because Trooper Payton had at least "arguable reasonable suspicion" and is therefore entitled to qualified immunity.[361]  Put another way, Trooper Payton could have easily misunderstood the state of the law concerning when nervousness can and can't factor into a reasonable-suspicion decision.  In the two decades since *Jones* and *Beck*, there has been significant precedential tension concerning how and when nervousness does or does not factor into an officer's reasonable-suspicion analysis.  That tension—and tension is putting it politely—prevents this Court from concluding that "clearly established" law put Trooper Payton on notice that his reasonable-suspicion analysis was deficient.  Trooper Payton was at least reasonable in believing he had reasonable suspicion of a drug crime.

## III.    Prolonged Handcuffing

Mr. Humphrey's final argument is that Trooper Payton violated the Fourth Amendment by leaving him in handcuffs for nine minutes after Trooper Payton had made the post-search decision to let Mr. Humphrey go.[362]  To be clear, Mr. Humphrey is not challenging Trooper Payton's initial decision to place Mr. Humphrey in handcuffs and in the backseat of the police car.[363]  Trooper Payton likely had the legal authority to do that because the Constitution allows police officers to detain suspects at the scene of a search to maintain security and order.[364]  Mr. Humphrey is challenging only Trooper Payton's failure to promptly unhandcuff Mr. Humphrey once the search of the U-Haul concluded.[365]

---

[361] *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019).

[362] Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 46–47.

[363] *Id.* at 46 ("[A]ssuming that [Trooper] Payton could reasonably handcuff [Mr.] Humphrey after the canine alert . . . .").

[364] *See Michigan v. Summers*, 452 U.S. 692 (1981); *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) ("The limits of a *Terry* stop were also not exceeded when the defendant was handcuffed and placed in a police car while the officers searched the truck.")

[365] Oct. 25, 2022 Hr'g Tr. at 9:4–16.

Before reaching the merits of this claim, the Court must address a procedural issue. Trooper Payton's Motion for Summary Judgment does not mention (let alone attack) any claim about handcuffing. It was only after Mr. Humphrey discussed the claim in his Response Brief that Trooper Payton addressed it in his Reply Brief.[366] Mr. Humphrey says Trooper Payton's failure to affirmatively move for summary judgment on this claim counts as a forfeiture or waiver, either of which would mean the claim must go to trial.[367] Trooper Payton disagrees. He says that he did not accidentally forfeit, much less purposely waive, his right to move for summary judgment on the handcuffing claim. He tries to excuse his initial failure to attack the claim by saying he "did not address this particular issue . . . because Mr. Humphrey's Complaint contains one generalized cause of action."[368] His point seems to be that Mr. Humphrey did not specifically set out a separate claim for handcuffing.

Trooper Payton's contention isn't completely meritless. Mr. Humphrey's Complaint contains over 130 factual allegations and then wraps up with one count broadly claiming that Trooper Payton violated the Fourth Amendment. But the Complaint does not specify exactly which actions Mr. Humphrey believed violated his Fourth Amendment rights. Nonetheless, the Court concludes that Mr. Humphrey's Complaint sufficiently raises the prolonged-handcuffing claim—which in turn means that Trooper Payton forfeited his right to move for summary judgment on that claim.[369]

Mr. Humphrey's Complaint alleges that (1) "Trooper Payton returned to the squad car and wrote [Mr. Humphrey] a warning," (2) "[i]t took Trooper Payton approximately five minutes to

---

[366] Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 46–47; Reply in Supp. of Def.'s Mot. for Summ. J. (Doc. 41) at 5.

[367] *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 37) at 47.

[368] Reply in Supp. of Def.'s Mot. for Summ. J. (Doc. 41) at 5.

[369] *See City of Kennett v. Env't Prot. Agency*, 887 F.3d 424, 429–30 (8th Cir. 2018).

write the warning," (3) Trooper Payton "left [Mr. Humphrey] handcuffed in the back seat of his squad car the entire time, despite knowing he had no valid basis for [Mr. Humphrey's] continued detention," and (4) "[o]nly after completing the written warning did Trooper Payton finally remove the handcuffs . . . ."[370] It is clear enough from this that Mr. Humphrey's Complaint takes issue with the fact that Trooper Payton left Mr. Humphrey in handcuffs while writing the warning. Trooper Payton missed his chance to move for summary judgment on the prolonged-handcuffing claim.

In any event, even if the Court could reach the merits of the handcuffing claim, summary judgment in Trooper Payton's favor would not be appropriate. Trooper Payton's constitutional authority to handcuff Mr. Humphrey was based on a need to secure the area while searching the U-Haul.[371] When Trooper Payton finished searching the U-Haul and decided to let Mr. Humphrey go, that justification evaporated. Still, Trooper Payton can avoid liability for a Fourth Amendment violation if he can show either (1) that there was "a separate, independent basis [that] support[ed] continued detention,"[372] or (2) that leaving Mr. Humphrey in handcuffs for nine minutes was otherwise "not unreasonable" under the "circumstances surrounding the search or seizure and the nature of the search or seizure itself."[373] But Trooper Payton doesn't even attempt to make either showing.

Trooper Payton hasn't offered any independent basis for keeping Mr. Humphrey in handcuffs. That's because there wasn't any. And he hasn't tried to make an argument that keeping Mr. Humphrey in handcuffs for nine minutes was reasonable under the circumstances. To the

---

[370] Compl. (Doc. 1) ¶¶ 122–26.

[371] *See supra* note 364 and accompanying text.

[372] *Wright v. United States*, 813 F.3d 689, 697 (8th Cir. 2015) (citing *Hill v. Scott*, 349 F.3d 1068, 1074 (8th Cir. 2003)).

[373] *Id.* at 698 (citation omitted).

contrary, Trooper Payton's counsel expressly conceded that Trooper Payton was negligent—i.e., not reasonable.[374]  Of course, that concession was based on the incorrect idea that Trooper Payton would not be liable if he was merely negligent.[375]  But it is a concession all the same.

Even without the concession, the Court would find (on the historical facts as they now stand for summary-judgment purposes) that Trooper Payton was unreasonable.  He knew at the time he should uncuff Mr. Humphrey: Immediately upon returning to the police car after finishing the search of the U-Haul, Trooper Payton told Mr. Humphrey that the handcuffs were going to be coming off.[376]  Throughout the next nine minutes, Mr. Humphrey made multiple comments about the handcuffs either causing him pain or being unnecessary.[377]  And in his deposition, Trooper

---

[374] During oral argument, the Court and Trooper Payton's counsel had the following exchange:

| THE COURT: | Right.  So if he was going to do that – I guess what I don't understand is – well, let me ask you this.  Do you think what Trooper Payton did was negligent? |
| MR. FRANCE: | I think it is boarder [sic] line negligence, yes. |
| THE COURT: | No.  No.  That is not what I asked.  Do you think it was negligent? |
| MR. FRANCE: | Yes. |

Oct. 25, 2022 Hr'g Tr. at 44:7–14.

[375] Reply in Supp. of Def.'s Mot. for Summ. J. (Doc. 41) at 7–8 (arguing that "Trooper Payton was at worst negligent" and that "[s]uch negligence is insufficient for liability under § 1983").  Trooper Payton's argument suffers from two major flaws.  First, he conflates intentionality with maliciousness.  *See* Oct. 25, 2022 Hr'g Tr. at 44:15–45:9.  It may very well be true that Trooper Payton wasn't maliciously trying to hurt Mr. Humphrey by not taking off the handcuffs.  But there's no doubt that Trooper Payton purposely kept the handcuffs on for those nine minutes.  It's not as though Trooper Payton forgot the handcuffs were still on.  As soon as he got in the car, he noted the handcuffs would be coming off eventually.  And, during the nine minutes at issue, Mr. Humphrey made multiple comments about the handcuffs still being on and that they were hurting him.  The second flaw in Trooper Payton's argument is that he is simply wrong that negligence is never a sufficient mens rea for liability under § 1983.  In support of that argument, he cited cases in which intent to harm was a substantive element of the underlying constitutional claim.  *See Montgomery v. City of Ames*, 749 F.3d 689, 694–95 (8th Cir. 2014) (discussing the conscious-shocking standard applicable to a duty-to-protect claim); *Davis v. Hall*, 992 F.2d 151, 152–53 (8th Cir. 1993) (analyzing the deliberate-indifference standard applicable to claims about inadequate medical care in detention facilities).  But a Fourth Amendment claim does not require intent to cause harm.  It requires failing to act as a reasonable officer would under the circumstances.  In other words, negligence.  *See Daniels v. Williams*, 474 U.S. 327, 329–30 (1986) (reaffirming that "§ 1983 . . . contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right.").

[376] *See supra* notes 188–91 and accompanying text.

[377] *See supra* notes 203–07, 217–21 and accompanying text.

Payton admitted that there was nothing that prevented him from removing the handcuffs before writing the warning.[378]

Moreover, Trooper Payton would not be entitled to qualified immunity on the prolonged-handcuffing claim. The Eighth Circuit has made it clear that once the justification for handcuffing a suspect goes away, the handcuffs need to come off.[379] No reasonable officer in Trooper Payton's position could have thought it justified to keep Mr. Humphrey handcuffed once the search of the U-Haul ended. It isn't as though Trooper Payton needed time "to defuse the situation and reorient" himself in order to "ensure[] that no further mistakes were made that day."[380] Mr. Humphrey was going to be let go, he had not done anything to indicate he was a safety concern, and there was no reason to think he would obstruct Trooper Payton's completion of the traffic stop. Trooper Payton has flatly admitted all of this. Accordingly, Trooper Payton must stand trial on Mr. Humphrey's claim that Trooper Payton violated the Fourth Amendment by keeping Mr. Humphrey handcuffed for an unreasonable amount of time.[381]

---

[378] Ex. 2 (Payton Dep.) to Def.'s Mot. for Summ. J. (Doc. 28-2) at 164:10–24.

[379] *See Wright*, 813 F.3d at 697 ("Generally, 'continuing to hold an individual in handcuffs once it has been determined that there was no lawful basis for the initial seizure is unlawful within the meaning of the Fourth Amendment.'" (alteration adopted) (quoting *Hill*, 349 F.3d at 1074)); *El-Ghazzawy v. Berthiaume*, 636 F.3d 452 (8th Cir. 2011); *see also Haynes v. Minnehan*, 14 F.4th 830, 837–38 (8th Cir. 2021) (discussing prior cases and concluding that clearly established law precluded qualified immunity).

[380] *Wright*, 813 F.3d at 699.

[381] During oral argument, there was a brief discussion as to whether Mr. Humphrey had suffered a physical injury sufficient to bring a claim about Trooper Payton's unreasonable use of handcuffs. *See* Oct. 25, 2022 Hr'g Tr. at 91:3–94:12. That discussion was inspired by a line of Eighth Circuit cases that say "allegations of pain as a result of being handcuffed, without some evidence of more permanent injury, are not sufficient to support a claim of excessive force." *Copeland v. Locke*, 613 F.3d 875, 881 (8th Cir. 2010) (alterations adopted) (quoting *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990)). It isn't entirely clear what this rule requires or when it applies. In some cases, the Eighth Circuit has required "medical records indicating [the plaintiff] suffered [a] long-term or permanent physical injury as a result of the handcuffs." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1033 (8th Cir. 2012) (quoting *Crumley v. City of St. Paul*, 342 F.3d 1003, 1008 (8th Cir. 2003)). In others, it has said that "there is no uniform requirement that a plaintiff show more than *de minimis* injury to establish an application of excessive force." *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (citing *Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1999)). And in some cases, whether a plaintiff suffered a physical injury from the use of handcuffs isn't even discussed, much less treated as a threshold requirement. *See Haynes*, 14 F.4th 830; *Wright*, 813 F.3d 689; *El-*

**CONCLUSION**

For the reasons given above, Trooper Payton's Motion for Summary Judgment is GRANTED in part and DENIED in part.[382]  Trooper Payton is entitled to summary judgment with respect to Mr. Humphrey's § 1983 Fourth Amendment claims arising from Trooper Payton's decisions to pull Mr. Humphrey over and to call for a drug dog.  On those issues—encompassing both the constitutional claims and qualified immunity—there are no genuine disputes of material historical fact and Trooper Payton is entitled to judgment as a matter of law.  Trooper Payton must stand trial, however, on Mr. Humphrey's claim that Trooper Payton violated the Fourth Amendment by unreasonably keeping Mr. Humphrey handcuffed after the completion of the U-Haul search.[383]

IT IS SO ORDERED this 20th day of December 2022.

_____

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

*Ghazzawy*, 636 F.3d 452.  Thankfully, this Court doesn't have to try to harmonize the caselaw—Trooper Payton hasn't argued that Mr. Humphrey failed to provide evidence of a sufficient physical injury.

[382] Trooper Payton also has a pending Motion to Exclude the Testimony of Plaintiff's Expert.  *See* Doc. 31.  The essence of that Motion is that the proffered expert testimony is improper because it goes to the legal question of reasonableness and is not designed to help the jury resolve any disputed questions of historical fact.  To the extent Trooper Payton is challenging the proffered expert testimony that relates to Mr. Humphrey's claims about the initiation of the traffic stop and the extension of the traffic stop, the Motion is moot.  There will be no trial on those claims, so there is no need to decide whether the proffered expert testimony is appropriate.  To the extent Trooper Payton is challenging the proffered expert testimony that relates to Mr. Humphrey's prolonged-handcuffing claim, the Court holds the Motion in abeyance.  The Court will resolve that portion of the Motion closer to the trial date.

[383] The Court invites Mr. Humphrey or Trooper Payton to file a Rule 54(b) motion on the initial-traffic-stop and traffic-stop-extension claims.  If Trooper Payton takes an interlocutory appeal on the handcuffing claim, entry of a final judgment on the other two claims may well promote efficiencies for the parties, the Eighth Circuit, and this Court.  Mr. Humphrey or Trooper Payton may file such a motion within fourteen days of the date of this Order.